## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | **Case No. 4:12-bk-_____** |
| **BAKERS FOOTWEAR GROUP, INC.,** | ) | |
| | ) | Hearing Date:  TBD |
| **Debtor.** | ) | Hearing Time:  TBD |
| | ) | Hearing Location:  Ctrm. __, St. Louis |

### EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
### (A) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING,
### (B) AUTHORIZING USE OF CASH COLLATERAL,
### (C) GRANTING LIENS, SECURITY INTERESTS, AND SUPER-PRIORITY
### EXPENSE CLAIMS, AND (D) PROVIDING ADEQUATE
### <u>PROTECTION TO PRE-PETITION SECURED LENDER</u>

NOW COMES Bakers Footwear Group, Inc. (the "Debtor") and moves this Court for authority to obtain post-petition financing and to use cash collateral and for related relief.  In support of this Motion, the Debtor shows the Court as follows:

### <u>Relief Requested</u>

1.      By this Motion, the Debtor respectfully requests the entry of an interim order, substantially in the form of <u>Exhibit A</u> attached hereto, and a final order, pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001(b)-(c):

       (a)      authorizing the Debtor to obtain post-petition financing from Crystal Financial LLC (the "DIP Lender") in the amount of $22,000,000 (the "DIP Financing"), including $6,000,000 on an interim basis pending a final hearing;

       (b)      authorizing the Debtor to execute and enter into the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement between the Debtor and the DIP

Lender (substantially in the form of <u>Exhibit B</u> attached hereto) (the "DIP Credit Agreement") and the other Loan Documents and to perform such other and further acts as may be required in connection with the Loan Documents;

      (c)      granting security interests, liens, and super-priority claims to the DIP Lender, including super-priority claims pursuant to Section 364(c)(1) of the Bankruptcy Code and liens pursuant to Sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, subject to the Carve Out;[1]

      (d)      granting adequate protection to Crystal Financial LLC (the "Pre-Petition Secured Lender"), in its capacity as Administrative Agent and Collateral Agent under that certain Credit Agreement dated as of June 13, 2012 (as amended, the "Pre-Petition Credit Agreement" and, collectively with all other documentation executed in connection therewith, the "Pre-Petition Loan Documents"), between the Debtor and the Pre-Petition Secured Lender;

      (e)      authorizing the Debtor to use cash collateral (as such term is defined in the Bankruptcy Code) (the "Cash Collateral") in which the Pre-Petition Secured Lender has an interest, and granting adequate protection to the Pre-Petition Senior Lender with respect to the use of its cash collateral and the use and diminution in the value of the other pre-petition collateral of the Pre-Petition Secured Lender;

      (f)      modifying the automatic stay of Section 362 of the Bankruptcy Code in certain respects; and

      (g)      granting certain related relief.

## Rule 4001(b)(1)(B) and 4001(c)(1)(B) Summary

2.     The following summary is qualified by reference to the more detailed provisions

of the DIP Credit Agreement and the Interim Order.

| Provision | Summary | Location in Documents |
|---|---|---|
| Borrower | Bakers Footwear Group, Inc. | |
| DIP Lender | Crystal Financial LLC | |
| Purposes of Funding | Operating and working-capital purposes, subject to budget; costs and expenses of negotiating and preparing DIP Credit Agreement and Loan Documents; refinancing of Pre-Petition Credit Agreement (upon entry of Final Order); funding of indemnity account | Interim Order ¶¶ 4, 8; Agreement § 7.15 |
| Principal Loan Amount | $22,000,000, including $6,000,000 on an interim basis, subject to borrowing base and budget | Agreement § 2.01 |
| Borrowing Base | 95% of eligible credit-card receivables; 95% of cost of eligible inventory, subject to reserves; 100% of in-transit cash; less availability reserves and availability block | Agreement § 2.01 and definition of "Borrowing Base" |
| Interest Rate | 3-month LIBOR plus 9% | Agreement § 2.06 |
| Fees | Commitment fee of 0.5%; closing fee of $1,500,000, less amount of early termination fee owed under Pre-Petition Credit Agreement; administrative fee of $5,000 per month | Agreement § 2.07 |
| Maturity Date | 6 months following closing date; 30 days following closing date if Final Order has not been entered; date of closing of sale of all or substantially all of Debtor's assets | Agreement § 2.05; Interim Order ¶ 28 |

---

[1] Capitalized terms not defined in this Motion have the meanings given thereto in the DIP Credit Agreement.

| Provision | Summary | Location in Documents |
|---|---|---|
| Events of Default | Usual and customary for debtor-in-possession facilities of this kind | Agreement § 8.01 |
| Liens and Priority | First-priority, priming security interest in all assets of the Debtor and super-priority administrative-expense claim, subject to certain permitted liens and the Carve Out | Agreement § 5.19; Interim Order ¶¶ 6-7, 10 |
| Borrowing Conditions | Usual and customary for debtor-in-possession facilities of this kind | Agreement §§ 4.01 and 4.02 |
| Provisions to Remain in Effect if Final Relief is Denied | Interim Order will remain in full force and effect until payment in full of obligations | Interim Order ¶ 51 |
| Carve Out | U.S. Trustee fees; $150,000 for Debtor's professionals, plus amounts of retainers; $200,000 for committee professionals and committee members' expenses; fees and expenses paid prior to event of default do not reduce Carve Out; fees and expenses also may be paid without regard to Carve Out in certain circumstances | Interim Order ¶ 25 |
| Adequate Protection for Pre-Petition Secured Lender | Replacement liens; super-priority claim; payment of interest at default rate; payment of fees and expenses of attorneys and financial advisors; application of Debtor's revenues and proceeds of asset sales to be applied to pre-petition claim; refinancing of claim upon entry of Final Order; establishment of indemnity account during lien-challenge period | Interim Order ¶ 14 |
| Determination of Validity, Enforceability, Priority, or Amount of Claim or Lien | Debtor agrees that Pre-Petition Secured Lender's claim is valid and secured by valid, unavoidable, first-priority security interest; statutory committees have 60 days to challenge; if no committee is appointed, other interested parties have 75 days to challenge | Interim Order ¶¶ E, 22-24 |

| Provision | Summary | Location in Documents |
|---|---|---|
| Waiver or Modification of Automatic Stay | Stay is modified to permit DIP Lender to exercise remedies following 7 days' notice and for certain administrative purposes | Interim Order ¶¶ 17, 21, 32-34 |
| Waiver or Modification of Right to File Plan, Extend Exclusivity, Request Use of Cash Collateral, or Request Authority to Borrow | Proceeds of any additional financing must be paid to DIP Lender; Debtor may not obtain financing *pari passu* with or senior to DIP Lender's security interest; Debtor may not use cash collateral without DIP Lender's consent; Debtor may not propose plan that does not pay DIP Lender in full in cash | Interim Order ¶¶ 39-40; Agreement § 8.01 |
| Deadline to File Plan, Obtain Approval of Disclosure Statement, Hold Confirmation Hearing, or Obtain Confirmation Order | Debtor must enter into definitive term sheet or similar agreement with respect to restructuring on or before November 2, 2012 or must begin Section 363 sale process | Agreement § 6.19(c) |
| Waiver or Modification of Non-Bankruptcy Law on Perfection or Foreclosure | DIP Lender's security interest is deemed perfected without filings or other actions | Interim Order ¶¶ 16 |
| Release, Waiver, or Limitation on Claim Belonging to Estate | See summaries above under "Determination of Validity, Enforceability, Priority, or Amount of Claim or Lien" and below under "Release, Waiver, or Limitation of Surcharge" | |
| Indemnification | Debtor indemnifies DIP Lender and related parties against certain losses and claims, other than those arising from gross negligence or willful misconduct; Pre-Petition Secured Lender retains indemnification rights pending expiration of lien-challenge period | Agreement § 10.04(b); Interim Order ¶ 14(f) |
| Release, Waiver, or Limitation of Surcharge | Collateral will not be subject to surcharge under Section 506(c) (upon entry of Final Order) | Interim Order ¶¶ 7(c), 37-38 |

| Provision | Summary | Location in Documents |
|---|---|---|
| Liens on Avoidance Actions | DIP Lender's security interest attaches to (a) recoveries on avoidance actions pursuant to Section 549 of the Bankruptcy Code, and (b) recoveries on other avoidance actions solely to reimburse the DIP Lender for the amount of the Carve Out, if any, used to finance pursuit of such recoveries; security interest, super-priority claim, and Pre-Petition Secured Lender's replacement liens and claims do not otherwise attach to avoidance actions | Interim Order ¶¶ 6(b), 10, 14(a)-(b) |

## **Jurisdiction**

3.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Venue of

this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the

meaning of 28 U.S.C. § 157(b)(2).

## **Background**

4.      The Debtor filed a voluntary petition for relief under Chapter 11 of the

Bankruptcy Code on October 3, 2012 (the "Petition Date").

5.      The Debtor has continued in possession of its property and has continued to

operate and manage its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108

of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner,

and no official committee has been appointed in this case.

6.      Headquartered in St. Louis, the Debtor is a national, mall-based, specialty retailer

of footwear and accessories for young women.  The Debtor's merchandise includes private-label

and national-brand dress, casual, and sport shoes, boots, sandals, and accessories.

7.      The Debtor was founded in St. Louis in 1926 as Weiss-Kraemer, Inc., later renamed Weiss and Neuman Shoe Co., a regional chain of footwear stores.  In 1997, the Debtor was acquired principally by its current chief executive officer, Peter Edison, who had previously served in various senior management positions at Edison Brothers Stores, Inc.  In June 1999, the Debtor purchased selected assets of the "Bakers" and "Wild Pair" footwear retailing chains (including approximately 200 store locations and inventory) from the bankruptcy estate of Edison Brothers.  The "Bakers" footwear retailing chain was founded in 1924 and is the third-oldest soft goods retail concept still in operation in the United States.

8.      In February 2001, the Debtor changed its name to Bakers Footwear Group, Inc. In February 2004, the Debtor conducted an initial public offering of its common stock.  The Debtor's common stock is currently quoted under the ticker symbol "BKRS" on the OTCQB, the OTC Markets Group's quotation platform.

9.      As of the Petition Date, the Debtor operates approximately 215 stores nationwide. The Debtor employs approximately 459 full-time employees and approximately 3,463 part-time employees, with approximately 130 employees working at its corporate office and warehouse locations or as regional managers, and approximately 3,792 employees working at its store locations.  The number of part-time employees fluctuates depending on the Debtor's seasonal needs.  None of the Debtor's employees is represented by a labor union.

10.      In June 2012, the Debtor entered into a $30 million credit facility (the "Pre-Petition Secured Credit Facility") with the Pre-Petition Secured Lender, which replaced its prior $30 million credit facility with Bank of America, N.A.  As of October 1, 2012, the unpaid principal balance owing under the Pre-Petition Secured Credit Facility was approximately $15,976,224.28.

11.     In June 2007, the Debtor issued $4 million in subordinated convertible debentures (the "Investor Subordinated Debentures") to investors in a private placement.  Under the current terms of the Investor Subordinated Debentures, interest payments are required to be paid semi-annually, with the principal amount to be repaid in four annual installments of $1 million beginning on February 15, 2013 (subject to certain conditions).

12.     In August 2010, the Debtor entered into a Debenture and Stock Purchase Agreement with Steven Madden, Ltd.  In connection with this agreement, the Debtor issued to Steven Madden, Ltd. a subordinated debenture in the principal amount of $5 million (the "Madden Subordinated Debenture").  Under the terms of the Madden Subordinated Debenture, interest payments are required to be paid quarterly, with the principal amount to be repaid in four annual installments beginning on August 31, 2017.

13.     The Debtor incurred net losses of $11.0 million and $9.3 million in fiscal years 2011 and 2010, respectively, which had a significant negative impact on the Debtor's financial position and liquidity.  The Debtor took a number of measures in an attempt to address these issues, including the following:

•     In December 2011, the Debtor sold its rights to the "Wild Pair" trademark to Steven Madden, Ltd., receiving net proceeds of approximately $3.8 million.  The Debtor retains a non-exclusive, royalty-free license that allows it to continue to offer "Wild Pair" merchandise in its stores (subject to certain conditions).

•     In June 2011 and April 2012, the Debtor amended the Investor Subordinated Debentures to change the principal repayment terms to payment in four $1 million annual payments commencing February 15, 2013.

-8-

14.    Unfortunately, fiscal year 2012 comparable-store sales have decreased 5.9% (through August 25, 2012), placing increased pressure on the Debtor's liquidity position.

15.    As a result of the Debtor's liquidity situation and after a careful review of its options, on August 21, 2012, the Debtor committed to a broad series of actions designed to restructure its business (the "Restructuring Plan"), including the following:

- The sale and assignment of leases and certain other assets for up to 52 stores to Aldo U.S., Inc. ("Aldo") for up to $6.375 million in cash, which is intended to close in three stages from January 2013 through June 2013, conditioned upon obtaining landlord and other consents.

- The intention to close additional stores through the expiration of leases, agreements with landlords, or otherwise.

- The liquidation of inventory at the affected stores in fall 2012, potentially raising an additional $6 million to $8 million in cash between October 2012 and June 2013.

- A reduction in the Debtor's workforce, potentially saving up to $7 million in annual savings once the reductions are fully implemented.

- The termination of the Debtor's licensing agreement for "H by Halston" effective December 31, 2012, intended to address scheduled royalty payments under this licensing agreement aggregating up to $2.625 million over the next three years.

16.    As a result of lower-than-planned sales and lower-than-planned inventory receipts, beginning in July 2012, the Debtor was not in compliance with the maximum borrowing limits under the Pre-Petition Secured Credit Facility or its obligations to repay excess amounts to the Lender, which constituted events of default under the Pre-Petition Secured Credit Facility.

17.    On September 6, 2012, the Debtor and the Pre-Petition Secured Lender entered into a Forbearance Agreement (the "Forbearance Agreement"), pursuant to which the Pre-Petition Secured Lender agreed to forbear from exercising any rights and remedies under the Pre-Petition Secured Credit Facility until October 6, 2012, or the earlier occurrence of a "Termination Event" under the Forbearance Agreement.

**Basis for Relief**

The Debtor's Urgent Need for Use of Cash Collateral and Post-Petition Financing

18.    It is essential to the Debtor's ability to proceed successfully in this Chapter 11 case that it obtain authorization to use cash collateral pursuant to Section 363 of the Bankruptcy Code and to obtain access to post-petition financing pursuant to Section 364 of the Bankruptcy Code, both of which are necessary to permit the Debtor to conduct its business operations and to maintain and to preserve the property and assets of the Debtor's estate.

19.    The Debtor's sales depend entirely on the uninterrupted flow of inventory and supplies into the Debtor's supply chain, and ultimately into the Debtor's stores. The Debtor requires a source of funding so that vendors will deliver their goods to the Debtor on credit with confidence that they will be paid when their post-petition invoices come due.

20.    Given the nature of the Debtor's business and the need to ensure an uninterrupted supply of inventory, the value of the Debtor's estate can be preserved only if the disruptions caused by the Debtor's Chapter 11 filing are minimized and the Debtor has liquidity to compensate for the decreased cash flow that may result from those disruptions. Approval of the DIP Financing will not only provide the Debtor with needed cash, but it also is intended to give

vendors the necessary confidence to restore customary trade terms.  The benefit of post-petition trade credit to the Debtor is as significant as the liquidity provided directly by the DIP Financing.

21.    Based on the terms and conditions of the DIP Financing, the arm's-length negotiations with the DIP Lender, and the lack of any other meaningful alternatives, the Debtor has determined that the DIP Financing offered by the DIP Lender best suits its needs by affording it working capital necessary to operate and to support its efforts to reorganize.  The Debtor believes that the DIP Financing was entered into in good faith and upon the most favorable terms that could be achieved under the circumstances.

22.    Absent authorization to use the Cash Collateral and to obtain the DIP Financing, the Debtor will have insufficient funds available to conduct ordinary business operations (including to pay insurance, payroll, employee benefits, rent, utility charges, professionals, and general overhead, and to purchase necessary inventory) and to maintain and preserve the property and assets of the Debtor's estate, which would result in the loss of the value of the Debtor's business and assets.  The Debtor believes that the use of the Cash Collateral and the DIP Financing will provide funds sufficient to permit the Debtor to operate its business and to pay its expenses during this Chapter 11 case.

<u>The Proposed Use of Cash Collateral</u>

23.    The Debtor has determined, in the exercise of its sound business judgment, that it requires use of the Cash Collateral in accordance with the terms and provision of the Interim Order.  The Debtor believes that all or substantially all of its cash and cash equivalents, as well as all cash that it will receive from the sale of inventory, is Cash Collateral of the Pre-Petition Secured Lender.  Unless the Debtor is authorized to use the Cash Collateral, it will be unable to operate its business.

-11-

24.     As adequate protection for the use of Cash Collateral and to protect the Pre-Petition Secured Lender against any decline in value of the Cash Collateral from the amount existing on the Petition Date, the Debtor requests that this Court authorize and approve such adequate protection as is summarized above and detailed in the Interim Order.

25.     The Court may authorize the Debtor to use Cash Collateral on an interim emergency basis pending the Final Hearing pursuant to Bankruptcy Rule 4001(b)-(c).

The Proposed DIP Financing

26.     The Debtor has determined, in the exercise of its sound business judgment, that it requires access to post-petition credit on the terms set forth in the Interim Order and the DIP Credit Agreement.  As a result, the Debtor seeks authority to enter into the DIP Documents with the DIP Lender to meet its financing needs.

27.     Pursuant to the DIP Credit Agreement, the DIP Lender will extend post-petition credit to the Debtor in compliance with the budget attached to the DIP Credit Agreement (as it may be amended from time to time).  The Debtor proposes to grant to the DIP Lender: (a) pursuant to Section 364(c)(1) of the Bankruptcy Code, super-priority administrative-expense status, with priority over all costs and expenses of administration of this Chapter 11 case that are incurred under any provision of the Bankruptcy Code; and (b) pursuant to Sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, liens and security interests in all of the Debtor's assets, subject only to certain permitted liens and the Carve Out.  Reference is made to the Interim Order and DIP Credit Agreement for a full recitation of the terms and conditions of the proposed DIP Financing.

<u>Request for Approval of the DIP Financing</u>

28.     As described above, it is essential that the Debtor immediately obtain access to sufficient post-petition financing.  The preservation of estate assets and the Debtor's ability to operate its business depend heavily upon the expeditious approval of the DIP Credit Agreement and the related actions requested herein.

29.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to Section 364(c) of the Bankruptcy Code, a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to super-priority administrative-expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.  In addition, pursuant to Section 364(d) of the Bankruptcy Code, a court may authorize a debtor to obtain post-petition credit secured by a senior or equal lien on encumbered property (*i.e.*, a "priming" lien) when a debtor is unable to obtain credit elsewhere and the interests of existing lienholders are adequately protected.

30.     The statutory requirement for obtaining post-petition credit under Section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  *See In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under Section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Section 364(c) must prove that it was unable to

-13-

obtain unsecured credit pursuant to Section 364(b)), *modified on other grounds*, 75 B.R. 553

(Bankr. E.D. Pa. 1987).

31.     Courts have articulated a three-part test to determine whether a debtor may obtain

financing under Section 364(c) of the Bankruptcy Code:

(a)     the debtor is unable to obtain unsecured credit under Section 364(b) (*i.e.*,

by granting a lender administrative-expense priority);

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable, and adequate, given the

circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (applying the above test and

holding that "[o]btaining credit should be permitted not only because it is not available

elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated

by credit, but also because the credit acquired is of significant benefit to the debtor's estate and

the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the

debtor to obtain comparable credit elsewhere"); *In re Farmland Industries, Inc.*, 294 B.R. 855,

879-80 (Bankr. W.D. Mo. 2003) (discussing eight factors identified in other cases).  *Cf. In re

Ames Department Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (holding that

financing will not be approved where "it is apparent that the purpose of the financing is to

benefit a creditor rather than the estate" and that the debtor must show that it has made a

reasonable effort to seek other sources of financing under Sections 364(a)-(b)).

32.     The Debtor could not have obtained a post-petition financing facility on the terms,

and of the type and magnitude required in this case, on an unsecured basis.  To show that the

credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a

good faith effort that credit was not available without" the protections of Sections 364(c) or 364(d) of the Bankruptcy Code.  *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Id.* at 1088; *see also Ames*, 115 B.R. at 40 (holding that debtor made reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected least onerous financing option from remaining two lenders). Moreover, where few lenders would likely be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

33.     Pursuant to Sections 364(a)-(b) of the Bankruptcy Code, the Debtor has attempted to obtain, but is unable to obtain, unsecured credit or unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code.  The terms of the DIP Financing have been negotiated in good faith and at arm's length, and the DIP Financing is being extended in good faith, as that term is used in Section 364(e) of the Bankruptcy Code.

34.     The DIP Financing is necessary to continue, among other things, the orderly operation of the Debtor's business and to maintain business relationships with vendors and suppliers.  If this Motion is denied or a ruling is delayed, the Debtor's ability to proceed successfully in Chapter 11 could be damaged irreparably.

35.     In the Debtor's business judgment, the DIP Financing is the only financing option available in the circumstances of this case.  The purpose of the DIP Financing is to enable the Debtor to maintain normal business operations during the pendency of this case.  Furthermore, the DIP Financing does not directly or indirectly deprive the Debtor's estate or other parties in

interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See In re Tenney Village Co.*, 104 B.R. 562, 568-69 (Bankr. D.N.H. 1989) (denying approval of a financing facility that, among other things, did not provide a carve-out for professional fees). The proposed DIP Financing provides, generally, that the security interests and administrative-expense claims granted to the DIP Lender are subject to the Carve Out.

36.    As described above, after appropriate investigation and analysis, the Debtor's management has concluded that the DIP Financing is the only alternative available in the circumstances of this case. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless a decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *In re Simasko Production Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Industries, Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Associates*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

-16-

37.    The Debtor has exercised sound business judgment in determining that the DIP Financing is appropriate and has satisfied the legal prerequisites to incur debt under the DIP Credit Agreement.  The terms of the DIP Financing are fair and reasonable and are in the best interests of the Debtor's estate.  Accordingly, the Debtor should be granted authority to enter into the DIP Financing and obtain funds from the DIP Lender on the secured, administrative "super-priority" basis described above, pursuant to Section 364(c) and (d) of the Bankruptcy Code.

38.    The Pre-Petition Secured Lender will be adequately protected, as required by Section 364(d) of the Bankruptcy Code, if the DIP Financing is approved.  The DIP Credit Agreement and the Interim Order provide that all proceeds of the sale of the Debtor's inventory (which is among the collateral of the Pre-Petition Secured Lender) will be paid to the Pre-Petition Secured Lender for application to the Debtor's obligations under the Pre-Petition Credit Agreement, and any remaining obligations under the Pre-Petition Credit Agreement will be refinanced upon the entry of a final order on this Motion.  The Pre-Petition Secured Lender has consented to the DIP Financing, including the provision of priming liens to the DIP Lender, on the terms and conditions set forth in the DIP Credit Agreement and the Interim Order.

<u>Request for Interim Borrowing Authority</u>

39.    Pending the final hearing on this Motion, the Debtor requires that the DIP Financing be available for, among other things, the orderly continuation and operation of its business, so that the Debtor may maintain business relationships with vendors and suppliers and maximize the Debtor's potential for successful operations.

40.    Absent interim relief, the Debtor faces the very real risk of substantial disruption in its business operations and damage to vendor and service-provider relationships.

-17-

Consequently, if interim relief is not obtained, the Debtor's efforts to operate will be immediately and irreparably jeopardized.

41.     Accordingly, the Debtor requests that, pending the final hearing on this Motion, the Court consider the Debtor's request for authorization to obtain interim funding under the DIP Financing in accordance with and pursuant to the terms and conditions of the DIP Credit Agreement.

42.     Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain post-petition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(c)(2).  In examining requests for interim relief under this rule, courts apply the same business-judgment standard applicable to other business decisions. *See, e.g., Simasko*, 47 B.R. at 449; *Ames*, 115 B.R. at 38. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent in the operation of its business. *See, e.g., Simasko*, 47 B.R. at 449; *Ames*, 115 B.R. at 36.

<u>Good Faith</u>

43.     The terms and conditions of the DIP Financing are fair and reasonable and were negotiated by the parties in good faith and at arm's length.  Therefore, the DIP Lender should be accorded the benefits of Section 364(e) of the Bankruptcy Code to the extent that any or all of the provisions of the DIP Financing, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed, or terminated by subsequent order of this or any other court.

<u>Final Hearing</u>

44.     The Debtor requests that the Court schedule the final hearing on this Motion at the earliest possible date in accordance with Bankruptcy Rule 4001(b)-(c), but in no event later than 21 days from entry of the Interim Order.

## **Notice**

45.     Notice of this Motion has been provided to the Pre-Petition Secured Lender, other creditors with effective financing statements on file with the Missouri Secretary of State, the Debtor's 20 largest unsecured creditors, and the Office of the United States Trustee.  In light of the nature of the relief requested, the Debtor submits that no further notice is necessary.

46.     The Debtor proposes to serve notice of the final hearing on the parties receiving notice of this Motion and any other party in interest that enters an appearance before such notice is served.  The Debtor submits that such notice is adequate and sufficient in accordance with Bankruptcy Rule 4001(b)-(c).

WHEREFORE, the Debtor respectfully requests that this Court:

(a)     enter an interim order, substantially in the form of Exhibit A, authorizing the Debtor to obtain post-petition financing and to use cash collateral, as more specifically described above;

(b)     schedule a final hearing and enter a final order authorizing the Debtor to obtain post-petition financing and to use cash collateral; and

(c)     grant the Debtor such other and further relief as is just and proper.

Dated: October 3, 2012.
       St. Louis, Missouri

                              Respectfully submitted,

                              BRYAN CAVE LLP


                              /s/ Brian C. Walsh
                              Brian C. Walsh, #58091MO
                              David M. Unseth, #48086MO
                              Laura Uberti Hughes, #60732MO
                              One Metropolitan Square
                              211 N. Broadway, Suite 3600
                              St. Louis, MO  63102
                              (314) 259-2000
                              Fax:  (314) 259-2020
                              brian.walsh@bryancave.com

                              PROPOSED ATTORNEYS FOR THE DEBTOR