**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 12-49658-705** |
| | § | |
| **BAKERS FOOTWEAR GROUP, INC.,** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | **[Related to Docket Nos. 264 and 265]** |

**ORDER (1) AUTHORIZING REPLACEMENT POST-PETITION FINANCING, (2) GRANTING LIENS AND PROVIDING SUPER PRIORITY ADMINISTRATIVE EXPENSE CLAIM, (3) AUTHORIZING USE OF CASH COLLATERAL, AND (4) MODIFYING THE AUTOMATIC STAY PURSUANT TO SECTIONS 105, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014**

Upon the motion (the "***Motion***"),[1] dated November 13, 2012 [Docket No. 264], of Bakers Footwear Group, Inc., as debtor and debtor-in-possession (the "***Debtor***"), pursuant to sections 105, 362, 363, and 364 of title 11 of the United States Code (the "***Bankruptcy Code***") and in accordance with Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") and the Local Bankruptcy Rules for the Eastern District of Missouri (the "***Local Rules***"), in the above captioned chapter 11 case (collectively, the "***Chapter 11 Case***"), for entry of an order (this "***Order***"), granting the following relief on a final basis:

**(I) Final DIP Financing**

(A) Authorizing the Debtor to obtain $9,500,000.00 in replacement post-petition financing (the "***DIP Facility***"), pursuant to that certain *Amended and Restated Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement* (as may be amended, modified, or supplemented, the "***DIP Credit Agreement***"), substantially in the form attached hereto as ***Exhibit "1,"*** by and between the Debtor, as borrower, and Salus Capital Partners, LLC, as Administrative Agent, Collateral Agent, and as Lender and secured party (the "***DIP Lender***") and various related DIP Financing Agreements (as defined below), which may be used for the following:

[1] Capitalized terms used in this Order but not defined herein shall have the meanings ascribed to such terms in the DIP Financing Agreements (as defined below).

          (i) Funding the Debtor's day-to-day operations and working capital needs; and

(ii) To pay in full all outstanding amounts outstanding under the existing Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement by and between Crystal Financial LLC ("***Crystal***") and the Debtor (the "***Crystal Obligations***").

(B) Approving, on a final basis, the DIP Credit Agreement and all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the DIP Lender, including, without limitation, security agreements (the "***DIP Security Agreement***"), pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("***UCC***") financing statements, the Assignment and Assumption and Resignation of Agent and Appointment of Successor Agent by and among the DIP Lender, the Debtor and Crystal (collectively, the "***Assignment Agreement***") and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, modified, or supplemented and in effect from time to time, the "***DIP Financing Agreements***");

(C) Granting, on a final basis, to the DIP Lender the following Liens (as defined in section 101(37) of the Bankruptcy Code) and claims:

(i) A first priority, valid, perfected, and enforceable Lien (as defined below), subject only to the Carve Out (as defined below) and the Permitted Prior Liens (as defined below), upon substantially all of the Debtor's real and personal property as provided in and as contemplated by this Order and the DIP Financing Agreements;

(ii) A superpriority administrative claim status in respect of all obligations under the DIP Financing Agreements (collectively, the "***DIP Obligations***"), subject to the Carve Out as provided herein;

**(II)** **Use of Cash Collateral**- Authorizing, on a final basis, the Debtor's use of "cash collateral," as such term is defined in section 363 of the Bankruptcy Code ("Cash Collateral"), to the extent the DIP Lender has an interest therein; and

**(III)** **Modifying the Automatic Stay –** Modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Order;

and upon consideration of the Debtor's Motion for Expedited Hearing dated November 13, 2012 [Docket No. 265] (the "Motion for Expedited Hearing"), and the Court having reviewed the

Motion and held a hearing with respect to the Motion on November 15, 2012 (the "***Hearing***"); and the Court having entered (a) that certain "*Interim Order (1) Authorizing Postpetition Financing, (2) Granting Liens and Providing Super Priority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing For Adequate Protection, (4) Modifying the Automatic Stay and (5) Scheduling a Final Hearing, Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014*", (b) that certain "*An Order Amending Certain Terms of Interim Order (1) Authorizing Postpetition Financing, (2) Granting Liens and Providing Super Priority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing for Adequate Protection, (4) Modifying the Automatic Stay and (5) Scheduling a Final Hearing, Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014*" ((a) and (b) collectively referred to herein as the "***Interim Crystal Order***") and (c) that certain "*Order (1) Authorizing Postpetition Financing, (2) Granting Liens and Providing Super Priority Administrative Expense Priority, (3) Authorizing Use of Cash Collateral and Providing For Adequate Protection, and (4) Modifying the Automatic Stay Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014*"(the "***Final Crystal Order***" and with the Interim Crystal Order, the "***Crystal Orders***"); and upon the Motion, the Interim Crystal Order, the Final Crystal Order and the record of the Hearing and all objections, if any, to the entry of this Order having been withdrawn, resolved, or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

**I. <u>Procedural Findings of Fact</u>**

A. **Petition Date.** On October 3, 2012 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of Missouri (the "***Court***"). The Debtor has continued in the management and operation of its business and property as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Case.

B. **Jurisdiction and Venue.** This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C. **Committee Formation.** On October 16, 2012, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "***Committee***") in the Chapter 11 Case.

D. **Notice.** The Hearing is being held pursuant to the authorization of Bankruptcy Rule 2002, 4001(b), (c), and (d) and Rule 9014, and the Local Rules. Notice of the Hearing and the relief requested in the Motion has been provided by the Debtor, to certain parties in interest, including: (i) the Office of the United States Trustee; (ii) the Committee's attorneys; (iii) the attorneys for Crystal Financial LLC; (iv) the attorneys for Salus Capital Partners, LLC and (v) all secured creditors of record. Under the circumstances, such notice of the Hearing and the

relief requested in the Motion is due, proper, and sufficient notice and complies with Bankruptcy Rules 2002 and 4001 and the Local Bankruptcy Rules.

## II. Debtor's Acknowledgements and Agreements

E. Without prejudice to the rights of parties in interest (other than the Committee and the Debtor) as set forth in Paragraph 20 below, the Debtor admits, stipulates, acknowledges, and agrees that (collectively, Paragraphs E (1) through E (5) hereof shall be referred to herein as the "***Debtor's Stipulations***"):

(1) **Existing DIP Financing Agreements**. Prior to the entry of this Order, the Debtor was a party to the following agreements, and was subject to the terms of:

(a) that certain *Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement Credit Agreement*, dated October 5, 2012 (as amended and in effect, the "***Existing DIP Credit Agreement***") with Crystal Financial LLC, as Administrative Agent, Collateral Agent, and as Lender and secured party (the "***Existing DIP Lender***"),

(b) the Crystal Orders, pursuant to which the Debtor granted security interests and Liens to the Existing DIP Lender upon substantially all of its personal property, including items defined as the "DIP Collateral" in the Existing DIP Security Agreement (collectively, the "***Existing DIP Collateral***");

(c) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Existing DIP Lender, including, without limitation, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto

(collectively, as amended, modified, or supplemented and in effect, collectively, the "***Existing DIP Financing Agreements***").

(2) **Prepetition Credit Agreements**. Prior to the commencement of the Chapter 11 Case, the Debtor was a party to the following agreements:

(a) that certain *Credit Agreement*, dated June 13, 2012 (as amended and in effect, the "***Prepetition Credit Agreement***") with Crystal

Financial LLC, as Administrative Agent, Collateral Agent, and as Lender and secured party (the "***Prepetition Lender***"),

(b)      that certain *Security Agreement* dated June 13, 2012 (as amended and in effect, the "***Prepetition Security Agreement***") with the Prepetition Lender pursuant to which the Debtor granted security interests and Liens to the Prepetition Lender upon substantially all of its personal property, including items defined as "Collateral" in the Prepetition Security Agreement (collectively, the "***Prepetition Collateral***");

(c)      all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition Lender, including, without limitation, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto

(collectively, as amended, modified, or supplemented and in effect, collectively, the "***Prepetition Financing Agreements***").

(3)      **Cash Collateral.**   The DIP Lender may have a security interest in and Lien on certain Cash Collateral, including all amounts on deposit in the Debtor's banking, checking, or other deposit accounts and all proceeds of the DIP Collateral, to secure the DIP Obligations.

(4)      **Prior Orders**.

(a)      On October 4, 2012, the Court entered the Interim Crystal Order.

(b)      On November 5, 2012, the Court entered the Final Crystal Order. Paragraph 47 of the Final Crystal Order permits the Existing DIP Credit Agreement to be amended with the approval of the Court.

(5)      **No Priming of DIP Facility**.   In entering into the DIP Financing Agreements, and as consideration therefor, the Debtor hereby agrees that until such time as all DIP Obligations have been irrevocably paid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Lender in its sole and exclusive discretion have been made) and the DIP Financing Agreements have been terminated in accordance with the terms thereof, the Debtor shall not in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lender under this Order by offering a subsequent lender or a party-in-interest a superior or *pari passu* Lien or claim pursuant to section 364(d) of the Bankruptcy Code or otherwise. Further,

(a) on the date that this Order is entered, the Debtor has waived, discharged, and released the DIP Lender, together with its affiliates, agents, attorneys, officers, directors, and employees, of any right the Debtor may have

(i) to challenge or object to any of the DIP Obligations,

(ii) to challenge or object to the security for the DIP Obligations, and

(iii) to bring or pursue any and all claims, objections, challenges, causes of action, and/or choses in action arising out of, based upon, or related to the DIP Financing Agreements or otherwise.

(b) the Debtor does not possess and will not assert any claim, counterclaim, setoff, or defense of any kind, nature, or description which would in any way affect the validity, enforceability, and non-avoidability of any of the DIP Financing Agreements or the DIP Liens, or any claim of the DIP Lender pursuant to the DIP Financing Agreements or otherwise.

(c) the Liens of the DIP Lender have priority over all other Liens except any Liens which are valid, properly perfected, unavoidable, and senior to the DIP Liens and set forth in Section 7.01 of the DIP Credit Agreement (collectively, the "***Permitted Prior Liens***").

**III. <u>Findings Regarding the Replacement Postpetition Financing.</u>**

F. **Need for Replacement Post-Petition Financing**. An immediate need exists for the Debtor to obtain funds from the DIP Facility in order to refinance the Existing DIP Financing Agreements, continue operations and to administer and preserve the value of its estate. The ability of the Debtor to finance its operations, to preserve and maintain the value of the Debtor's assets, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, its creditors, its equity holders, and the possibility for a successful reorganization or sale of the Debtor's assets. Without the DIP Facility, the Debtor would have to suspend its ordinary course business operation and liquidate all of its assets. Due to the time urgency related to the

Borrower's financial condition and to complete the DIP Facility in the most efficient practicable, Crystal has agreed to assign the Existing DIP Credit Agreement, the other Existing DIP Financing Agreements and certain of the Prepetition Financing Agreements, and its security interest in the Existing DIP Collateral and the Prepetition Collateral, to the DIP Lender pursuant to the Assignment Agreement. The Debtor has consented thereto and is a party to the Assignment Agreement. The DIP Lender, the Existing DIP Lender, and the Debtor have agreed to enter into the Assignment Agreement, and, with the exception of provisions authorizing the Debtor to execute and deliver the Assignment Agreement, the effectiveness of this Order is conditioned upon the payment by the DIP Lender to the Existing DIP Lender of the consideration contemplated by the Assignment Agreement prior to 9:59 a.m. Eastern Standard Time on November 16, 2012, provided that the DIP Lender's willingness to make such payment is subject to the entry of this Order and the satisfaction of each of the conditions contained in the DIP Credit Agreement and the other DIP Financing Agreements.

G.    **No Credit Available on More Favorable Terms**.  The Debtor has been unable to obtain any of the following:

(1)    unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense,

(2)    credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code,

(3)    credit for money borrowed secured solely by a Lien on property of the estate that is not otherwise subject to a Lien, or

(4)    credit for money borrowed secured by a junior Lien on property of the estate which is subject to a Lien, in each case, on more favorable terms and conditions than those provided in the DIP Credit Agreement, and this Order.

The Debtor is unable to obtain credit for borrowed money without granting to the DIP Lender the

DIP Protections (as defined below).

H. **Prior Liens**. Nothing herein shall constitute a finding or ruling by this Court that any Permitted Prior Liens are valid, senior, perfected, or unavoidable. Moreover, nothing shall prejudice the following:

(1) the rights of any party-in-interest, including, but not limited to, the Debtor, the DIP Lender, and any Committee appointed pursuant to section 1102 of the Bankruptcy Code, to challenge the validity, priority, perfection, and extent of any such Permitted Prior Liens, or

(2) the rights of the Existing DIP Lender and the Prepetition Lender pursuant to the Interim Crystal Order and the Final Crystal Order.

I. **Adequacy of the Budget.** The Budget (as defined below), attached hereto as ***Exhibit "2,"*** is adequate, considering all the available assets, to pay the administrative expenses due and accruing during the period covered by this Order.

J. **Section 552 of the Bankruptcy Code**. In light of the DIP Lender's agreement to subordinate its Liens and superpriority claims to the Carve Out, the DIP Lender is entitled to all rights and benefits of section 552(b) of the Bankruptcy Code and the Debtor shall not assert that the "equities of the case" exception shall apply.

K. **Conditions Precedent to DIP Lender's Extension of Financing.** The DIP Lender has indicated a willingness to provide financing to the Debtor in accordance with the DIP Credit Agreement and the other DIP Financing Agreements and subject to the following:

(1) the entry of this Order, and

(2) findings by this Court that such financing is essential to the Debtor's estate, that the DIP Lender is a good faith financier, and that the DIP Lender's claims, superpriority claims, security interests, and Liens and other protections granted pursuant to this Order and the DIP Facility will not be affected by any subsequent reversal, modification, vacation, or amendment of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

L. **Business Judgment and Good Faith Pursuant to Section 364(e) of the Bankruptcy Code.** The terms and conditions of the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and the fees paid and to be paid thereunder (i) are fair, reasonable, and the best available under the circumstances, (ii) reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and (iii) are supported by reasonably equivalent value and consideration. The DIP Facility was negotiated in good faith and at arms' length between the Debtor and the DIP Lender, and the use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the protections and benefits of section 364(e) of the Bankruptcy Code.

M. **Relief Essential; Best Interest.** The relief requested in the Motion (and as provided in this Order) is necessary, essential, and appropriate for the continued operation of the Debtor's business and the management and preservation of the Debtor's assets and personal property. It is in the best interest of Debtor's estate that the Debtor be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement and the other DIP Financing Agreements. The Debtor has demonstrated good and sufficient cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:**

1. The DIP Motion is granted in accordance with the terms and conditions set forth in this Order, the DIP Credit Agreement, and the other DIP Financing Agreements. The Motion for Expedited Hearing also is granted.

**I. DIP FINANCING.**

**A. Approval of Entry into the DIP Financing Agreements.**

2. The Debtor is expressly and immediately authorized, empowered, and directed to execute and deliver the DIP Financing Agreements (including, without limitation, the Assignment Agreement) and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Order and the DIP Financing Agreements, and to execute and deliver all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Order and the DIP Financing Agreements. The Debtor is hereby authorized and directed to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Credit Agreement and all other DIP Financing Agreements as such become due, including, without limitation, the Collateral Monitoring Fee, Commitment Fee, Early Termination Fee and reasonable attorneys', financial advisors' and accountants' fees, and disbursements as provided for in the DIP Credit Agreement which amounts, subject to the provisions of Paragraph 40 below, shall not otherwise be subject to approval of this Court. Upon execution and delivery, the DIP Financing Agreements shall represent valid and binding obligations of the Debtor enforceable against the Debtor in accordance with their terms. Notwithstanding anything to the contrary in this Order, with the exception of provisions authorizing the Debtor to execute and deliver the Assignment Agreement, the effectiveness of this Order (including, without limitation, the granting of the DIP

Liens, the DIP Superpriority Claim and the other DIP Protections in favor of the DIP Lender) is conditioned upon the payment by the DIP Lender to the Existing DIP Lender of the consideration contemplated by the Assignment Agreement prior to 9:59 a.m. Eastern Standard Time on November 16, 2012 and the satisfaction of the other conditions precedent in the Assignment Agreement. Upon such payment, and the satisfaction of such conditions precedent, this Order and all of the obligations of the Debtor to the DIP Lender under the DIP Facility and this Order shall be in full force and effect without further action of the Court, the Debtor or any other party in interest.

**B. Authorization to Borrow**.

3. In order to enable it to continue to operate its business during the Chapter 11 Case, and subject to the terms and conditions of this Order, the DIP Credit Agreement, the other DIP Financing Agreements, and the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), the Debtor is hereby authorized under the DIP Facility to borrow up to a total committed amount of $9,500,000.00 in accordance with the terms and conditions of the DIP Credit Agreement.

**C. Application of DIP Proceeds**.

4. The proceeds of the DIP Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with and as may be limited by the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement), solely as follows:

(a) to pay costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of the DIP Credit Agreement and the other DIP Financing Agreements;

     (b)     for general operating and working capital purposes, for the payment of transaction expenses, for the payment of fees, expenses, and costs incurred in connection with the Chapter 11 Case, and other proper corporate purposes of Debtor not otherwise prohibited by the terms hereof for working capital, capital expenditures, and other lawful corporate purposes of the Debtor; and

     (c)     to pay the consideration contemplated by the Assignment Agreement and thereby refinance and pay in full the Crystal Obligations.

**D.    Conditions Precedent**.

5.    The DIP Lender shall have no obligation to make any loan or advance under the DIP Credit Agreement unless the conditions precedent to make such loan under the DIP Credit Agreement have been satisfied in full or waived, as determined by the DIP Lender in its reasonable discretion, in accordance with the DIP Credit Agreement.

**E.    The DIP Liens**.

6.    Effective immediately upon entry of this Order, the DIP Lender is hereby granted pursuant to sections 362, 364(c)(2), and 364(c)(3) of the Bankruptcy Code, first priority, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests and Liens (collectively, the "***DIP Liens***") senior and superior in priority to all other secured and unsecured creditors of the Debtor's estates except as otherwise provided in this Order, upon and to all of the following (collectively, the "***DIP Collateral***"), in each instance whether acquired prior to, on or after the Petition Date, and all products and proceeds thereof:

(a) The Collateral, as defined in the DIP Security Agreement, including:

    (i)    all Accounts;

    (ii)    all Goods, including Equipment, Inventory and Fixtures;

    (iii)    all Documents, Instruments and Chattel Paper;

    (iv)    all Letters of Credit and Letter-of-Credit Rights;

    (v)    all Securities Collateral;

(vi) all Investment Property;

(vii) all Intellectual Property Collateral;

(viii) all Commercial Tort Claims;

(ix) all General Intangibles;

(x) all Deposit Accounts, including without limitation, all deposit accounts and cash on deposit in those accounts maintained by the Debtor with Bank of America, N. A. or any of its affiliates (collectively, "BofA") which was provided as collateral for the Debtor's reimbursement obligations to BofA for letters of credit issued by BofA for the Debtor's account;

(xi) all Supporting Obligations;

(xii) all books and records relating to the Collateral; and

(xiii) to the extent not covered by clauses (i) through (xii), all other personal property of the Debtor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

(b) Bankruptcy Recoveries (as defined below), but only (A) the full amount of any such recovery or settlement thereof to the extent arising under Section 549 of the Bankruptcy Code and (B) all amounts necessary to reimburse the DIP Lender for the amount of the Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all other Bankruptcy Recoveries (the foregoing Bankruptcy Recoveries in (A) and (B) being referred to collectively as the "**Specified Bankruptcy Recoveries**"). As used herein, "**Bankruptcy Recoveries**" shall mean any claims and causes of action to which the Debtor may be entitled to assert by reason of any avoidance or other power vested in or on behalf of the Debtor or the estate of the Debtor under Chapter 5 of the Bankruptcy Code and any and all recoveries and settlements thereof;

(c) The proceeds of all of the Debtor's interests in leaseholds, but not the leaseholds themselves; and

(d) Any owned real property.

**F. DIP Lien Priority.**

7. The DIP Liens to be created and granted to the DIP Lender, as provided herein, are:

(a) created pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code,

(b) first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or Lien or claim to the DIP Collateral, and

(c) subject only to (i) the Carve Out, (ii) the Permitted Prior Liens, and (iii) the security interest granted in Section 16.12 of that certain Agency Agreement dated as of November 5, 2012 among the Debtor and a joint venture consisting of SB Capital Group, LLC and Tiger Capital Group, LLC.

The DIP Liens shall secure all DIP Obligations and the proceeds of the DIP Collateral shall be applied in the same order and priority set forth in the DIP Credit Agreement. The DIP Liens shall not be made subject to or *pari passu* with any Lien or security interest by any court order heretofore or hereafter entered in the Chapter 11 Case and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case, upon the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or in any other proceedings related to any of the foregoing (each a "***Successor Case***"), and/or upon the dismissal of the Chapter 11 Case. The DIP Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or the assertion by the Debtor of the "equities of the case" exception of section 552 of the Bankruptcy Code, and, upon entry of the Order, shall not be subject to section 506(c) of the Bankruptcy Code.

**G. Enforceable Obligations**.

8. The DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtor, and shall be enforceable against the Debtor, its estate, and any successors thereto, and their creditors in accordance with their terms.

**H. Protection of the DIP Lender and Other Rights**.

9. From and after the Petition Date, the Debtor shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP

Financing Agreements and this Order and in compliance with the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).

**I. Superpriority Administrative Claim Status.**

10. Subject to the Carve Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "***DIP Superpriority Claim***" and, together with the DIP Liens, collectively, the "***DIP Protections***") with priority in the Chapter 11 Case under sections 364(c)(1), 503(b), and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy, or attachment; *provided*, *however*, that the DIP Protections shall not attach to any Bankruptcy Recoveries other than the Specified Bankruptcy Recoveries; provided, further that nothing in this Order shall impair the superpriority claim granted in Section 16.12 of that certain Agency Agreement dated as of November 5, 2012 among the Debtor and a joint venture consisting of SB Capital Group, LLC and Tiger Capital Group, LLC.

11. Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in the Chapter 11 Case, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

## II. USE OF CASH COLLATERAL.

### A. Authorization to Use Cash Collateral.

12. Pursuant to the terms and conditions of this Order, the DIP Facility, the DIP Credit Agreement, and the other DIP Financing Agreements, and in accordance with and as may be limited by the budget (as the same may be modified, supplemented, or updated from time to time consistent with the terms of the DIP Credit Agreement, the "***Budget***"), the Debtor is authorized to use Cash Collateral and to use the advances under the DIP Facility during the period commencing immediately after the entry of this Order and terminating upon notice being provided by the DIP Lender to the Debtor that (i) a DIP Order Event of Default (as defined below) has occurred and is continuing, and (ii) the termination of the DIP Credit Facility.

13. Nothing in this Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business or other proceeds resulting therefrom, except (x) with respect to the sale of assets as contemplated in the Store Closing Program Motion and the assumption and assignment of leases as contemplated in the Leasehold Sale Motion (or such other disposition of the Debtor's leaseholds as may be acceptable to the DIP Lender, in its exclusive discretion) (as each of those terms is defined in the DIP Credit Agreement), and (y) as otherwise permitted in the DIP Facility under the DIP Credit Agreement and the other DIP Financing Agreements and in accordance with and as may be limited by the Budget (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreement).

## III. POSTPETITION LIEN PERFECTION.

14. This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, security agreement, notice of Lien, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other

action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priority granted herein.

15.     Notwithstanding the foregoing, the DIP Lender may, in its discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Case.

16.     The Debtor shall execute and deliver to the DIP Lender all such financing statements, deeds of trust, mortgages, security agreements, notices of Liens, and other similar instruments and documents as the DIP Lender may reasonably request to evidence, confirm, validate, or perfect, or to ensure the contemplated priority of, the DIP Liens granted pursuant hereto.

17.     The DIP Lender, in its discretion, may file a photocopy of this Order as a financing statement with any recording office designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the subject filing or recording office shall be authorized to file or record such copy of this Order.

18.     The DIP Lender shall, in addition to the rights granted to it under the DIP Financing Agreements, be deemed to be the successor-in-interest to the Prepetition Lender and the Existing DIP Lender with respect to all third party notifications in connection with the

Prepetition Financing Agreements, the Existing DIP Financing Agreements, all Existing DIP Collateral access agreements all Prepetition Collateral access agreements, and all other agreements with third parties (including any agreement with a customs broker, freight forwarder, or credit card processor) relating to, or waiving claims against, any Existing DIP Collateral and any Prepetition Collateral, including without limitation, each collateral access agreement duly executed and delivered by any landlord of the Debtor and including, for the avoidance of doubt, all deposit account control agreements, securities account control agreements, and credit card agreements.

19.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified pursuant to the terms of the DIP Financing Agreements as necessary to

(a)    permit the Debtor to grant the DIP Liens and to incur all liabilities and obligations to the DIP Lender under the DIP Financing Agreements, the DIP Facility, and this Order, and

(b)    authorize the DIP Lender to retain and apply payments hereunder as provided by the DIP Financing Agreements and this Order.

## IV.    RESERVATION OF CERTAIN THIRD PARTY RIGHTS AND BAR OF CHALLENGES AND CLAIMS.

20.    Nothing in this Order or the DIP Credit Agreement shall prejudice whatever rights any party-in-interest with requisite standing (other than the Debtor and the Committee) may have under the Interim Crystal Order or the Final Crystal Order; ***provided, however*** that:

(a)    any challenge or objection raised by any such party, or any order granting or permitting (whether in whole or in part) any such challenge or objection to the Debtor's Stipulations (under and as defined in the Interim Crystal Order or the Final Crystal Order), including an objection or challenge to (i) the validity, extent, perfection, or priority of the security interests and Liens of the Prepetition Lender in and to the Prepetition Collateral, or (ii) the validity, allowability, priority, status, or amount of the Prepetition Debt (as each such term is defined in the Interim Crystal Order or the Final Crystal Order), or

    (b) any claim, suit or action against the Prepetition Lender in connection with or related to the Prepetition Debt, or the actions or inactions of the Prepetition Lender arising out of or related to the Prepetition Debt, or any order allowing such claim, suit or action (whether in whole or in part);

shall not affect, modify, subordinate or impair the validity, extent, perfection, enforceability, status or priority of (i) the DIP Liens granted to the DIP Lender; (ii) the DIP Obligations; or (iii) the DIP Financing Agreements, each of which shall remain in full force and effect.

## V. <u>CARVE OUT AND PAYMENT OF PROFESSIONALS.</u>

21. Subject to the terms and conditions contained in this Paragraph 21, the DIP Liens, and the DIP Superpriority Claim are subordinate only to the following (collectively, the "Carve Out"):

(a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6) for fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee (collectively, the "U.S. Trustee Fees"); and

(b) professional fees of, and costs and expenses incurred by, professionals or professional firms retained by the Debtor and of the Committee, always as provided in and as may be limited by the Carve Out Budget (defined below) and allowed by the Court (collectively, the "Case Professionals") in an aggregate amount not to exceed the sum of (x) $150,000 with respect to professionals or professional firms retained by the Debtor (in addition to any retainers held by such professional firms on the Petition Date), and (y) $400,000 with respect to professionals or professional firms retained by the Committee and out-of-pocket costs and expenses incurred by members of the Committee (inclusive of any retainers held by such professional firms). As used herein, "Carve Out Budget" means that budgetary projection of professional fees and expenses for Case Professionals, on an accrual basis, annexed hereto marked ***Exhibit "3"***.

22. Notwithstanding anything to the contrary contained herein, so long as no notice of the occurrence of a DIP Order Event of Default shall have been delivered, the Debtor shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 331, as the same may be due and payable and allowed by the Court, but always as provided in and as may be limited by the Carve Out Budget and the same shall not reduce the

Carve Out described in Paragraph 21(b) above. Further, nothing contained herein shall limit payment of compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 331, as the same may be due and payable and allowed by the Court even if they exceed the amounts contained in the Budget or the Carve Out Budget, out of funds other than the Carve Out (y) after the Challenge Period Termination Date if no Challenge has been brought (as such terms are defined in the Final Crystal Order) or (z) after the DIP Obligations have been irrevocably paid in full to the DIP Lender.

23. Nothing herein, including the inclusion of line items in the Budget or the Carve Out Budget for Case Professionals, shall be construed as consent to the allowance of any professional fees or expenses of the Debtor, of the Committee, or of any person, or shall affect the right of the DIP Lender to object to the allowance and payment of such fees and expenses or to permit the Debtor to pay any such amounts not set forth in the Budget or in excess of the Carve Out Budget. Any unused portion of the Carve Out shall at all times remain Cash Collateral as provided herein.

## VI. COMMITMENT TERMINATION DATE, DIP EVENT OF DEFAULT, AND REMEDIES

### A. Commitment Termination Date

24. All DIP Obligations shall be immediately due and payable and all authority to use the proceeds of the DIP Facility and to use Cash Collateral shall cease on the date that is the earliest to occur of any of the following (the "***Commitment Termination Date***"):

(a) the date that is twelve (12) months after the Restatement Date(as defined in the DIP Credit Agreement);

(b) the date on which the maturity of the DIP Obligations is accelerated and the commitments under the DIP Facility (the "***DIP Commitments***") have been irrevocably terminated as a result of the occurrence of an Event of Default (as defined in the DIP Credit Agreement) in accordance with the DIP Credit Agreement;

       (c) the closing of a sale of all or substantially all of the assets of the Debtor pursuant to the provisions of Section 363 of the Bankruptcy Code; or

(d) the effective date of a chapter 11 plan (a "***Plan***").

**B. DIP Events of Default.**

25. The occurrence of the Commitment Termination Date shall constitute a "***DIP Order Event of Default.***"

26. Unless and until the DIP Obligations have been irrevocably repaid in full in cash (or other arrangements for payment of the DIP Obligations satisfactory to the DIP Lender in its sole and exclusive discretion have been made) and all DIP Commitments have been irrevocably terminated, the protections afforded to the DIP Lender pursuant to this Order and under the DIP Financing Agreements, and any actions taken pursuant thereto, shall survive the entry of any order confirming a Plan or converting the Chapter 11 Case into a Successor Case, and the DIP Liens and the DIP Superpriority Claim shall continue in the Chapter 11 Case and in any Successor Case, and such DIP Liens and DIP Superpriority Claim shall maintain their respective priorities as provided by this Order.

**C. Rights and Remedies Upon Event of Default.**

27. Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that (i) after the occurrence of any Event of Default under the DIP Credit Agreement and (ii) at any time thereafter during the continuance of such Event of Default, upon **seven (7) days** prior written notice of such occurrence, in each case given to each of (w) the Debtor, (x) counsel to the Debtor, (y) counsel for the Committee, and (z) the Office of the United States Trustee, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Financing Agreements.

28. After expiration of the seven (7) day notice period by the DIP Lender of the occurrence of an Event of Default and provided that such Event of Default is still continuing:

    (a) the Debtor shall continue to deliver and cause the delivery of the proceeds of DIP Collateral to the DIP Lender as provided in the DIP Financing Agreements and this Order;

    (b) the DIP Lender shall continue to apply such proceeds in accordance with the provisions of the DIP Financing Agreements and this Order; and

    (c) the Debtor shall have no right to use any of such proceeds, nor any other Cash Collateral, other than towards the satisfaction of the DIP Obligations and the Carve Out.

29. Following the giving of written notice by the DIP Lender of the occurrence of an Event of Default, the Debtor and the Committee shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether an Event of Default has occurred. If the Debtor or the Committee does not contest the occurrence of an Event of Default and therefore the right of the DIP Lender to exercise its remedies, or if the Debtor or the Committee does timely contest the occurrence of an Event of Default and the Court after notice and hearing declines to stay the enforcement thereof, the automatic stay, as to the DIP Lender, shall automatically terminate at the end of such seven (7) day notice period. For the avoidance of doubt, (i) the termination of the automatic stay in such circumstances shall permit the acceleration of the maturity of the DIP Obligations and the termination of the DIP Commitments and therefore the occurrence of a DIP Order Event of Default; and (ii) nothing contained in this Order shall modify the right of the DIP Lender to refuse to make additional advances under the DIP Credit Agreement if a Default or Event of Default (as those terms are defined in the DIP Credit Agreement) exists or would result from the making of any such advance.

30. Subject to the provisions of Paragraphs 27, 28 and 29 above, upon the occurrence of a DIP Order Event of Default, the DIP Lender is authorized to exercise its remedies and

proceed under or pursuant to the DIP Financing Agreements; except that, with respect to any of the Debtor's leasehold locations, the DIP Lender's rights shall be limited to such rights (i) as may be ordered by the Court upon motion and notice to the applicable landlord with an opportunity to respond that is reasonable under the circumstances; (ii) to which the applicable landlord agrees in writing with the DIP Lender; or (iii) which the DIP Lender has under applicable non-bankruptcy law. All proceeds realized from any of the foregoing shall be turned over to the DIP Lender for application to the Carve Out (if not previously funded as provided herein), and the DIP Obligations under, and in accordance with the provisions of, the DIP Financing Agreements and this Order.

31. Nothing included herein shall prejudice, impair, or otherwise affect the DIP Lender's rights to seek any other or supplemental relief in respect of the Debtor, nor the DIP Lender's rights, as provided in the DIP Credit Agreement, to suspend or terminate the making of loans and granting financial accommodations under the DIP Credit Agreement.

**D. No Waiver of Remedies**.

32. The delay in or the failure of the DIP Lender to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Lender's rights and remedies. Notwithstanding anything herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights and remedies of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the DIP Lender to (i) request conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Case, or the appointment of a trustee in the Chapter 11 Case; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan; or (iii) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) the DIP Lender may have.

## VII. CERTAIN LIMITING PROVISIONS

### A. Section 506(c) Claims and Waiver

33. Nothing contained in this Order shall be deemed a consent by the DIP Lender to any charge, Lien, assessment, or claim against the DIP Collateral or the DIP Liens under section 506(c) of the Bankruptcy Code or otherwise.

34. As a further condition of the DIP Facility and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Financing Agreements, upon entry of this Order, the Debtor (and any successor thereto or any representative thereof, including any trustees appointed in the Chapter 11 Case or any Successor Case) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code.

### B. Proceeds of Subsequent Financing

35. Without limiting the provisions and protections of Paragraph 36 below, if at any time prior to the irrevocable repayment in full of all DIP Obligations and the termination of the DIP Lender's obligations to make loans and advances under the DIP Facility, including subsequent to the confirmation of any Plan with respect to the Debtor, the Debtor's estate, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(c)(1) or 364(d) of the Bankruptcy Code in violation of the DIP Financing Agreements, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Lender and applied in reduction of the DIP Obligations.

### C. Prohibitions.

36. Unless the DIP Lender has provided its prior written consent or all DIP Obligations have been irrevocably paid in full in cash (or will be irrevocably paid in full in cash upon entry of an order approving indebtedness described in Paragraph 35 above, or other

arrangements for the payment of the DIP Obligations satisfactory to the DIP Lender in its sole and exclusive discretion have been made) and all DIP Commitments (as defined below) have terminated, neither the Debtor nor the Committee shall seek or consent to the entry of, and it shall be an Event of Default under the DIP Credit Agreement if there shall be entered, in the Chapter 11 Case, or in any Successor Case, any order which authorizes any of the following:

(a) Any modification, stay, vacation or amendment to the DIP Orders to which the DIP Lender has not consented;

(b) A priority claim or administrative expense or unsecured claim against the Debtor (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the DIP Lender in respect of the Obligations, except with respect to the Carve Out;

(c) Any Lien on any DIP Collateral having a priority equal or superior to the Lien securing the DIP Obligations, except (a) with respect to the Carve Out, or (b) for the Permitted Prior Liens;

(d) Any order which authorizes the return of any of the Debtor’s property pursuant to section 546(h) of the Bankruptcy Code; or

(e) Any order which authorizes the payment of any Indebtedness (other than Indebtedness reflected in the Approved Budget, and other Indebtedness approved by the DIP Lender, in each case incurred prior to the Petition Date, or the grant of “adequate protection” (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien other than as set forth in the DIP Orders).

**D. Restrictions on Disposition of Collateral.**

37. Following the entry of this Order, The Debtor shall not do the following:

(a) sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the DIP Lender required under the DIP Financing Agreements (and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or an order of this Court), except for the following:

(i) sales of the Debtor’s Inventory in the ordinary course of business,

(ii) as part of the disposition of assets as contemplated in the Store

Closing Program Motion and the Leasehold Sale Motion (or such other disposition of the Debtor's leaseholds as may be acceptable to the Lender, in its exclusive discretion), or

(iii) except as otherwise provided for in the DIP Financing Agreements and this Order and approved by the Court, or

(b) assume, reject, or assign any Lease without the prior consultation with the DIP Lender, except as contemplated in the Store Closing Motion, Leasehold Sale Motion (or such other disposition of the Debtor's leaseholds as may be acceptable to the Lender, in its exclusive discretion), a Plan, or as otherwise provided for in the DIP Financing Agreements.

## VIII. OTHER RIGHTS AND OBLIGATIONS

### A. Good Faith Under Section 364(e) of the Bankruptcy Code. No Modification or Stay of this Order.

38. Based on the findings set forth in this Order, and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Order, in the event any or all of the provisions of this Order are hereafter modified, amended, or vacated by a subsequent order of this or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code and, no such appeal, modification, amendment, or vacation shall affect the validity and enforceability of any advances made hereunder or the Liens or priority authorized or created hereby.

39. Notwithstanding any such modification, amendment, or vacation, any claim granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment, or vacation of any DIP Protections granted to the DIP Lender shall be governed in all respects by the original provisions of this Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges, and benefits, including the DIP Protections granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Facility are made in reliance on this Order, the obligations owed the DIP Lender prior to the effective date of any stay, modification, or vacation of this Order shall not, as a result of any subsequent order in the

Chapter 11 Case or in any Successor Case, be subordinated, lose their Lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the Liens and claims granted to the DIP Lender under this Order and/or the DIP Financing Agreements.

**B. DIP Lender Expenses.**

40. As provided in the DIP Financing Agreements, all reasonable out-of-pocket costs and expenses of the DIP Lender in connection with the DIP Financing Agreements, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees and disbursements, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement obligations with respect to fees and expenses, and other out of pocket expenses will be paid by the Debtor, whether or not the transactions contemplated hereby are consummated. Payment of such fees shall not be subject to allowance by the Court; ***provided***, ***however***, the Debtor may seek a determination by the Court whether such fees and expenses are reasonable. Under no circumstances shall professionals for the DIP Lender be required to comply with the U.S. Trustee fee guidelines; ***provided***, ***however***, the Debtor shall provide to the Office of the United States Trustee and counsel to the Committee a copy of any invoices for professional fees and expenses provided to the Debtor during the pendency of the Debtor's Chapter 11 Case.

**C. Binding Effect**.

41. The provisions of this Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtor or with respect to the property of the estates of the Debtor), any Committee(s) (subject to the provisions of Paragraph

20 above), whether in the Chapter 11 Case, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case.

**D. No Third Party Rights**.

42. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

**E. No Marshaling**.

43. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

**F. Section 552(b)of the Bankruptcy Code.**

44. The DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the Debtor shall not assert that the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall apply to the DIP Lender with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

**G. Amendments**.

45. The Debtor and the DIP Lender may amend, modify, supplement, or waive any provision of the DIP Financing Agreements without further approval of the Court after consultation with the Committee unless such amendment, modification, supplement, or waiver (i) increases the interest rate (other than as a result of the imposition of the Default Rate), (ii) increases the DIP Commitments, or (iii) changes the maturity date of the DIP Facility. Except as set forth above, all waivers, modifications, or amendments of any of the provisions hereof shall not be effective unless set forth in writing, signed by on behalf of the Debtor and the DIP Lender (after having obtained the approval of the DIP Lender as provided in the DIP Financing Agreements) and approved by the Court.

**H. Survival of Order**.

46. The provisions of this Order, and any actions taken pursuant hereto, shall survive entry of any order which may be entered:

(a) confirming any Plan in the Chapter 11 Case,

(b) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code,

(c) to the extent authorized by applicable law, dismissing the Chapter 11 Case,

(d) withdrawing of the reference of the Chapter 11 Case from this Court, or

(e) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Case in this Court.

47. The terms and provisions of this Order including the DIP Protections granted pursuant to this Order and the DIP Financing Agreements shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Order until all of the DIP Obligations of the Debtor to the DIP Lender pursuant to the DIP Financing Agreements have been irrevocably paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

**I. Inconsistency**.

48. In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements and of this Order, the provisions of this Order shall govern and control.

**J. Enforceability**.

49. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately upon execution hereof.

**K. Objections Overruled**.

50. All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

**L. Waiver of Any Applicable Stay**.

51. Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Order.

**M. Proofs of Claim.**

52. The DIP Lender will not be required to file proofs of claim in the Chapter 11 Case or in any Successor Case.

**N. Headings.**

53. The headings in this Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Order.

**O. Retention of Jurisdiction**.

54. The Court has and will retain jurisdiction to enforce this Order according to its terms.

**P. Crystal Financing Agreements.**

55. The DIP Financing Agreements, and all rights of the DIP Lender thereunder, shall remain in full force and effect notwithstanding any defect in the Existing DIP Financing Agreements or the Prepetition Financing Agreements.

56. The Debtor is directed to serve a copy of this Order on all parties entitled to notice no later than two days after the date of this Order and to file a certificate of service forthwith thereafter.

DATED: November 15, 2012
St. Louis, Missouri 63102
mtc

CHARLES E. RENDLEN
U.S. Bankruptcy Judge

**<u>Exhibit "1"</u>**

**DIP Credit Agreement**

*CHS Draft 11/13*

**AMENDED AND RESTATED SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of November __, 2012

among

**BAKERS FOOTWEAR GROUP, INC.**, as debtor and debtor-in-possession
as the Borrower

**SALUS CAPITAL PARTNERS LLC,**
as Administrative Agent and Collateral Agent
and

The Lenders Party Hereto

TABLE OF CONTENTS

Article I DEFINITIONS AND ACCOUNTING TERMS ........ 1

**1.01 Defined Terms.** ........ 2

**1.02 Other Interpretive Provisions.** ........ 38

**1.03 Accounting Terms.** ........ 39

**1.04 Rounding.** ........ 39

**1.05 Times of Day.** ........ 39

**1.06 Letter of Credit Amounts** ........ 39

Article II THE COMMITMENTS AND LOANS ........ 39

**2.01 Loans; Reserves.** ........ 39

**2.02 Borrowings.** ........ 40

**2.03 Letters of Credit** ........ 41

**2.04 Prepayments.** ........ 48

**2.05 Termination or Reduction of Commitments.** ........ 49

**2.06 Repayment of Obligations** ........ 50

**2.07 Interest.** ........ 50

**2.08 Fees.** ........ 51

**2.09 Computation of Interest and Fees.** ........ 52

**2.10 Evidence of Debt.** ........ 52

**2.11 Payments Generally; Agent's Clawback.** ........ 52

**2.12 Sharing of Payments by Lenders.** ........ 54

**2.13 Settlement Among Lenders.** ........ 54

Article III TAXES, YIELD PROTECTION AND ILLEGALITY ........ 55

**3.01 Taxes.** ........ 55

**3.02 Reserved.** ........ 56

**3.03 Reserved.** ........ 56

**3.04 Increased Costs.** ........ 56

**3.05 Mitigation Obligations.** ........ 57

**3.06 Survival.** ........ 58

**3.07 Replacement of Lenders.** ........ 58

Article IV CONDITIONS PRECEDENT TO LOANS ........ 58

**4.01 Conditions of Initial Loan.** ........ 58

**4.02 Conditions to all Loans.** ........ 61

Article V REPRESENTATIONS AND WARRANTIES ........ 62

**5.01 Existence, Qualification and Power Each Loan Party.** ........ 62
**5.02 Authorization; No Contravention.** ........ 63
**5.03 Governmental Authorization; Other Consents.** ........ 63
**5.04 Binding Effect.** ........ 63
**5.05 Financial Statements; No Material Adverse Effect.** ........ 63
**5.06 Litigation.** ........ 64
**5.07 No Default.** ........ 64
**5.08 Ownership of Property; Liens.** ........ 64
**5.09 Environmental Compliance.** ........ 64
**5.10 Insurance.** ........ 65
**5.11 Taxes.** ........ 65
**5.12 ERISA Compliance.** ........ 66
**5.13 Subsidiaries; Equity Interests.** ........ 66
**5.14 Margin Regulations; Investment Company Act.** ........ 67
**5.15 Disclosure.** ........ 67
**5.16 Compliance with Laws.** ........ 67
**5.17 Intellectual Property; Licenses, Etc.** ........ 67
**5.18 Labor Matters.** ........ 67
**5.19 Security Documents.** ........ 68
**5.20 Solvency.** ........ 69
**5.21 Deposit Accounts; Credit Card Arrangements.** ........ 69
**5.22 Brokers.** ........ 69
**5.23 Customer and Trade Relations.** ........ 69
**5.24 Material Contracts.** ........ 69
**5.25 Customs Brokers and Freight Forwarders.** ........ 69
**5.26 Casualty.** ........ 70
Article VI AFFIRMATIVE COVENANTS ........ 70
**6.01 Financial Statements.** ........ 70
**6.02 Certificates; Other Information.** ........ 70
**6.03 Notices.** ........ 72
**6.04 Payment of Obligations.** ........ 72
**6.05 Preservation of Existence, Etc.** ........ 73
**6.06 Maintenance of Properties.** ........ 73
**6.07 Maintenance of Insurance.** ........ 73

**6.08 Compliance with Laws.** ... 74
**6.09 Books and Records; Accountants.** ... 75
**6.10 Inspection Rights.** ... 75
**6.11 Additional Loan Parties.** ... 75
**6.12 Cash Management.** ... 76
**6.13 Information Regarding the Collateral.** ... 77
**6.14 Physical Inventories.** ... 78
**6.15 Environmental Laws.** ... 78
**6.16 Further Assurances.** ... 78
**6.17 Compliance with Terms of Leaseholds.** ... 79
**6.18 Material Contracts.** ... 79
**6.19 Bankruptcy Related Covenants.** ... 79
**6.20 Certain Accounts.** ... 81
Article VII NEGATIVE COVENANTS ... 81
**7.01 Liens.** ... 81
**7.02 Investments.** ... 81
**7.03 Indebtedness; Disqualified Stock; Equity Issuances.** ... 81
**7.04 Fundamental Changes.** ... 81
**7.05 Dispositions.** ... 82
**7.06 Restricted Payments.** ... 82
**7.07 Prepayments of Indebtedness.** ... 82
**7.08 Change in Nature of Business.** ... 82
**7.09 Transactions with Affiliates.** ... 82
**7.10 Burdensome Agreements.** ... 83
**7.11 Use of Proceeds.** ... 83
**7.12 Amendment of Material Documents.** ... 83
**7.13 Fiscal Year.** ... 83
**7.14 Deposit Accounts; Credit Card Processors.** ... 83
**7.15 Budgeted Expenses.** ... 84
Article VIII EVENTS OF DEFAULT AND REMEDIES ... 84
**8.01 Events of Default.** ... 84
**8.02 Remedies Upon Event of Default.** ... 87
**8.03 Application of Funds.** ... 88
Article IX THE AGENT ... 89

**9.01 Appointment and Authority.** ........ 89

**9.02 Rights as a Lender.** ........ 89

**9.03 Exculpatory Provisions.** ........ 90

**9.04 Reliance by Agent.** ........ 91

**9.05 Delegation of Duties.** ........ 91

**9.06 Resignation of Agent.** ........ 91

**9.07 Non-Reliance on Agent and Other Lenders.** ........ 92

**9.08 Reserved.** ........ 92

**9.09 Collateral and Guaranty Matters.** ........ 92

**9.10 Notice of Transfer.** ........ 93

**9.11 Reports and Financial Statements.** ........ 93

**9.12 Agency for Perfection.** ........ 94

**9.13 Indemnification of Agent.** ........ 94

**9.14 Relation Among Lenders.** ........ 94

**9.15 Defaulting Lenders.** ........ 94

Article X MISCELLANEOUS ........ 95

**10.01 Amendments, Etc.** ........ 95

**10.02 Notices; Effectiveness; Electronic Communications.** ........ 97

**10.03 No Waiver; Cumulative Remedies.** ........ 98

**10.04 Expenses; Indemnity; Damage Waiver.** ........ 99

**10.05 Payments Set Aside.** ........ 101

**10.06 Successors and Assigns.** ........ 101

**10.07 Treatment of Certain Information; Confidentiality.** ........ 104

**10.08 Right of Setoff.** ........ 105

**10.09 Interest Rate Limitation.** ........ 106

**10.10 Counterparts; Integration; Effectiveness.** ........ 106

**10.11 Survival.** ........ 106

**10.12 Severability.** ........ 107

**10.13 Governing Law; Jurisdiction; Etc.** ........ 107

**10.14 Waiver of Jury Trial.** ........ 108

**10.15 No Advisory or Fiduciary Responsibility.** ........ 108

**10.16 USA PATRIOT Act Notice.** ........ 109

**10.17 Foreign Asset Control Regulations.** ........ 109

**10.18 Time of the Essence.** ........ 109

**10.19 Press Releases.** .......... 110
**10.20 No Strict Construction.** .......... 110
**10.21 Attachments.** .......... 110
**10.22 Relationship with DIP Orders.** .......... 110

**SCHEDULES**

| | |
|---|---|
| 1.01 | Affiliate Subordinated Indebtedness |
| 1.02 | Madden Subordinated Indebtedness |
| 2.01 | Commitments and Applicable Percentages |
| 5.01 | Loan Parties Organizational Information |
| 5.08(b)(1) | Owned Real Estate |
| 5.08(b)(2) | Leased Real Estate |
| 5.10 | Insurance |
| 5.13 | Subsidiaries; Other Equity Investments |
| 5.18 | Collective Bargaining Agreements |
| 5.21(a) | DDAs |
| 5.21(b) | Credit Card Arrangements |
| 5.24 | Material Contracts |
| 5.25 | Customs Brokers and Freight Forwarders |
| 6.02(e) | Financial and Collateral Reporting |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 10.02 | Agent's Office; Certain Addresses for Notices |

**EXHIBITS**

***Form of***

| | |
|---|---|
| A | Loan Notice |
| B-1 | Revolving Note |
| B-2 | Term Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | Borrowing Base Certificate |
| F | Borrowing Order |
| G | Plan Support Term Sheet |
| H | Exit Financing Commitment Letter |

**AMENDED AND RESTATED SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This AMENDED AND RESTATED SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT ("Agreement") is entered into as of November ___, 2012, among **BAKERS FOOTWEAR GROUP, INC**., a Missouri corporation, as debtor and debtor-in-possession (the "Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and **SALUS CAPITAL PARTNERS, LLC,** as Administrative Agent and Collateral Agent.

W I T N E S S E T H:

WHEREAS, on October 3, 2012 (the "Petition Date"), the Borrower commenced Chapter 11 Case No. 4:12-bk-49658 (the "Chapter 11 Case") by filing a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, with the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court"). The Borrower continues to operate its business and manage its properties as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, the Borrower has requested that the Lenders provide a senior secured, super-priority revolving credit facility to the Borrower on the terms and conditions set forth herein;

WHEREAS, the Borrower has requested that the Term Lenders provide a term loan facility in the principal amount of $1,500,000, the proceeds of which shall be used by the Borrower for purposes permitted under, and otherwise in accordance with and subject to the terms of this Agreement;

WHEREAS, prior to the date of this Agreement, the Borrower, on the one hand, and Crystal Financial, LLC, as agent thereunder (the "Existing Agent") and the lenders party thereto (the "Existing Lenders"), on the other hand, previously entered into a Senior Secured Super-Priority Debtor-In-Possession Credit Agreement dated as of October 5, 2012 (the "Existing Credit Agreement"), pursuant to which the lenders party thereto provided the Borrower with certain financial accommodations;

WHEREAS, pursuant to the Borrowing Order (as defined below), the proceeds of the loans hereunder are being used by the Borrower to pay-off in full its obligations under the Existing Credit Agreement to the Existing Agent and the Existing Lenders and the Agent and Lenders desire to amend and restate the Existing Credit Agreement as provided herein; and

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree that the Existing Credit Agreement shall be amended and restated in its entirety to read as set forth herein.

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.01 Defined Terms**. As used in this Agreement, the following terms shall have the meanings set forth below:

"Acceptable Document of Title" means, with respect to any Inventory, a tangible, negotiable bill of lading or other Document (as defined in the UCC) that (a) is issued by a common carrier which is not an Affiliate of the Approved Foreign Vendor or any Loan Party which is in actual possession of such Inventory, (b) is issued to the order of a Loan Party or, if so requested by the Agent, to the order of the Agent, (c) names the Agent as a notification party and bears a conspicuous notation on its face of the Agent's security interest therein, (d) is not subject to any Lien (other than in favor of the Agent), and (e) is on terms otherwise reasonably acceptable to the Agent.

"Account" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered or (c) arising out of the use of a credit or charge card or information contained on or for use with the card.

"ACH" means automated clearing house transfers.

"Acquisition" means, with respect to any Person (a) a purchase of a Controlling interest in, the Equity Interests of any other Person, (b) a purchase or other acquisition of all or substantially all of the assets or properties of, another Person or of any business unit of another Person, (c) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a Controlling interest in the Equity Interests, of any Person, or (d) any acquisition of any Store locations, in each case in any transaction or group of transactions which are part of a common plan.

"Act" shall have the meaning provided in Section 10.16.

"Affiliate" means, with respect to any Person, (i) another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, (ii) any director, officer, managing member, partner, trustee, or beneficiary of that Person, (iii) any other Person directly or indirectly holding 10% or more of any class of the Equity Interests of that Person, and (iv) any other Person 10% or more of any class of whose Equity Interests is held directly or indirectly by that Person.

"Affiliate Subordinated Indebtedness" means the Indebtedness described on Schedule 1.01 hereto owing by the Loan Parties to certain of their Affiliates, which Indebtedness is expressly subordinated in right of payment to the prior payment in full of the Obligations pursuant to the Affiliate Subordination Agreement and the Borrowing Order.

"Affiliate Subordination Agreement" means the Subordination Agreement dated as of June 13, 2012 by and among the Agent (as successor to the Existing Agent), the Loan Parties and certain Affiliates of the Loan Parties, with respect to the Affiliate Subordinated Indebtedness.

"Agency Agreement" means that certain Agency Agreement dated as of November 5, 2012 among the Borrower, as Merchant, and a joint venture consisting of SB Capital Group, LLC and Tiger Capital Group, LLC, as amended, supplemented or modified from time to time to the extent permitted by the Bankruptcy Court.

"Agent" means Salus in its capacity as administrative agent and collateral agent under any of the Loan Documents, or any successor thereto in such capacities.

"Agent's Office" means the Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Agent may from time to time notify the Borrower and the Lenders.

"Aggregate Commitments" means the sum of the Aggregate Revolving Commitments plus the outstanding principal balance of the Term Loan.

"Aggregate Revolving Commitments" means the Revolving Commitments of all the Revolving Lenders. As of the Closing Date, the Aggregate Revolving Commitments are $8,000,000.

"Agreement" means this Amended and Restated Senior Secured Super-Priority Debtor-in-Possession Credit Agreement.

"Applicable Lenders" means the Required Lenders, all affected Lenders, or all Lenders, as the context may require.

"Applicable Percentage" means, in each case as the context requires, (a) with respect to any Revolving Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Revolving Commitments represented by such Lender's Revolving Commitment at such time, (b) with respect to any Term Lender at any time, the portion of the Term Loan represented by the outstanding principal balance of such Term Lender's Term Loan at such time, or (c) with respect to all Lenders at any time, the percentage of the sum of the Aggregate Revolving Commitments represented by the sum of such Lender's Revolving Commitment and the outstanding principal balance of such Lender's Term Loan at such time, in each case as the context provides. If the commitment of each Lender to make Loans has been terminated pursuant to Section 2.05 or Section 8.02 or if the Aggregate Revolving Commitments have expired, then the Applicable Percentage of each Revolving Lender shall be determined based on the Applicable Percentage of such Revolving Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Appraised Value" means, with respect to Eligible Inventory, the appraised orderly liquidation value, net of costs and expenses to be incurred in connection with any such liquidation, which value is expressed as a percentage of Cost of Eligible Inventory as set forth in the inventory stock ledger of the Borrower, which value shall be determined from time to time by the most recent appraisal undertaken by an independent appraiser engaged by the Agent.

"Approved Budget" has the meaning specified in Section 7.15.

"Approved Foreign Vendor" means a Foreign Vendor which (a) is located in any country acceptable to the Agent in its discretion, (b) has not asserted any reclamation, repossession, diversion, stoppage in transit, Lien or title retention rights in respect of such Inventory, and (c), if so requested by the Agent, has entered into and is in full compliance with the terms of a Foreign Vendor Agreement.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender (c) an entity or an Affiliate of an entity that administers or manages a Lender, or (d) the same investment advisor or an advisor under common control with such Lender, Affiliate or advisor, as applicable.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Agent, in substantially the form of Exhibit D or any other form approved by the Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease, agreement or instrument were accounted for as a capital lease.

"Audited Financial Statements" means the audited consolidated balance sheet of the Borrower and its Subsidiaries for the Fiscal Year ended January 28, 2012, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year of the Borrower and its Subsidiaries, including the notes thereto.

"Auto-Extension Letter of Credit" shall have the meaning specified in Section 2.03(b)(iii).

"Availability" means, as of any date of determination thereof by the Agent, the result, if a positive number, of:

(a) The Loan Cap

minus

(b) The Total Revolver Outstandings.

In calculating Availability at any time and for any purpose under this Agreement, the Borrower shall certify to the Agent that all accounts payable and Taxes are being paid on a timely basis.

"Availability Block" means an amount equal to $200,000.

"Availability Period" means the period from and including the Restatement Date to the Termination Date.

"Availability Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as the Agent from time to time determines in its discretion as being appropriate (a) to reflect the impediments to the Agent's ability to realize upon the Collateral, (b) to reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Collateral, (c) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party, (d) to reflect that a Default or an Event of Default then exists, or (e) to reflect the amount of any priority or administrative expense claims that, in the Agent's reasonable determination, require payment during the Chapter 11 Case (including, without limitation, the Carve Out Reserve), or (f) to reflect the value of Inventory at leased locations with respect to which the lease therefor has not been assumed commencing as of the date that is twelve weeks prior to the deadline by which such lease must be assumed or rejected. Without limiting the generality of the foregoing, Availability Reserves may include, in the Agent's discretion, (but are not limited to) reserves based on: (i) rent; (ii) customs duties, and other costs to release Inventory which is being imported into the United States; (iii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, claims of the PBGC and other Taxes which may have priority over the interests of the Agent in the Collateral; (iv) salaries, wages and benefits due to employees of any Loan Party, (v) Customer Credit Liabilities (valued at 50% of the outstanding principal amount thereof), (vi) customer deposits, (viii) reserves for reasonably anticipated changes in the Appraised Value of Eligible Inventory between appraisals, (viii) warehousemen's or bailee's charges and other Permitted Encumbrances which may have priority over the interests of the Agent in the Collateral, (ix) amounts due to vendors on account of consigned goods, (x) royalties payable in respect of licensed merchandise, and (xi) amounts due to depository banks with respect to cash management and treasury services fees, charges and expenses.

"BANA Collateral" shall have the meaning provided in clause (n) of the definition of "Permitted Encumbrances."

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" has the meaning specified in the recitals to this Agreement.

"Blocked Account" has the meaning provided in Section 6.12(a)(ii).

"Blocked Account Agreement" means with respect to an account established by a Loan Party, an agreement, in form and substance reasonably satisfactory to the Agent, establishing control (as defined in the UCC) of such account by the Agent and whereby the bank maintaining such account agrees to comply only with the instructions originated by the Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom deposit accounts are maintained and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" has the meaning specified in Section 6.02.

"Borrowing" means a Revolving Credit Borrowing or the Term Borrowing, as the context may require.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a) the face amount of Eligible Credit Card Receivables multiplied by 95%;

<u>plus</u>

(b) the Cost of Eligible Inventory, net of Inventory Reserves, *multiplied by* the lesser of (i) 115% *multiplied by* the Low Appraised Value of Eligible Inventory and (ii) 95% *multiplied by* the High Appraised Value of Eligible Inventory;

<u>plus</u>

(c) Solely from the Restatement Date until the earlier of (i) December 8, 2012 and (ii) receipt by the Borrower of the Inventory Liquidation Payment, 80% of Inventory Liquidation Payment;

<u>minus</u>

(d) the then amount of all Availability Reserves;

<u>minus</u>

(e) the Availability Block.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit E hereto (with such changes therein as may be required by the Agent to reflect the components of and reserves against the Borrowing Base as provided for hereunder from time to time), executed and certified as accurate and complete by a Responsible Officer of the Borrower which shall include appropriate exhibits, schedules, supporting documentation, and additional reports as reasonably requested by the Agent.

"Borrowing Order" means an order entered by the Bankruptcy Court, substantially in the form of, and containing the provisions set forth in, Exhibit F (or such other form and provisions as may be reasonably acceptable to the Agent), authorizing, *inter alia* the Borrower to obtain credit and incur (or guaranty) Obligations, granting Liens to secure the Obligations, and providing for the super priority of the Credit Parties' claims.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Agent's Office is located.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" shall mean a carve out for the following expenses: (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6) for fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee, (b) professional fees of, and costs and expenses incurred by, Case Professionals of the Borrower, to the extent provided in the Carve Out Budget (as defined in the Borrowing Order) and allowed by the Bankruptcy Court, in an amount not to exceed $150,000 (in addition to any retainers held by such Case Professionals on the Petition Date); and (c) professional fees of, and costs and expenses incurred by, other Case Professionals and other out-of-pocket costs and expenses of members of the Creditors' Committee or any other statutory committee, to the extent provided in the Carve Out Budget and allowed by the Bankruptcy Court, in an amount not to exceed $200,000.

"Carve Out Reserve" means a Reserve equal to the maximum possible amount of the Carve Out.

"Case Professionals" means Persons or firms retained by the Borrower or the Creditors' Committee or other statutory committee appointed in the Chapter 11 Case pursuant to Sections 327 and 1103 of the Bankruptcy Code.

"Cash Collateral Account" means a non-interest bearing account established by one or more of the Loan Parties with Salus, and in the name of, the Agent (or as the Agent shall otherwise direct) and under the sole and exclusive dominion and control of the Agent, in which deposits are required to be made in accordance with Section 2.03(g) or 8.02(c).

"Cash Collateralize" has the meaning specified in Section 2.03(g). Derivatives of such term have corresponding meanings.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the United States Environmental Protection Agency.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request,

rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a) Peter Edison shall cease to be chief executive officer of the Borrower; or

(b) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than Peter Edison, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of 25% or more of the Equity Interests of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such Equity Interests that such "person" or "group" has the right to acquire pursuant to any option right); or

(b) during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(c) any "change in control" or "sale" or "disposition" or similar event as defined in any Organizational Document of any Loan Party or in any Material Contract, or any document governing Material Indebtedness of any Loan Party; or

(d)    the Borrower fails at any time to own, directly or indirectly, 100% of the Equity Interests of each other Loan Party free and clear of all Liens (other than the Liens in favor of the Agent), except where such failure is as a result of a transaction permitted by the Loan Documents.

"Chapter 11 Case" has the meaning provided in the recitals to this Agreement.

"Collateral" means the "DIP Collateral" as defined in the Borrowing Order.

"Collateral Access Agreement" means an agreement reasonably satisfactory in form and substance to the Agent executed by (a) a bailee or other Person in possession of Collateral, and (b) any landlord of Real Estate leased by any Loan Party, pursuant to which such Person (i) acknowledges the Agent's Lien on the Collateral, (ii) releases or subordinates such Person's Liens in the Collateral held by such Person or located on such Real Estate, (iii) provides the Agent with access to the Collateral held by such bailee or other Person or located in or on such Real Estate, (iv) as to any landlord, provides the Agent with a reasonable time to sell and dispose of the Collateral from such Real Estate, and (v) makes such other agreements with the Agent as the Agent may reasonably require.

"Collection Account" has the meaning provided in Section 6.12(b).

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Loan Party in the ordinary course of business of such Loan Party.

"Commercial Letter of Credit Agreement" means the Commercial Letter of Credit Agreement relating to the issuance of a Commercial Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"Commitment" means, as to each Lender, such Lender's Revolving Commitment and Term Commitment, as applicable.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Confirmation Agreement" means the Confirmation and Amendment of Ancillary Loan Documents dated as of November [16], 2012 among the Loan Parties and the Agent, together with any amendments thereto.

"Consent" means actual consent given by a Lender from whom such consent is sought; or the passage of seven (7) Business Days from receipt of written notice to a Lender from the Agent of a proposed course of action to be followed by the Agent without such Lender giving the Agent written notice of that Lender's objection to such course of action.

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the lower of cost or market value of Inventory, based upon the Borrower's customary accounting practices as of the Restatement Date, as such calculated cost is determined from invoices received by the Borrower, the Borrower's purchase journals or the Borrower's stock ledger. "Cost" does not include inventory capitalization costs or other non purchase price charges (such as freight) used in the Borrower's calculation of cost of goods sold.

"Credit Card Issuer" shall mean any person (other than the Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc., and Novus Services, Inc. and other issuers approved by the Agent.

"Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to the Borrower's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in Section 6.12(a)(i).

"Credit Card Receivables" means each "Account" or "Payment Intangible" (as each are defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Creditors' Committee" means any official committee of creditors formed, appointed or approved in the Chapter 11 Case pursuant to the Bankruptcy Code.

"Credit Extensions" mean each of the following: (a) a Borrowing and (b) an L/C Credit Extension.

"Credit Party" or "Credit Parties" means (a) individually, (i) each Lender and its Affiliates, (ii) the Agent, (iii) each L/C Issuer, (iv) each beneficiary of each indemnification obligation undertaken by any Loan Party under any Loan Document, (v) any other Person to

whom Obligations under this Agreement and other Loan Documents are owing, and (vi) the successors and assigns of each of the foregoing, and (b) collectively, all of the foregoing.

"Credit Party Expenses" means (a) all reasonable out-of-pocket expenses incurred by the Agent and its Affiliates, in connection with this Agreement and the other Loan Documents, including without limitation (i) the reasonable fees, charges and disbursements of (A) counsel for the Agent, (B) outside consultants for the Agent, (C) appraisers, (D) commercial finance examiners, and (E) all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Obligations, (ii) in connection with (A) the preparation, negotiation, administration, management, execution and delivery of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (B) the enforcement or protection of their rights in connection with this Agreement or the Loan Documents or efforts to monitor, preserve, protect, collect, or enforce the Collateral or in connection with the Chapter 11 Case, or (C) any workout, restructuring or negotiations in respect of any Obligations, (iii) with respect to any L/C Issuer, and its Affiliates, all reasonable out-of-pocket expenses incurred in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder; and (iv) all customary fees and charges (as adjusted from time to time) of the Agent with respect to access to online Loan information, the disbursement of funds (or the receipt of funds) to or for the account of Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, and (b) all reasonable out-of-pocket expenses incurred by the Credit Parties who are not the Agent, an L/C Issuer or any Affiliate of any of them, after the occurrence and during the continuance of an Event of Default, provided that such Credit Parties shall be entitled to reimbursement for no more than one counsel representing all such Credit Parties (absent a conflict of interest in which case the Credit Parties may engage and be reimbursed for additional counsel).

"Customer Credit Liabilities" means at any time, the aggregate remaining value at such time of (a) outstanding gift certificates and gift cards of the Borrower entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price for any Inventory, and (b) outstanding merchandise credits of the Borrower.

"Customs Broker/Carrier Agreement" means an agreement in form and substance reasonably satisfactory to the Agent among a Loan Party, a customs broker, freight forwarder, consolidator, or carrier, and the Agent, in which the customs broker, freight forwarder, consolidator, or carrier acknowledges that it has control over and holds the documents evidencing ownership of the subject Inventory for the benefit of the Agent and agrees, upon notice from the Agent, to hold and dispose of the subject Inventory solely as directed by the Agent.

"DDA" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each DDA shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any DDA.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means, when used with respect to Loans and other Obligations, an interest rate equal to the interest rate otherwise applicable to such Loan or Obligations plus four percent (4.00%) per annum.

"Defaulting Lender" means any Revolving Lender that (a) has failed to fund any portion of the Revolving Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Agent or any other Revolving Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, (c) has failed or refused to abide by any of its obligations under this Agreement, or (d) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"Designation Rights" means designation rights to approximately 150 of the Leases, which may be sold by the Borrower pursuant to the Leasehold Sale Motion.

"Deteriorating Lender" means any Defaulting Lender or any Revolving Lender as to which (a) the Agent has a good faith belief that such Revolving Lender has defaulted in fulfilling its obligations under one or more other syndicated credit facilities, or (b) a Person that Controls such Revolving Lender has been deemed insolvent or become the subject of a bankruptcy, insolvency or similar proceeding.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction), whether in one transaction or in a series of transactions, of any property (including, without limitation, any Equity Interests) by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case at the option of the holder thereof), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days after the date on which the Loans mature. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Borrower and its Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock or portion thereof, plus accrued dividends.

"Dollars" and "$" mean lawful money of the United States.

"Early Termination Fee" has the meaning given in Section 2.08.

"Effect of Bankruptcy" means, with respect to any Contractual Obligation, contract or agreement to which the Borrower is a party, any default or other legal consequences arising on account of the commencement or the filing of the Chapter 11 Case (including the implementation of any stay), or the rejection of any such Contractual Obligation, contract or agreement with the approval of the Bankruptcy Court if required under any applicable Governmental Authority.

"Eligible Assignee" means (a) a Lender or any of its Affiliates or an Approved Fund, and (b) any other Person (other than a natural Person) approved by the Agent; provided that notwithstanding the foregoing, "Eligible Assignee" shall not include a Loan Party or any of their respective Affiliates or Subsidiaries.

"Eligible Credit Card Receivables" means at the time of any determination thereof, each Credit Card Receivable that satisfies the following criteria at the time of creation and continues to meet the same at the time of such determination: such Credit Card Receivable (i) has been earned by performance and represents the bona fide amounts due to the Borrower from a Credit Card Issuer or Credit Card Processor, and in each case is originated in the ordinary course of business of the Borrower, and (ii) in each case is acceptable to the Agent in its discretion, and is not ineligible for inclusion in the calculation of the Borrowing Base pursuant to any of clauses (a) through (i) below. Without limiting the foregoing, to qualify as an Eligible Credit Card Receivable, an Account shall indicate no Person other than the Borrower as payee or remittance party. In determining the amount to be so included, the face amount of an Account shall be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that the Borrower may be obligated to rebate to a customer, a Credit Card Issuer or Credit Card Processor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the Borrower to reduce the amount of such Credit Card Receivable. Except as otherwise agreed by the Agent, any Credit Card Receivable included within any of the following categories shall not constitute an Eligible Credit Card Receivable:

(a) Credit Card Receivables which do not constitute an "Account" (as defined in the UCC);

(b) Credit Card Receivables that have been outstanding for more than five (5) Business Days from the date of sale;

(c) Credit Card Receivables (i) that are not subject to a perfected first-priority security interest in favor of the Agent, or (ii) with respect to which the Borrower does not have good and valid title thereto, free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents);

(d) Credit Card Receivables which are disputed, are with recourse, or with respect to which a claim, counterclaim, offset or chargeback has been asserted (to the extent of such claim, counterclaim, offset or chargeback);

(e) Credit Card Receivables as to which a Credit Card Issuer or a Credit Card Processor has the right under certain circumstances to require the Borrower to repurchase the Accounts from such Credit Card Issuer or Credit Card Processor;

(f) Credit Card Receivables due from a Credit Card Issuer or a Credit Card Processor of the applicable credit card which is the subject of any bankruptcy or insolvency proceedings;

(g) Credit Card Receivables which are not a valid, legally enforceable obligation of the applicable Credit Card Issuer or a Credit Card Processor with respect thereto;

(h) Credit Card Receivables which do not conform to all representations, warranties or other provisions in the Loan Documents relating to Credit Card Receivables;

(i) Credit Card Receivables which are evidenced by "chattel paper" or an "instrument" of any kind unless such "chattel paper" or "instrument" is in the possession of the Agent, and to the extent necessary or appropriate, endorsed to the Agent; or

(j) Credit Card Receivables which the Agent determines in its discretion to be uncertain of collection or which do not meet such other reasonable eligibility criteria for Credit Card Receivables as the Agent may determine.

"Eligible In-Transit Inventory" means, as of any date of determination thereof, without duplication of other Eligible Inventory, In-Transit Inventory that, except as set forth in the proviso below, is set forth in the Borrower's stock ledger and which meets the following criteria:

(a) such In-Transit Inventory has been shipped from a foreign location for receipt by the Borrower, but which has not yet been delivered to the Borrower, which In-Transit Inventory has been in transit for forty-five (45) days or less from the date of shipment of such Inventory;

(b) the purchase order for such In-Transit Inventory is in the name of the Borrower and title and risk of loss has passed to the Borrower;

(c) an Acceptable Document of Title has been issued for such In-Transit Inventory, and in each case as to which the Agent has control (as defined in the UCC) over the documents of title which evidence ownership of the subject Inventory;

(d) the Loan Parties have delivered to the Agent a Customs Broker/Carrier Agreement with all customs brokers, freight forwarders and other carriers in possession of such In-Transit Inventory;

(e) such In-Transit Inventory is insured to the reasonable satisfaction of the Agent (including, without limitation, marine cargo insurance);

(f) such In-Transit Inventory would otherwise would constitute Eligible Inventory; and

(g) the Foreign Vendor with respect to such In-Transit Inventory is an Approved Foreign Vendor;

provided that an amount of up to $250,000 of In-Transit Inventory set forth in the Borrower's general ledger and shipped from locations other than China may be included as Eligible In-Transit Inventory so long as such In-Transit Inventory otherwise meets the criteria set forth in clauses (a) through (h) above, and provided further that the Agent may, in its discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Agent determines that such Inventory is subject to any Person's right of reclamation, repudiation, stoppage in transit or any event has occurred or is reasonably anticipated by the Agent to arise which may otherwise adversely impact the value of such Inventory or the ability of the Agent to realize upon such Inventory.

"Eligible Inventory" means, as of the date of determination thereof, without duplication, (i) Eligible In-Transit Inventory and (ii) items of Inventory of the Borrower set forth in the stock ledger of the Borrower that are finished goods, merchantable and readily saleable to the public in the ordinary course of the Borrower's business deemed by the Agent in its discretion to be eligible for inclusion in the calculation of the Borrowing Base, in each case that, except as otherwise agreed by the Agent, (A) complies with each of the representations and warranties respecting Inventory made by the Borrower in the Loan Documents, and (B) is not excluded as ineligible by virtue of one or more of the criteria set forth below. Except as otherwise agreed by the Agent, in its discretion, the following items of Inventory shall not be included in Eligible Inventory:

(a) Inventory that is not solely owned by the Borrower or the Borrower does not have good and valid title thereto free and clear of any Lien (other than Liens granted to the Agent pursuant to the Security Documents);

(b) Inventory that is leased by or is on consignment to the Borrower or which is consigned by the Borrower to a Person which is not a Loan Party;

(c) Inventory (other than Eligible In-Transit Inventory) that is not located in the United States of America (excluding territories or possessions of the United States) at a location that is owned or leased by the Borrower, except (i) Inventory in transit between such owned or leased locations, or (ii) to the extent that the Borrower has furnished the Agent with (A) any UCC financing statements or other documents that the Agent may determine to be necessary to perfect its security interest in such Inventory at such location, and (B) a Collateral Access Agreement executed by the Person owning any such location;

(d) Inventory that is located in a distribution center leased by the Borrower unless the applicable lessor has delivered to the Agent a Collateral Access Agreement;

(e) Inventory that is comprised of goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor, (iii) are

obsolete, or custom items, work-in-process, raw materials, or that constitute samples, spare parts, promotional, marketing, labels, bags and other packaging and shipping materials or supplies used or consumed in the Borrower's business, (iv) are seasonal in nature and which have been packed away for sale in the subsequent season, (v) not in compliance with all standards imposed by any Governmental Authority having regulatory authority over such Inventory, its use or sale, or (vi) are bill and hold goods;

(f) Inventory that is not subject to a perfected first priority security interest in favor of the Agent;

(g) Inventory that is not insured in compliance with the provisions of Section 5.10

(h) Inventory that has been sold but not yet delivered or as to which the Borrower has accepted a deposit; or

(i) Inventory that is subject to any licensing, patent, royalty, trademark, trade name or copyright agreement with any third party from which the Borrower or any of its Subsidiaries has received written notice of a bona fide dispute in respect of any such agreement.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, obligation, damage, loss, claim, action, suit, judgment, order, fine, penalty, fee, expense, or cost, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal or presence of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equipment" has the meaning set forth in the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member

or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Tax Code (and Sections 414(m) and (o) of the Tax Code for purposes of provisions relating to Section 412 of the Tax Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 8.01. An Event of Default shall be deemed to be continuing unless and until that Event of Default has been duly waived as provided in Section 10.01 hereof.

"Excluded Taxes" means, with respect to the Agent, any Lender, the L/C Issuer or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which any Loan Party is located and (c) any United States federal, state or local backup withholding tax, and (d) any United States federal withholding tax imposed under FATCA.

"Executive Order" has the meaning set forth in Section 10.17.

"Existing Agent" has the meaning set forth in the recitals.

"Existing Credit Agreement" has the meaning set forth in the recitals.

"Existing Letters of Credit" means those letters of credit identified on Schedule 1.03 which were issued by Bank of America, N.A.

"Exit Financing Commitment Letter" means that certain letter agreement dated November 2, 2012 between the Borrower and Salus attached hereto as Exhibit H.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, indemnity payments, any purchase price adjustments and the release by Bank of America, N.A. of any of the BANA Collateral.

"Facility Guaranty" means any Guaranty made by a Guarantor in favor of the Agent and the other Credit Parties, in form reasonably satisfactory to the Agent.

"FATCA" means Sections 1471 through 1474 of the Tax Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%), as determined by the Agent, charged to such reference bank(s) as the Agent may determine on such day on such transactions.

"Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal or seek leave to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Fiscal Year" means any period of 52/53 consecutive weeks ending on or about the last Saturday in January of any calendar year as determined in accordance with the customary retail accounting calendar.

"Foreign Asset Control Regulations" has the meaning set forth in Section 10.17.

"Foreign Vendor" means a Person that sells In-Transit Inventory to the Borrower.

"Foreign Vendor Agreement" means an agreement between a Foreign Vendor and the Agent in form and substance reasonably satisfactory to the Agent and pursuant to which, among

other things, the parties shall agree upon their relative rights with respect to In-Transit Inventory of the Borrower purchased from such Foreign Vendor.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fronting Fee" has the meaning assigned to such term in Section 2.03(j).

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means each Subsidiary of the Borrower that shall be required to execute and deliver a Facility Guaranty pursuant to Section 6.11.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"High Appraised Value" means the highest end of the range of Appraised Value set forth in an appraisal provided to the Agent for the purpose of calculating Appraised Value.

"Honor Date" means the date of any payment by any L/C Issuer under a Letter of Credit.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b) the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c) net obligations of such Person under any Swap Contract;

(d) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(e) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f) all Attributable Indebtedness of such Person;

(g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person (including, without limitation, Disqualified Stock), or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Intellectual Property" means all present and future: trade secrets, know-how and other proprietary information; trademarks, trademark applications, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights and copyright applications; (including copyrights for computer programs) and all tangible and intangible property embodying the copyrights, unpatented inventions (whether or not patentable); patents and patent applications; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Interest Payment Date" means, as to any Loan, the first Business Day of each month and the Termination Date.

"Interest Period" means, as to each Loan, the period commencing on the first day of each calendar month and ending on the last day of such calendar month, provided that no Interest Period shall extend beyond the Termination Date.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Borrower's and/or its Subsidiaries' internal controls over financial reporting.

"In-Transit Inventory" means Inventory of the Borrower which is in the possession of a common carrier and is in transit from a Foreign Vendor of the Borrower from a location outside of the continental United States to a location of the Borrower that is within the continental United States.

"Inventory" has the meaning given that term in the UCC, and shall also include, without limitation, all: (a) goods which (i) are leased by a Person as lessor, (ii) are held by a Person for sale or lease or to be furnished under a contract of service, (iii) are furnished by a Person under a contract of service, or (iv) consist of raw materials, work in process, or materials used or

consumed in a business; (b) goods of said description in transit; (c) goods of said description which are returned, repossessed or rejected; and (d) packaging, advertising, and shipping materials related to any of the foregoing.

"Inventory Liquidation" means the disposition of Borrower's Inventory at approximately 150 Stores (including a put right for Inventory at the remaining 63 Stores) pursuant to the Bankruptcy Court's order dated November 8, 2012 granting the Store Closing Program Motion.

"Inventory Liquidation Payment" means the second installment of the proceeds of the Inventory Liquidation, to the extent secured by the Guaranty L/C (under, and as defined in the the Agency Agreement).

"Inventory Reserves" means such reserves as may be established from time to time by the Agent in its discretion with respect to the determination of the saleability, at retail, of the Eligible Inventory, which reflect such other factors as affect the market value of the Eligible Inventory or which reflect claims and liabilities that the Agent determines will need to be satisfied in connection with the realization upon the Inventory. Without limiting the generality of the foregoing, Inventory Reserves may, in the Agent's discretion, include (but are not limited to) reserves based on:

        (a)      Obsolescence;

        (b)      Seasonality;

        (c)      Shrink;

        (d)      Imbalance;

        (e)      Change in Inventory character;

        (f)      Change in Inventory composition;

        (g)      Change in Inventory mix;

        (h)      Mark-downs (both permanent and point of sale);

        (i)      Retail mark-ons and mark-ups inconsistent with prior period practice and performance, industry standards, current business plans or advertising calendar and planned advertising events; and

        (j)      Out-of-date and/or expired Inventory.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) any Acquisition. For purposes of covenant compliance, the amount of any Investment shall be the

amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"ISP" means, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" means with respect to any Letter of Credit, the Letter Credit Application, the Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and any other document, agreement and instrument entered into by the applicable L/C Issuer and a Borrower (or any Subsidiary thereof) or in favor of the applicable L/C Issuer and relating to any such Letter of Credit.

"Joinder Agreement" means an agreement, in form reasonably satisfactory to the Agent pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Guarantor, as the Agent may determine.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"L/C Credit Extension" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the increase of the amount thereof.

"L/C Issuer" means collectively, (a) Salus, (b) Bank of America, N.A. in its capacity as issuer of the Existing Letters of Credit, (c) any other financial institution that, with the consent of the Agent (and subject to such financial institution's entry into agreements reasonably satisfactory to the Agent), agrees to become an L/C Issuer for the purpose of issuing Letters of Credit hereunder, and (d) any successor issuer of Letters of Credit hereunder (which successor may only be a Revolving Lender selected by the Agent in its discretion). Any L/C Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such L/C Issuer and/or for such Affiliate to act as an advising, transferring, confirming and/or nominated bank in connection with the issuance or administration of any such Letter of Credit, in which case the term "L/C Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"L/C Obligations" means, as at any date of determination, the aggregate undrawn amount available to be drawn under all outstanding Letters of Credit. For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with Section 1.06. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be

drawn thereunder by reason of the operation of any "rule" under the ISP or any article of UCP 600, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lease" means any agreement, whether written or oral, no matter how styled or structured, pursuant to which a Loan Party is entitled to the use or occupancy of any real property for any period of time.

"Leasehold Sale Motion" means (i) that certain motion filed by the Borrower in the Bankruptcy Case on November 6, 2012, pursuant to which the Borrower sought permission from the Bankruptcy Court to assign certain Leases or to sell the Designation Rights thereto and (ii) any other motion filed by the Borrower in the Bankruptcy Case relating to the disposition of all or any portion of such Leases or the Designation Rights thereto by another means.

"Lender" means, individually, a Revolving Lender or a Term Lender, and collectively, all such persons.

"Lending Office" means, as to any Lender, the office or offices as such Lender may from time to time notify the Borrower and the Agent.

"Letter of Credit" means each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder and shall include any Existing Letters of Credit.

"Letter of Credit Application" means an application for the issuance or amendment of a Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"Letter of Credit Expiration Date" means the day that is seven days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"Letter of Credit Sublimit" means an amount equal to $500,000.00. The Letter of Credit Sublimit is part of, and not in addition to, the Aggregate Revolving Commitments. A permanent reduction of the Aggregate Revolving Commitments shall not require a corresponding pro rata reduction in the Letter of Credit Sublimit; provided, however, that if the Aggregate Revolving Commitments are reduced to an amount less than the Letter of Credit Sublimit, then the Letter of Credit Sublimit shall be reduced to an amount equal to (or, at Borrower's option, less than) the Aggregate Revolving Commitments.

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale, Capital Lease Obligation, Synthetic Lease Obligation, or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquidation" means the exercise by the Agent of those rights and remedies accorded to the Agent under the Loan Documents and applicable Laws as a creditor of the Loan Parties with

respect to the realization on the Collateral, including (after the occurrence and during the continuation of an Event of Default) the conduct by the Loan Parties acting with the consent of the Agent, of any public, private or "going-out-of-business", "store closing" or other similar sale or any other disposition of the Collateral for the purpose of liquidating the Collateral. Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Loan" means an extension of credit by a Lender to the Borrower under Article II.

"Loan Account" has the meaning assigned to such term in Section 2.09.

"Loan Cap" means, at any time of determination, the lesser of (a) the Aggregate Revolving Commitments and (b) the Borrowing Base.

"Loan Documents" means this Agreement, each Note, each Issuer Document, all Borrowing Base Certificates, the Security Documents, the Facility Guaranty, the Subordination Agreements and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"Loan Notice" means a notice of a Revolving Credit Borrowing, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Low Appraised Value" means the lowest end of the range of Appraised Value set forth in an appraisal provided to the Agent for the purpose of calculating Appraised Value.

"Low Selling Period" means (a) the months of January, February, June, July, August and September and/or (b) any other month deemed to be within such period in the appraisal provided to the Agent for the purpose of calculating Appraised Value.

"Madden Subordinated Indebtedness" means the Indebtedness described on Schedule 1.02 hereto owing by the Loan Parties to Steve Madden Ltd. and its affiliates, which Indebtedness is expressly subordinated in right of payment to the prior payment in full of the Obligations pursuant to the Madden Subordination Agreement and the Borrowing Order.

"Madden Subordination Agreement" means the Subordination Agreement dated as of June 13, 2012 by and among the Agent (as successor to the Existing Agent), the Loan Parties and Steve Madden Ltd., with respect to the Madden Subordinated Indebtedness.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of any Loan Party or the Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party; or (c) a material impairment of the rights and remedies of the Agent or the Lenders under any Loan Document or a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party. In determining whether any individual event would result in a Material

Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other than existing events would result in a Material Adverse Effect; provided that a "Material Adverse Effect" shall not be deemed to exist as a result of the Effect of Bankruptcy or the events leading up to and resulting therefrom.

"Material Contract" means, with respect to any Person, each contract to which such Person is a party material to the business, condition (financial or otherwise), operations, performance or properties of such Person.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties in an aggregate principal amount exceeding $500,000. For purposes of determining the amount of Material Indebtedness at any time, (a) undrawn committed or available amounts shall be included, and (b) all amounts owing to all creditors under any combined or syndicated credit arrangement shall be included. Without limiting the foregoing, the Subordinated Indebtedness shall at all times be deemed "Material Indebtedness" hereunder.

"Maturity Date" means the date which is twelve (12) months following the Restatement Date.

"Maximum Rate" has the meaning provided therefor in Section 10.09.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Proceeds" means (a) with respect to any Disposition by any Loan Party or any of its Subsidiaries (including the Inventory Liquidation), or any Extraordinary Receipt received or paid to the account of any Loan Party or any of its Subsidiaries, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such transaction (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable and customary out-of-pocket expenses incurred by such Loan Party or such Subsidiary in connection with such transaction (including, without limitation, appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party to third parties (other than Affiliates)) and (C) with respect to a Disposition pursuant to the Leasehold Sale Motion, amounts necessary to cure defaults pursuant to Section 365(b) of the Bankruptcy Code (other than such amounts that are assumed by the assignee or purchaser); and

(b)     with respect to the sale or issuance of any Equity Interest by any Loan Party or any of its Subsidiaries, or the incurrence or issuance of any Indebtedness by any Loan Party or

any of its Subsidiaries, the excess of (i) the sum of the cash and cash equivalents received in connection with such transaction over (ii) the underwriting discounts and commissions, and other reasonable and customary out-of-pocket expenses, incurred by such Loan Party or such Subsidiary in connection therewith.

"Non-Extension Notice Date" has the meaning specified in Section 2.03(b)(iii).

"Note" means (a) a Revolving Note or (b) a Term Note, as each may be amended, restated, supplemented or modified from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means all advances to, and debts (including principal, interest, fees, costs, and expenses), liabilities, obligations, covenants, indemnities, and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit (including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide cash collateral therefor), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity, and (d) in each case, all shareholder or other equity holder agreements, voting trusts and similar arrangements to which such Person is a party or which is applicable to its Equity Interests and all other arrangements relating to the Control or management of such Person.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"Outstanding Amount" means (i) with respect to Revolving Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Loans occurring on such date; and (ii) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date.

"Overadvance" means a Credit Extension to the extent that, immediately after its having been made, Availability is less than zero.

"Participant" has the meaning specified in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Disposition" means any of the following:

(a) dispositions of Inventory in the ordinary course of business;

(b) bulk sales or other dispositions of Inventory in connection with store closings pursuant to the Store Closing Program Motion, at arm's length;

(c) dispositions pursuant to the Leasehold Sale Motion;

(d) non-exclusive licenses of Intellectual Property of a Loan Party or any of its Subsidiaries in the ordinary course of business;

(e) licenses for the conduct of licensed departments within the Loan Parties' Stores in the ordinary course of business; provided that, if requested by the Agent, the Agent shall have entered into an intercreditor agreement with the Person operating such licensed department on terms and conditions reasonably satisfactory to the Agent;

(f) Sales, transfers and dispositions among the Loan Parties or by any Subsidiary to a Loan Party; and

(g) Sales, transfers and dispositions by any Subsidiary which is not a Loan Party to another Subsidiary that is not a Loan Party.

"Permitted Encumbrances" means:

(a) Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 6.04;

(b) Carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by applicable Laws, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days or are being contested in compliance with Section 6.04;

(c) Pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(d) Deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e) Liens in respect of judgments that would not constitute an Event of Default hereunder;

(f) Easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property;

(g) Liens existing on the Restatement Date listed on Schedule 7.01;

(h) Liens on fixed or capital assets of any Loan Party which secure Indebtedness permitted under clauses (e) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within ninety (90) days after such acquisition, (ii) the Indebtedness secured thereby does not exceed the cost of acquisition of the applicable assets, and (iii) such Liens shall attach only to the assets acquired or refinanced with such Indebtedness and shall not extend to any other property or assets of the Loan Parties;

(i) Liens in favor of the Agent under the Loan Documents and Landlords' and lessors' statutory Liens in respect of rent not in default beyond any applicable notice and cure period;

(k) Possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the Restatement Date and other Permitted Investments, <u>provided</u> that such liens (a) attach only to such Investments and (b) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(1) Liens arising solely by virtue of any statutory or common law provisions relating to banker's Liens, Liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m) Liens arising from precautionary UCC filings regarding "true" operating leases or, to the extent permitted under the Loan Documents, the consignment of goods to a Loan Party;

(n) Liens in favor of Bank of America, N.A. on cash collateral (the "BANA Collateral") in an amount not to exceed 105% of the stated amount of letters of credit issued by Bank of America, N.A. which remain outstanding after the Restatement Date;

(o) Liens in favor of customs and revenues authorities imposed by applicable Laws arising in the ordinary course of business in connection with the importation of goods and securing obligations (i) that are not overdue by more than thirty (30) days, or (ii)(A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation; and

(p) Liens authorized by the Bankruptcy Court's order granting the Store Closing Program Motion.

"Permitted Indebtedness" means each of the following:

(a) Indebtedness outstanding on the Restatement Date listed on Schedule 7.03;

(b) the Affiliate Subordinated Indebtedness, provided that such Indebtedness shall at all times be subject to the Affiliate Subordination Agreement and the Borrowing Order;

(c) the Madden Subordinated Indebtedness, provided that such Indebtedness shall at all times be subject to the Madden Subordination Agreement and the Borrowing Order;

(d) Indebtedness of any Loan Party to any other Loan Party;

(e) Contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business in connection with the construction or improvement of Stores; and

(f) the Obligations.

"Permitted Investments" means each of the following:

(a) readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof;

(b) commercial paper issued by any Person organized under the laws of the United States of America, any state thereof or the District of Columbia and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c)     time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (b) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(d)     Investments, classified in accordance with GAAP as current assets of the Loan Parties, in any money market fund or mutual fund maintained with Stifel, Nicolaus & Company, Incorporated pursuant to Section 6.20(b) hereof;

(e)     Investments existing on the Restatement Date set forth on Schedule 7.02, but not any increase in the amount thereof (other than as a result of any increase in market value thereof) or any other modification of the terms thereof effected by a Loan Party or its Subsidiaries;

(f)     (i) Investments by any Loan Party and its Subsidiaries in their respective Subsidiaries outstanding on the Restatement Date, (ii) additional Investments by any Loan Party and its Subsidiaries in Loan Parties, and (iii) additional Investments by Subsidiaries of the Loan Parties that are not Loan Parties in other Subsidiaries that are not Loan Parties;

(g)     Guarantees constituting Permitted Indebtedness; and

(h)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business.

provided, however, that notwithstanding the foregoing, no such Investments specified in clauses (a) through (c) shall be permitted unless no Loans are then outstanding, and such Investments shall be pledged to the Agent as additional collateral for the Obligations pursuant to such agreements as may be reasonably required by the Agent.

"Permitted Overadvance" means an Overadvance made by the Agent, in its discretion, which:

(a)     is made to maintain, protect or preserve the Collateral and/or the Credit Parties' rights under the Loan Documents or which is otherwise for the benefit of the Credit Parties; or

(b)     is made to enhance the likelihood of, or to maximize the amount of, repayment of any Obligation;

(c)     is an Unintentional Overadvance; or

(d) is made to pay any other amount chargeable to any Loan Party hereunder.

provided however, that the foregoing shall not result in any claim or liability against the Agent (regardless of the amount of any Overadvance) for Unintentional Overadvances and such Unintentional Overadvances shall not reduce the amount of Permitted Overadvances allowed hereunder; provided further that in no event shall the Agent make an Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions would exceed the Aggregate Revolving Commitments (as in effect prior to any termination of the Revolving Commitments pursuant to Section 2.05 hereof).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"Petition Date" has the meaning provided in the recitals to this Agreement.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Plan of Reorganization" means a plan filed in the Chapter 11 Case pursuant to Chapter 11 of the Bankruptcy Code having terms substantially as agreed upon in the Plan Support Term Sheet attached hereto as Exhibit G and otherwise acceptable to the Agent.

"Prepayment Event" means:

(a) any Disposition (including pursuant to a sale and leaseback transaction) of any property or asset of a Loan Party outside of the ordinary course of business; provided, that receipt of proceeds of the Inventory Liquidation (excluding amounts received for reimbursement of Expenses (under and as defined in the Agency Agreement) to the extent payable pursuant to the order of the Bankruptcy Court approving the Agency Agreement) and the receipt of proceeds of the Disposition authorized by the Leasehold Sale Motion shall be deemed to be "Term Loan Prepayment Events";

(b) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of (and payments in lieu thereof), any property or asset of a Loan Party, unless the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Agent;

(c) the issuance by a Loan Party of any Equity Interests, other than any such issuance of Equity Interests (i) to a Loan Party, or (ii) as a compensatory issuance to any employee, director, or consultant (including under any option plan);

(d) the incurrence by a Loan Party of any Indebtedness for borrowed money other than Permitted Indebtedness; or

(e) the receipt by any Loan Party of any Extraordinary Receipts.

"Professional Fees and Expenses" means, subject to any limitations contained in the Borrowing Order, (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930(a)(6), and (b) professional fees of, and costs and expenses incurred by, Case Professionals.

"Real Estate" means all Leases and all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof.

"Register" has the meaning specified in Section 10.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Reported Fee Accruals" shall mean fees, expenses and costs incurred or accrued by the Case Professionals, which amounts shall be reported in arrears by the Borrower to the Agent on a monthly basis.

"Reports" has the meaning provided in Section 9.11(a).

"Request for Credit Extension" means (a) with respect to a Borrowing of Revolving Loans or the Term Loan, a Loan Notice and (b) with respect to an L/C Credit Extension, a Letter of Credit Application and, if required by the applicable L/C Issuer, a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable.

"Required Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the sum of the Aggregate Revolving Commitments and the then aggregate outstanding principal balance of the Term Loan or, if the Aggregate Revolving Commitments and has been terminated pursuant to Section 8.02, Lenders holding in the aggregate more than fifty percent (50%) of the Total Outstandings; provided that the Revolving Commitment of, and the portion in the aggregate of the Total Outstandings held or deemed held by, any Defaulting Lender or Deteriorating Lender shall be excluded for purposes of making a determination of Required Lenders.

"Required Revolving Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the Aggregate Revolving Commitments or, if the commitment of each Revolving Lender to make Revolving Loans has been terminated pursuant to Section 8.02, Lenders holding in the aggregate more than fifty percent (50%) of the Total Revolver Outstandings; provided, that the Revolving Commitment of, and the portion of the Total Revolver Outstandings held or deemed held by, any Defaulting Lender or Deteriorating Lender shall be excluded for purposes of making a determination of Required Revolving Lenders.

"Required Term Lenders" means, as of any date of determination, Lenders holding more than fifty percent (50%) of the then outstanding principal balance of the Term Loan.

“Restatement Date” means November [__], 2012.

“Reserves” means all Inventory Reserves and Availability Reserves. The Agent shall have the right, at any time and from time to time after the Restatement Date in its reasonable discretion to establish, modify or eliminate Reserves.

“Responsible Officer” means the chief executive officer, president or chief financial officer of a Loan Party or any of the other individuals designated in writing to the Agent by an existing Responsible Officer of a Loan Party as an authorized signatory of any certificate or other document to be delivered hereunder. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

“Restricted Payment” means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to such Person’s stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment. Without limiting the foregoing, “Restricted Payments” with respect to any Person shall also include all payments made by such Person with any proceeds of a dissolution or liquidation of such Person.

“Revolving Commitment” means, as to each Revolving Lender, its obligation to make Revolving Loans to the Borrower pursuant to Section 2.01 in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Revolving Lender’s name on Schedule 2.01 or in the Assignment and Assumption pursuant to which the Revolving Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

“Revolving Credit Borrowing” means a borrowing consisting of simultaneous Revolving Loans made by each of the Revolving Lenders pursuant to Section 2.01.

“Revolving Lender” means each Lender having a Revolving Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Assumption by which such Person becomes a Revolving Lender.

“Revolving Loan” has the meaning specified in Section 2.01(b).

“Revolving Note” means a promissory note made by the Borrower in favor of a Revolving Lender evidencing the Revolving Loans made by such Revolving Lender, substantially in the form of Exhibit B-1.

“S&P” means Standard & Poor’s Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

Case 12-49658 Doc 28 Filed 11/20/12 Entered 11/20/12 13:34:13 Main Document
Pg 74 of 156

"Salus" means Salus Capital Partners, LLC and its successors.

"Salus Entity" shall mean Salus or any of its Affiliates.

"Security Agreement" means the Security Agreement dated as of November [16], 2012 among the Loan Parties and the Agent, together with any amendments thereto.

"Security Documents" means the Security Agreement, the Blocked Account Agreements, the Credit Card Notifications and each other security agreement or other instrument or document executed and delivered to the Agent pursuant to this Agreement or any other Loan Document granting a Lien to secure any of the Obligations.

"Settlement Date" has the meaning provided in Section 2.13(a).

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Borrower and its Subsidiaries as of that date determined in accordance with GAAP.

"Shrink" means Inventory which has been lost, misplaced, stolen, or is otherwise unaccounted for.

"Spot Rate" for a currency means the rate determined by the Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Agent may obtain such spot rate from another financial institution designated by the Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit and that (a) is used in lieu or in support of performance guaranties or performance, surety or similar bonds (excluding appeal bonds) arising in the ordinary course of business, (b) is used in lieu or in support of stay or appeal bonds, (c) supports the payment of insurance premiums for reasonably necessary casualty insurance carried by any of the Loan Parties, or (d) supports payment or performance for identified purchases or exchanges of products or services in the ordinary course of business.

"Standby Letter of Credit Agreement" means the Standby Letter of Credit Agreement relating to the issuance of a Standby Letter of Credit in the form from time to time in use by the applicable L/C Issuer.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Store" means any retail store (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Store Closing Program Motion" means that certain motion filed by the Borrower in the Bankruptcy Case pursuant to which the Borrower sought and obtained approval from the Bankruptcy Court for a sale process under Section 363 of the Bankruptcy Code to close 150 of the Borrower's retail Store locations and liquidate all of the Inventory located at those Stores.

"Subordination Agreements" means, collectively, the Affiliate Subordination Agreement and the Madden Subordination Agreement.

"Subordinated Indebtedness" means, collectively, the Affiliate Subordinated Indebtedness and the Madden Subordinated Indebtedness.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of a Loan Party.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Tax Code" means the Internal Revenue Code of 1986, and the regulations promulgated thereunder, as amended and in effect.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Borrowing" means the borrowing of the Term Loan made by each of the Term Lenders on the Closing Date pursuant to Section 2.01(a).

"Term Commitment" means, as to each Term Lender, its obligation to make a portion of the Term Loan pursuant to Section 2.01(a) in an aggregate principal amount not to exceed the amount set forth opposite such Term Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable. As of the Closing Date, the aggregate amount of Term Commitments is $1,500,000.

"Term Lender" means each Lender having a Term Commitment as set forth on Schedule 2.01 hereto or in the Assignment and Assumption by which such Person becomes a Term Lender, or after the making of the Term Loan, each Lender holding any portion of the Term Loan.

"Term Loan" means the term loan made by the Term Lenders on the Closing Date pursuant to Section 2.01(a).

"Term Loan Maturity Date" means the earlier of (i) the date of completion of the auction contemplated by the Leasehold Sale Motion and (ii) December 22, 2012.

"Term Loan Prepayment Events" means collectively, (a) the receipt of proceeds of the Inventory Liquidation (excluding amounts received for reimbursement of Expenses (under and as defined in the Agency Agreement) to the extent payable pursuant to the order of the Bankruptcy Court approving the Agency Agreement) and (b) the receipt of proceeds of the Disposition authorized by the Leasehold Sale Motion and shall include, for the avoidance of doubt the receipt of the Inventory Liquidation Payment after the Restatement Date.

"Term Note" means a promissory note made by the Borrower in favor of a Term Lender evidencing the Term Loan made by such Term Lender, substantially in the form of Exhibit B-2.

"Termination Date" means the earliest to occur of (i) the Maturity Date (ii) the occurrence of an Event of Default; (iii) the closing of a sale of all or substantially all of the assets of the Borrower pursuant to the provisions of Section 363 of the Bankruptcy Code and (iv) the emergence of the Borrower from Chapter 11 of the Bankruptcy Code.

"Total Outstandings" means the outstanding principal balance of the Term Loan plus the Total Revolver Outstandings.

"Total Revolver Outstandings" means the aggregate Outstanding Amount of all Revolving Loans.

"Trading with the Enemy Act" has the meaning set forth in Section 10.17.

"UCC" or "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UCP 600" means the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce and in effect as of July 1, 2007 (or such later version thereof as may be in effect at the time of issuance).

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unintentional Overadvance" means an Overadvance which, to the Agent's knowledge, did not constitute an Overadvance when made but which has become an Overadvance resulting from changed circumstances beyond the control of the Credit Parties, including, without limitation, a reduction in the Appraised Value of property or assets included in the Borrowing Base, a change in eligibility criteria, Reserves, or a misrepresentation by the Loan Parties.

"United States" and "U.S." mean the United States of America.

**1.02 Other Interpretive Provisions.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c) Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d) Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds (or, in the case of contingent reimbursement obligations with respect to Letters of Credit and any other contingent Obligations, providing Cash Collateralization or other collateral as may be requested by the Agent) of all of the Obligations

(including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations)) other than unasserted contingent indemnification Obligations.

**1.03 Accounting Terms.**

(a) Generally. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b) Changes in GAAP. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

**1.04 Rounding.** Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

**1.05 Times of Day.** Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

**1.06 Letter of Credit Amounts**. Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

## ARTICLE II
## THE COMMITMENTS AND LOANS

**2.01 Loans; Reserves**.

(a) Subject to the terms and conditions set forth herein, each Term Lender severally agrees to make a loan to the Borrower on the Restatement Date in a principal amount

not to exceed the Term Commitment of such Term Lender. Amounts repaid in respect of the Term Loan may not be reborrowed, and upon each Term Lender's making of such Term Loan, the Term Commitment of such Term Lender shall be terminated.

(b) Subject to the terms and conditions set forth herein, each Revolving Lender severally agrees to make loans (each such loan, a "Revolving Loan") to the Borrower from time to time, on any Business Day during the Availability Period on which the Agent's offices are open to conduct business, in an aggregate amount not to exceed at any time outstanding the lesser of (x) the amount of such Lender's Revolving Commitment, or (y) such Lender's Applicable Percentage of the Borrowing Base; subject in each case to the following limitations:

(i) after giving effect to any Revolving Credit Borrowing, the Total Revolver Outstandings shall not exceed the Loan Cap,

(ii) after giving effect to any Revolving Credit Borrowing, the aggregate Outstanding Amount of the Revolving Loans of any Lender shall not exceed the lesser of (A) such Lender's Revolving Commitment and (B) such Revolving Lender's Applicable Percentage of the Borrowing Base, and

(iii) the Outstanding Amount of all L/C Obligations shall not at any time exceed the Letter of Credit Sublimit.

Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01, prepay under Section 2.04, and reborrow Revolving Loans under this Section 2.01.

(c) The advance rates set forth in the Borrowing Base may be increased or decreased by the Agent at any time and from time to time in its reasonable discretion based on the Agent's review of updated field examinations, collateral appraisals or evaluations, historical rates of dilution, changes in chargeoff rates and other like metrics. Each Loan Party consents to any such increases or decreases and acknowledges that decreasing such advance rates or increasing or imposing any Reserves may limit or restrict the amounts available to be borrowed hereunder. The rights of the Agent to increase advance rates hereunder are subject to the provisions of Section 10.01 hereof. The Agent shall use commercially reasonable efforts to notify the Borrower of any increase or decrease in any advance rate or the establishment or modification of any Reserves under this Agreement and shall disclose to the Borrower the basis for any decrease in any advance rate or the establishment or increase of any Reserves; provided that neither the Agent nor any other Credit Party shall have any liability for failure to so notify the Borrower of any such changes (or the basis for any such changes), and any such changes by the Agent shall be effective from the date such changes are made by the Agent regardless of whether or when communicated to the Borrower.

**2.02 Borrowings**.

(a) Each Revolving Credit Borrowing shall be made upon the Borrower's irrevocable written notice to the Agent via a Request for Credit Extension, which notice must be received by the Agent, not later than 12:00 p.m. on the requested day of any Revolving Credit

Borrowing, appropriately completed and signed by a Responsible Officer of the Borrower. Each Request for Credit Extension shall include the most recently submitted Borrowing Base Certificate submitted by the Borrower to the Agent pursuant to Section 6.02(b) and shall specify (i) the requested date of the Revolving Credit Borrowing (which shall be a Business Day), and (ii) the principal amount of Loans to be borrowed.

(b) Following receipt of a Request for Credit Extension, the Agent shall promptly notify each applicable Lender of the amount of its Applicable Percentage of the applicable requested Revolving Loans. Each applicable Lender shall make the amount of its applicable Revolving Loan available to the Agent in immediately available funds at the Agent's Office not later than 2:00 p.m. on the Business Day specified in the applicable Request for Credit Extension. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Borrowing, Section 4.01) and receipt of funds required pursuant to Section 2.13(b) hereof, the Agent shall make all funds so received available to the Borrower in like funds by no later than 4:00 p.m. on the day of receipt by the Agent by wire transfer of such funds, in accordance with instructions provided to the Agent by the Borrower.

(c) The Agent, without the request of the Borrower, may advance any interest, fee, service charge (including direct wire fees), expenses, or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account as a Revolving Loan notwithstanding that an Overadvance may result thereby. The Agent shall advise the Borrower of any such advance or charge promptly after the making thereof. Such action on the part of the Agent shall not constitute a waiver of the Agent's rights and the Borrower's obligations under Section 2.04(a). Any amount which is added to the principal balance of the Loan Account as provided in this Section 2.02(c) shall bear interest at the interest rate then and thereafter applicable to the Revolving Loans.

(d) Reserved.

(e) The Agent, the L/C Issuer and the Lenders shall have no obligation to make any Loan or to provide any Letter of Credit if an Overadvance would result. The Agent may, in its discretion, make Permitted Overadvances without the consent of the Borrower and the Lenders, and the Borrower and the L/C Issuer and each Lender shall be bound thereby. Any Permitted Overadvance may constitute a Loan which shall accrue interest in accordance with Section 2.07(b) hereof, and an Obligation and shall be repaid by the Borrower in accordance with the provisions of Section 2.04(a). The making of any such Permitted Overadvance on any one occasion shall not obligate the Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding. The Agent shall have no liability for, and no Loan Party or Credit Party shall have the right to, or shall, bring any claim of any kind whatsoever against the Agent with respect to Unintentional Overadvances regardless of the amount of any such Overadvance(s).

**2.03 Letters of Credit**

(a) The Letter of Credit Commitment.

(i) Subject to the terms and conditions set forth herein, each L/C Issuer shall (A) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, issue Letters of Credit for the account of the Borrower, and amend or extend Letters of Credit previously issued by it, in accordance with Section 2.03(b) below, and (B) honor drawings under the Letters of Credit; provided, that after giving effect to any L/C Credit Extension with respect to any Letter of Credit and any Revolving Credit Borrowing made in accordance with Section 2.03(g) below, (x) the Total Revolver Outstandings shall not exceed Loan Cap, (y) the aggregate Outstanding Amount of the Revolving Loans of any Revolving Lender shall not exceed such Lender's Revolving Commitment, and (z) the Outstanding Amount of the L/C Obligations shall not exceed the Letter of Credit Sublimit. Each request by the Borrower for the issuance or amendment of a Letter of Credit shall be deemed to be a representation by the Borrower that the L/C Credit Extension so requested complies with the conditions set forth in the proviso to the preceding sentence. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed. All Existing Letters of Credit shall be deemed to have been issued pursuant hereto, and from and after the Closing Date shall be subject to and governed by the terms and conditions hereof.

(ii) No Letter of Credit shall be issued if:

(A) subject to Section (b)(iii), the expiry date of such requested Standby Letter of Credit would occur more than twelve months after the date of issuance or last extension, unless the Required Revolving Lenders have approved such expiry date; or

(B) subject to Section (b)(iii), the expiry date of such requested Commercial Letter of Credit would occur more than 120 days after the date of issuance or last extension, unless the Required Revolving Lenders have approved such expiry date; or

(C) the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless all the Lenders have approved such expiry date.

(iii) No Letter of Credit shall be issued without the prior consent of the Agent if:

(A) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the applicable L/C Issuer from issuing such Letter of Credit, or any Law applicable to the applicable L/C Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the applicable L/C Issuer shall prohibit, or request that the applicable L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in

particular or shall impose upon the applicable L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the applicable L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon the applicable L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Restatement Date and which the applicable L/C Issuer in good faith deems material to it;

        (B)    the issuance of such Letter of Credit would violate one or more policies of the applicable L/C Issuer applicable to letters of credit generally;

        (C)    except as otherwise agreed by the Agent and the applicable L/C Issuer, such Letter of Credit is in an initial Stated Amount less than $25,000, in the case of a Commercial Letter of Credit, or $100,000, in the case of a Standby Letter of Credit;

        (D)    such Letter of Credit is to be denominated in a currency other than Dollars; provided that if the applicable L/C Issuer, with the consent of the Agent, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrower of the honoring of any drawing under such Letter of Credit shall be paid in Dollars based on the Spot Rate; or

        (iv)    The applicable L/C Issuer shall not amend any Letter of Credit if (A) such L/C Issuer would not be permitted at such time to issue such Letter of Credit in its amended form under the terms hereof or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

        (v)    Each L/C Issuer shall have all of the benefits and immunities (A) provided to the Agent in Article IX with respect to any acts taken or omissions suffered by such L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Agent" as used in Article IX. included such L/C Issuer with respect to such acts or omissions, and (B) as additionally provided herein with respect to such L/C Issuer.

        (b)    Procedures for Issuance and Amendment of Letters of Credit.

        (i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to the applicable L/C Issuer (with a copy to the Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of the Borrower.  Such Letter of Credit Application must be received by such L/C Issuer and the Agent not later than 11:00 a.m. at least two Business Days (or such other date and time as the Agent and such L/C Issuer may agree in a particular instance in their sole discretion) prior to the proposed issuance date or date of amendment, as the case may be.  In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the Agent and such L/C Issuer: (A) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (B) the amount thereof; (C) the expiry date thereof; (D) the name and address of the beneficiary thereof; (E) the

documents to be presented by such beneficiary in case of any drawing thereunder; (F) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (G) such other matters as the Agent or such L/C Issuer may require. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the Agent and the applicable L/C Issuer (A) the Letter of Credit to be amended; (B) the proposed date of amendment thereof (which shall be a Business Day); (C) the nature of the proposed amendment; and (D) such other matters as the Agent or such L/C Issuer may require. Additionally, the Borrower shall furnish to the applicable L/C Issuer and the Agent such other documents and information pertaining to such requested Letter of Credit issuance or amendment, and any Issuer Documents (including, if requested by the applicable L/C Issuer, a Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable), as the applicable L/C Issuer or the Agent may require.

(ii)      Promptly after receipt of any Letter of Credit Application, the applicable L/C Issuer will confirm with the Agent (by telephone or in writing) that the Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, such L/C Issuer will provide the Agent with a copy thereof. Unless the applicable L/C Issuer has received written notice from any Lender, the Agent or any Loan Party, at least one Business Day prior to the requested date of issuance or amendment of the applicable Letter of Credit, that one or more applicable conditions contained in Article IV shall not then be satisfied or unless such L/C Issuer would not be permitted, or would have no obligation, at such time to issue such Letter of Credit under the terms hereof (by reason of the provisions of clause (ii) or (iii) of Section 2.03(a) or otherwise), then, subject to the terms and conditions hereof, such L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrower or enter into the applicable amendment, as the case may be, in each case in accordance with such L/C Issuer's usual and customary business practices.

(iii)     If the Borrower so requests in any applicable Letter of Credit Application, the applicable L/C Issuer may, in its sole and absolute discretion, agree to issue a Standby Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit the applicable L/C Issuer to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Standby Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such twelve-month period to be agreed upon at the time such Standby Letter of Credit is issued. Unless otherwise directed by the Agent or the applicable L/C Issuer, the Borrower shall not be required to make a specific request to the Agent or the applicable L/C Issuer for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the applicable L/C Issuer to permit the extension of such Standby Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; provided, however, that the Agent shall instruct the applicable L/C Issuer not to permit any such extension if (A) the applicable L/C Issuer has determined that it would not be permitted, or would have no obligation, at such time to issue such Standby Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the

provisions of clause (ii) or (iii) of Section 2.03(a) or otherwise), or (B) the applicable L/C Issuer has received notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Extension Notice Date (1) from the Agent that the Required Lenders have elected not to permit such extension or (2) from the Agent, any Lender or the Borrower that one or more of the applicable conditions specified in Section 4.02 is not then satisfied, and in each such case directing the applicable L/C Issuer not to permit such extension.

(iv) Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the applicable L/C Issuer will also deliver to the Borrower and the Agent a true and complete copy of such Letter of Credit or amendment.

(c) Drawings. Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the applicable L/C Issuer shall notify the Borrower and the Agent thereof not less than two (2) Business Days prior to the Honor Date; provided, however, that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the applicable L/C Issuer with respect to any such payment. Any notice given by the applicable L/C Issuer or the Agent pursuant to this Section 2.03(c) may be given by telephone if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such telephonic notice.

(d) Reserved.

(e) Obligations Absolute. The obligation of the Borrower to reimburse the applicable L/C Issuer for each drawing under each Letter of Credit shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i) any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other Loan Document;

(ii) the existence of any claim, counterclaim, setoff, defense or other right that the Borrower or any Subsidiary may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the applicable L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii) any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv) any payment by the applicable L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the applicable L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v) any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Borrower or any of its Subsidiaries; or

(vi) the fact that any Default or Event of Default shall have occurred and be continuing.

The Borrower shall promptly examine a copy of each Letter of Credit and each amendment thereto that is delivered to it and, in the event of any claim of noncompliance with the Borrower's instructions or other irregularity, the Borrower will immediately notify the Agent and the applicable L/C Issuer. The Borrower shall be conclusively deemed to have waived any such claim against the applicable L/C Issuer and its correspondents unless such notice is given as aforesaid.

(f) Role of L/C Issuer. Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, the applicable L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the applicable L/C Issuer, the Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the applicable L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; (iii) any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit or any error in interpretation of technical terms; or (iv) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided, however, that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the applicable L/C Issuer, the Agent, any of their respective Related Parties nor any correspondent, participant or assignee of the applicable L/C Issuer shall be liable or responsible for any of the matters described in clauses (i) through (v) of Section 2.03(e) or for any action, neglect or omission under or in connection with any Letter of Credit or Issuer Documents, including, without limitation, the issuance or any amendment of any Letter of Credit, the failure to issue or amend any Letter of Credit, or the honoring or dishonoring of any

demand under any Letter of Credit, and such action or neglect or omission will bind the Borrower; provided, however, that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against the applicable L/C Issuer, and the applicable L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential, exemplary or punitive damages suffered by the Borrower which the Borrower proves were caused by the applicable L/C Issuer's willful misconduct or gross negligence or the applicable L/C Issuer's willful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit; provided, further that any claim against the applicable L/C Issuer by the Borrower for any loss suffered or incurred by the Borrower shall be reduced by an amount equal to the sum of (i) the amount (if any) saved by the Borrower as a result of the breach or other wrongful conduct that allegedly caused such loss, and (ii) the amount (if any) of the loss that would have been avoided had the Borrower taken all reasonable steps to mitigate such loss, including, without limitation, by enforcing their rights against any beneficiary and, in case of a claim of wrongful dishonor, by specifically and timely authorizing the applicable L/C Issuer to cure such dishonor. In furtherance and not in limitation of the foregoing, the applicable L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary (or the applicable L/C Issuer may refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit and may disregard any requirement in a Letter of Credit that notice of dishonor be given in a particular manner and any requirement that presentation be made at a particular place or by a particular time of day), and the applicable L/C Issuer shall not be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason. The applicable L/C Issuer shall not be responsible for the wording of any Letter of Credit (including, without limitation, any drawing conditions or any terms or conditions that are ineffective, ambiguous, inconsistent, unduly complicated or reasonably impossible to satisfy), notwithstanding any assistance the applicable L/C Issuer may provide to the Borrower with drafting or recommending text for any Letter of Credit Application or with the structuring of any transaction related to any Letter of Credit, and the Borrower hereby acknowledges and agrees that any such assistance will not constitute legal or other advice by the applicable L/C Issuer or any representation or warranty by the applicable L/C Issuer that any such wording or such Letter of Credit will be effective. Without limiting the foregoing, the applicable L/C Issuer may, as it deems appropriate, modify or alter and use in any Letter of Credit the terminology contained on the Letter of Credit Application for such Letter of Credit.

(g) Cash Collateral. The Borrower shall immediately Cash Collateralize, with the proceeds of Revolving Loans, the Outstanding Amount of all L/C Obligations with respect to all Letters of Credit upon the issuance thereof. In furtherance thereof, on the date of issuance of each Letter of Credit hereunder the Borrowers shall request a Committed Borrowing to be disbursed on such date in order to Cash Collateralize the Outstanding Amount of all L/C Obligations with respect to such Letter of Credit in accordance with this Section 2.03(g). Sections 2.04(e) and 8.02(c) set forth certain additional requirements to deliver Cash Collateral hereunder. For purposes of this Section 2.03, Section 2.04(e) and Section 8.02(c), "Cash Collateralize" means to pledge and deposit with or deliver to the applicable L/C Issuer, for its benefit, as collateral for the applicable L/C Obligations, cash or deposit account balances in an

amount equal to one hundred percent (100%) of the Outstanding Amount of such L/C Obligations (other than L/C Obligations with respect to Letters of Credit denominated in a currency other than Dollars, which L/C Obligations shall be Cash Collateralized in an amount equal to 105% of the Outstanding Amount of such L/C Obligations), pursuant to documentation in form and substance reasonably satisfactory to the Agent and the applicable L/C Issuer (which documents are hereby Consented to by the Lenders). Cash Collateral shall be maintained in an interest bearing account established with the applicable L/C Issuer. If at any time the Agent or the applicable L/C Issuer determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Agent or the applicable L/C Issuer or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrower will, forthwith upon demand by the Agent, pay to the Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Agent determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse the applicable L/C Issuer and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.

(h)     Applicability of ISP and UCP 600.  Unless otherwise expressly agreed by the applicable L/C Issuer and the Borrower when a Letter of Credit is issued, (i) the rules of the ISP and the UCP 600 shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP 600 shall apply to each Commercial Letter of Credit.

(i)     Reserved.

(j)     Fronting Fee and Documentary and Processing Charges Payable to L/C Issuer.  The Borrower shall pay directly to the applicable L/C Issuer, for its own account, the fronting fee (the "Fronting Fee") specified by the applicable L/C Issuer.  Such Fronting Fees shall be due and payable on the first day after the end of each month, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand.   For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with Section 1.06.  In addition, the Borrower shall pay directly to the applicable L/C Issuer, for its own account, the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the applicable L/C Issuer relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

(k)     Conflict with Issuer Documents.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

**2.04    Prepayments.**

(a)     If for any reason the Total Revolver Outstandings at any time exceed the Loan Cap as then in effect, or if the Total Outstandings exceed the Aggregate Commitments, the Borrower shall immediately prepay the Revolving Loans and Cash Collateralize the L/C Obligations in an amount equal to such excess.  If for any reason the outstanding principal

amount of the Term Loan exceeds 100% of the sum of (i) the highest existing equity bids for the Leases or the Designation Rights pursuant to the Leasehold Sale Motion plus (i) the Inventory Liquidation Payment, in each case to the extent not already applied to the Term Loan hereunder, the Borrower shall immediately prepay the Term Loan in an amount equal to such excess.

(b) The Borrower shall prepay the Loans to the extent required pursuant to the provisions of Section 6.12 hereof.

(c) The Borrower shall prepay the Revolving Loans in an amount equal to the Net Cash Proceeds received by a Loan Party on account of a Prepayment Event and shall prepay the Term Loan in an amount equal to the Net Cash Proceeds received by a Loan Party on account of a Term Loan Prepayment Event.

(d) Upon the expiration of any Letter of Credit, or any reduction in the amount of any Letter of Credit, the Borrower shall immediately prepay the Committed Loans then outstanding with the cash collateral held by the applicable L/C Issuer on account of such Letter of Credit in an amount equal to (i) in the case of the expiration of such Letter of Credit, the aggregate amount of cash collateral held by the applicable L/C Issuer on account of such Letter of Credit prior to giving effect to such prepayment, and (ii) in the case of any reduction in the amount of such Letter of Credit, (A) the aggregate amount of cash collateral held by the applicable L/C Issuer on account of such Letter of Credit prior to giving effect to such prepayment minus (ii) the amount of cash collateral required to cash collateralize the aggregate undrawn amount available to be drawn on such Letter of Credit, after giving effect to the reduction thereof, in accordance with Section 2.03(g).

(e) Prepayments made pursuant to clause (a), (b) or (d) above, first, shall be applied ratably to the outstanding Revolving Loans, and second, shall be used to Cash Collateralize the remaining L/C Obligations (to the extent that any such L/C Obligations are not already Cash Collateralized). Upon the drawing of any Letter of Credit that has been Cash Collateralized, the funds held as Cash Collateral shall be applied (without any further action by or notice to or from the Borrower or any other Loan Party) to reimburse the applicable L/C Issuer or the Lenders, as applicable.

**2.05 Termination or Reduction of Commitments.**

(a) The Borrower may, upon irrevocable notice to the Agent, terminate the Aggregate Revolving Commitments or from time to time permanently reduce the Aggregate Revolving Commitments; provided that (i) any such notice shall be received by the Agent not later than 11:00 a.m. three Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $500,000 in excess thereof, and (iii) the Borrower shall not terminate or reduce (A) the Aggregate Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolver Outstandings would exceed the Aggregate Revolving Commitments, and (B) the Letter of Credit Sublimit if, after giving effect thereto, the Outstanding Amount of L/C Obligations not fully Cash Collateralized hereunder would exceed the Letter of Credit Sublimit. If, after giving effect to any reduction of the Aggregate Revolving Commitments, the Letter of Credit Sublimit exceeds the amount of the Aggregate Revolving

Commitments, the Letter of Credit Sublimit shall be automatically reduced by the amount of such excess.

(b)     The Agent will promptly notify the Lenders of any termination or reduction of the Aggregate Revolving Commitments under this Section 2.05. Upon any reduction of the Aggregate Revolving Commitments, the Revolving Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. If, as a result of such termination or reduction, the Loans hereunder would exceed the Aggregate Revolving Commitments, the Borrower shall contemporaneously with such reduction or termination, prepay a portion of the then outstanding Loans in an amount not less than such excess. All fees (including, without limitation, commitment fees, Early Termination Fees) and interest in respect of the Aggregate Revolving Commitments accrued until the effective date of any termination of the Aggregate Revolving Commitments shall be paid on the effective date of such termination.

(c)     The Term Commitment of each Term Lender shall automatically terminate upon such Term Lender's funding of its portion of the Term Loan, which shall occur no later than the Restatement Date.

**2.06    Repayment of Obligations**.  The Borrower shall repay to the Term Lenders on the Term Loan Maturity Date the aggregate principal amount of the Term Loan outstanding on such date, along with accrued but unpaid interest and all other Obligations outstanding with respect to the Term Loan. The Borrower shall repay to the Lenders on the Termination Date all Obligations outstanding on such date (other than contingent indemnification claims for which a claim has not been asserted).

**2.07    Interest**.

(a)     Subject to the provisions of Section 2.07(b) below, (i) each Revolving Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to 8.0% and (ii) the Term Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to 16.0%.

(b)     (i) If any amount payable under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a rate per annum equal to the Default Rate to the fullest extent permitted by Law.

(ii) If any other Event of Default exists, then the Agent may, and upon the request of the Required Lenders shall, notify the Borrower that all outstanding Obligations shall bear interest retroactively from the date such Default arose or, at the Agent's option in its sole discretion, from the date of such notice, at a rate per annum equal to the Default Rate and such Obligations shall bear interest retroactively from the date such Default arose, or, at the Agent's option in its sole discretion, from the date of such notice, at the Default Rate to the fullest extent permitted by Law.

(iii) Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c) Except as provided in Section 2.07(b)(iii), interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment.

**2.08 Fees.**

(a) Commitment Fee. The Borrower shall pay to the Agent for the account of each Lender in accordance with its Applicable Percentage, a commitment fee equal to 0.75% multiplied by the actual daily amount by which the Aggregate Revolving Commitments exceed the Total Revolver Outstandings during the immediately preceding month. The commitment fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable monthly in arrears on the first Business Day of each month, commencing with the first such date to occur after the Restatement Date, and on the last day of the Availability Period.

(b) Collateral Monitoring Fee. The Borrowers shall pay to the Agent, for the ratable benefit of the Lenders, a fee in the amount of (i) $40,000 per month during the Low Selling Period and (ii) $25,000 per month otherwise (the "Collateral Monitoring Fee"). All Collateral Monitoring Fees payable pursuant to this Section 2.08(b) through the Maturity Date shall be fully earned on the Restatement Date and, once paid, shall not be refundable for any reason whatsoever, and shall be paid monthly on the first day of each calendar month commencing on December 1, 2012; provided that on the Restatement Date, the Borrower shall pay to the Lender an amount equal to $833.33 multiplied by the number of days in the month of November, 2012 remaining as of such date. Any unpaid balance of the Collateral Monitoring Fee outstanding on the Termination Date shall be paid on the Termination Date.

(c) Early Termination Fee. In the event that, prior to the Maturity Date, (i) the Termination Date occurs, for any reason other than the occurrence of the effective date of the Plan of Reorganization, (ii) the Borrower reduces (in whole or in part) the Aggregate Revolving Commitments or (iii) the Term Loan is repaid or reduced (in whole or in part) for any reason other than the occurrence of a Term Loan Prepayment Event or the occurrence of the Term Loan Maturity Date, the Borrower shall pay to the Agent, for the ratable benefit of the Revolving Lenders, a fee (the "Early Termination Fee") in respect of amounts which are or become payable by reason thereof equal to three percent (3.0%) of the sum of (x) the Revolving Commitments then in effect plus (y) the outstanding principal amount of the Term Loan (in each case without regard to any termination thereof), in the case of clause (i) or of the amount of any reduction in the Aggregate Revolving Commitments in the case of clause (ii) or the amount of the Term Loan so repaid or reduced, in the case of clause (iii). All parties to this Agreement agree and acknowledge that the applicable Lenders will have suffered damages on account of the early termination of this Agreement or any portion of the Revolving Commitments or Term Loan and that, in view of the difficulty in ascertaining the amount of such damages, the Early Termination Fee constitutes reasonable compensation and liquidated damages to compensate the Lenders on account thereof.

**2.09 Computation of Interest and Fees.** All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made. For purposes of the calculation of interest on the Loans and the Outstanding Amount, all payments made by or on account of the Borrowers shall be deemed to have been applied to the Loans two (2) Business Days after receipt of such payments by the Agent (as such receipt is determined pursuant to Section 2.11). Each determination by the Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.10 Evidence of Debt.** The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by the Agent (the "Loan Account") in the ordinary course of business. In addition, each Lender may record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Loan from such Lender, each payment and prepayment of principal of any such Loan, and each payment of interest, fees and other amounts due in connection with the Obligations due to such Lender. The accounts or records maintained by the Agent and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Agent in respect of such matters, the accounts and records of the Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Agent, the Borrower shall execute and deliver to such Lender (through the Agent) one or more Notes, which shall evidence such Lender's Loans, in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto. Upon receipt of an affidavit of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrower will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor.

**2.11 Payments Generally; Agent's Clawback.**

(a) General. All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Agent, for the account of the respective Lenders to which such payment is owed, at the Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All other payments received by the Agent shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue and shall be calculated pursuant to Section 2.09. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b) (i) Funding by Revolving Lenders; Presumption by Agent. Unless the Agent shall have received notice from a Lender prior to 12:00 noon on the date of such Revolving Credit Borrowing that such Lender will not make available to the Agent such Lender's share of such Revolving Credit Borrowing, the Agent may assume that such Revolving Lender has made such share available on such date in accordance with Section 2.02, and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Revolving Lender has not in fact made its share of the applicable Borrowing available to the Agent, then the applicable Revolving Lender and the Borrower severally agree to pay to the Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative processing or similar fees customarily charged by the Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Revolving Loans. If the Borrower and such Lender shall pay such interest to the Agent for the same or an overlapping period, the Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Revolving Lender pays its share of the applicable Borrowing to the Agent, then the amount so paid shall constitute such Revolving Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Agent.

(ii) Payments by Borrower; Presumptions by Agent. Unless the Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Agent for the account of any of the Lenders or the applicable L/C Issuer hereunder that the Borrower will not make such payment, the Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable L/C Issuer, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders. or the applicable L/C Issuer, as the case may be, severally agrees to repay to the Agent forthwith on demand the amount so distributed to such Lender or the applicable L/C Issuer, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation. A notice of the Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c) Failure to Satisfy Conditions Precedent. If any Lender makes available to the Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Agent because the conditions to the Loans set forth in Article IV are not satisfied or waived in accordance with the terms hereof (subject to the provisions of the last paragraph of Section 4.02 hereof), the Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans and to make payments hereunder are several and not joint.  The failure of any Lender to make any Loan or to make any payment hereunder on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its applicable Loan or to make its payment hereunder.

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.12    Sharing of Payments by Lenders.**  If any Credit Party shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on, or other amounts with respect to, any of the Obligations resulting in (a) any Revolving Lender's receiving payment of a proportion of the aggregate amount of Obligations in respect of Revolving Loans greater than its pro rata share thereof as provided herein, or (b) a Term Lender receiving payment of a portion of the aggregate amount of Obligations in respect of the Term Loan greater than its pro rata share thereof as provided herein (including as in contravention of the priorities of payment set forth in Section 8.03), then the Credit Party receiving such greater proportion shall (a) notify the Agent of such fact, and (b) purchase (for cash at face value) participations in the Obligations of the other Revolving Lenders or Term Lenders, as applicable, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Credit Parties ratably and in the priorities set forth in Section 8.03, provided that:

(a)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its portion of the Term Loan or its Revolving Loans or subparticipations in L/C Obligations to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

**2.13    Settlement Among Lenders.**

(a)     The amount of each Revolving Lender's Applicable Percentage of outstanding Revolving Loans shall be computed weekly (or more frequently in the Agent's

discretion) and shall be adjusted upward or downward based on all Revolving Loans and repayments of Revolving Loans received by the Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Agent.

(b) The Agent shall deliver to each of the Revolving Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Revolving Loans for the period and the amount of repayments received for the period. As reflected on the summary statement, (i) the Agent shall transfer to each Revolving Lender its Applicable Percentage of repayments, and (ii) each Revolving Lender shall transfer to the Agent (as provided below) or the Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Loans made by each Revolving Lender shall be equal to such Lender's Applicable Percentage of all Revolving Loans outstanding as of such Settlement Date. If the summary statement requires transfers to be made to the Agent by the Revolving Lenders and is received prior to 1:00 p.m. on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 1:00 p.m., then no later than 3:00 p.m. on the next Business Day. The obligation of each Revolving Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Agent. If and to the extent any Revolving Lender shall not have so made its transfer to the Agent, such Revolving Lender agrees to pay to the Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Agent, equal to the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation plus any administrative, processing, or similar fees customarily charged by the Agent in connection with the foregoing.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

### 3.01 Taxes.

(a) Payments Free of Taxes. Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes, provided that if the Borrower shall be required by Law to deduct any Indemnified Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the applicable Credit Party receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with Law.

(b) Indemnification by the Loan Parties. The Loan Parties shall indemnify each Credit Party, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by such Credit Party and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the

amount of such payment or liability delivered to the Borrower by a Credit Party (with a copy to the Agent), or by the Agent on its own behalf or on behalf of any Credit Party, shall be conclusive absent manifest error.

(c)     Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes by the Loan Parties to a Governmental Authority, the Borrower shall deliver to the Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(d)     Treatment of Certain Refunds.  If any Credit Party determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this Section, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of such Credit Party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Loan Parties, upon the request of such Credit Party, agree to repay the amount paid over to the Loan Parties (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Credit Party in the event that such Credit Party is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require any Credit Party to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

**3.02    Reserved.**

**3.03    Reserved.**

**3.04    Increased Costs.**

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or any L/C Issuer;

(ii)     subject any Lender or any L/C Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, or any Loan made by it, or change the basis of taxation of payments to such Lender or such L/C Issuer in respect thereof (except for Indemnified Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender or such L/C Issuer); or

(iii)     impose on any Lender or any L/C Issuer any other condition, cost or expense affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any such Loan (or of maintaining its obligation to make any such Loan), or to increase the cost to such L/C Issuer of issuing or maintaining any Letter of Credit (or of maintaining its obligation to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender or such L/C Issuer hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or such L/C Issuer, the Loan Parties will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such L/C Issuer, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender or any L/C Issuer determines that any Change in Law affecting such Lender or such L/C Issuer or any Lending Office of such Lender or such Lender's or such L/C Issuer's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or such L/C Issuer's capital or on the capital of such Lender's or such L/C Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, or the Letters of Credit issued by such L/C Issuer, to a level below that which such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such L/C Issuer's policies and the policies of such Lender's or such L/C Issuer's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender or such L/C Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or such L/C Issuer or such Lender's or such L/C Issuer's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender or a L/C Issuer setting forth the amount or amounts necessary to compensate such Lender or such L/C Issuer or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender or such L/C Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender or any L/C Issuer to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's or such L/C Issuer's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender or a L/C Issuer pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or such L/C Issuer, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such L/C Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.05     Mitigation Obligations.**  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such

Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**3.06 Survival.** All of the Loan Parties' obligations under this Article III shall survive termination of the Aggregate Revolving Commitments and repayment of all other Obligations hereunder.

**3.07 Replacement of Lenders.** If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights (other than its existing rights to payments pursuant to Section 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a) the Borrower shall have paid to the Agent the assignment fee specified in Section 10.06(b);

(b) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d) such assignment does not conflict with any Laws.

## ARTICLE IV
## CONDITIONS PRECEDENT TO LOANS

**4.01 Conditions of Initial Loan.** The obligation of each Lender and each L/C Issuer to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a) The Agent's receipt of the following, each of which shall be originals, telecopies or other electronic image scan transmission (e.g., "pdf" or "tif " via e-mail) (followed

Case 12-49658 Doc 28 Filed 10/31/12 Entered 10/31/12 17:49:19 Main Document
Pg 98 of 156

promptly by originals) unless otherwise specified in form and substance reasonably satisfactory to the Agent:

(i) counterparts of this Agreement each properly executed by a Responsible Officer of the signing Loan Party and the Lenders sufficient in number for distribution to the Agent, each Lender and the Borrower;

(ii) a Revolving Note executed by the Borrower in favor of each Revolving Lender requesting a Revolving Note and a Term Note executed by the Borrower in favor of each Term Lender requesting a Term Note;

(iii) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Agent may require evidencing (A) the authority of each Loan Party to enter into this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party and (B) the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to become a party;

(iv) copies of each Loan Party's Organization Documents and such other documents and certifications as the Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing, in good standing, and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to so qualify in such jurisdiction would not reasonably be expected to have a Material Adverse Effect;

(v) a favorable opinion of Bryan Cave LLP, counsel to the Loan Parties, addressed to the Agent and each Lender, as to such matters concerning the Loan Parties and the Loan Documents as the Agent may reasonably request, including, without limitation, a statement from counsel to the Borrower that the Borrowing Order is in full force and effect and is not then subject to a stay or appeal;

(vi) a certificate of a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.01 and 4.02 have been satisfied, (B) that there has been no event or circumstance since the date of the Audited Financial Statements, other than as a result of the Effect of Bankruptcy, that has had or would be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (C) either that (1) no consents, licenses or approvals are required in connection with the execution, delivery and performance by such Loan Party and the validity against such Loan Party of the Loan Documents to which it is a party, or (2) that all such consents, licenses and approvals have been obtained and are in full force and effect;

(vii) evidence that all insurance required to be maintained pursuant to the Loan Documents and all endorsements in favor of the Agent required under the Loan Documents have been obtained and are in effect;

(viii)   the Security Documents and certificates evidencing any stock being pledged thereunder, together with undated stock powers executed in blank, each duly executed by the applicable Loan Parties;

(ix)   each of the Subordination Agreements, duly executed by all parties thereto, along with copies of the documents evidencing the Subordinated Indebtedness, certified by the Borrower, and all other Loan Documents, each duly executed by the applicable Loan Parties;

(x)   an assignment and assumption from the lenders under the Existing Credit Agreement and a resignation as agent from the Existing Agent, each reasonably satisfactory in form and substance to the Agent, evidencing that the Existing Credit Agreement and the related "Loan Documents" (as defined in the Existing Credit Agreement) has been or concurrently with the Restatement Date are being assigned to the Agent and Lenders;

(xi)   results of searches or other evidence reasonably satisfactory to the Agent (in each case dated as of a date reasonably satisfactory to the Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances and Liens for which termination statements and releases or subordination agreements reasonably satisfactory to the Agent are being tendered concurrently with such extension of credit or other arrangements reasonably satisfactory to the Agent for the delivery of such termination statements, releases and subordinations have been made;

(xii)   (A) all documents and instruments, including Uniform Commercial Code financing statements and the entry of the Borrowing Order, required by law or reasonably requested by the Agent to be filed, registered or recorded to create or perfect the first priority Liens intended to be created under the Loan Documents and a super-priority administrative claim with the priority set forth in the Borrowing Order, and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Agent, (B) the Credit Card Notifications, and Blocked Account Agreements required pursuant to Section 6.12 hereof shall have been obtained, and (C) control agreements with respect to the Loan Parties' securities and investment accounts have been obtained; and

(xiii)   such other assurances, certificates, documents, consents or opinions as the Agent reasonably may require.

(b)   The Agent shall have received and reviewed the Approved Budget, which shall be in form and substance reasonably satisfactory to the Agent.

(c)   The Agent shall have received a Borrowing Order authorizing the execution and delivery of all of the Loan Documents on terms and conditions outlined herein and otherwise reasonably satisfactory to the Agent.

(d)   The Agent shall have received an order of the Bankruptcy Court approving and permitting the continuance of the Borrower's current cash management systems and such order shall be in full force and effect.

(e) The Agent shall have received a Borrowing Base Certificate dated the Restatement Date and executed by a Responsible Officer of the Borrower.

(f) The Agent shall be reasonably satisfied that any financial statements delivered to it and the Lenders fairly present the business and financial condition of the Loan Parties and that there has been no Material Adverse Effect since the date of the Audited Financial Statements other than such events as may be attributable to an Effect of Bankruptcy.

(g) The Agent and the Lenders shall have received and be satisfied with any other information (financial or otherwise) reasonably requested by the Agent.

(h) There shall not be pending any litigation or other proceeding, the result of which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect which is not stayed by the commencement of the Chapter 11 Case.

(i) There shall not have occurred any default of any Material Contract of any Loan Party, other than as a result of the Effect of Bankruptcy, which shall have continued beyond any applicable notice and cure period.

(j) The consummation of the transactions contemplated hereby shall not violate any Law or any Organization Document.

(k) All fees required to be paid to the Agent on or before the Restatement Date shall have been paid in full, and all fees required to be paid to the Lenders on or before the Restatement Date shall have been paid in full.

(l) The Borrower shall have paid all fees, charges and disbursements of counsel to the Agent to the extent invoiced prior to or on the Restatement Date.

(m) The Agent and the Lenders shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(n) No material changes in governmental regulations or policies affecting any Loan Party or any Credit Party shall have occurred prior to the Restatement Date.

**4.02 Conditions to all Loans.** The obligation of each Lender to honor any Request for Credit Extension (including a Loan Notice on the Restatement Date) and each L/C Issuer to issue each Letter of Credit is subject to the following conditions precedent:

(a) The representations and warranties of each Loan Party contained in Article V or in any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Loan, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date, (ii) in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects (after giving effect to such materiality

qualification) and (iii) for purposes of this Section 4.02, the representations and warranties contained in subsection (a) of Section 5.05 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a) and (b), respectively, of Section 6.01.

(b)     No Default or Event of Default shall exist, or would result from such proposed Loan or from the application of the proceeds thereof.

(c)     The Agent and, if applicable, the applicable L/C Issuer shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)     No event or circumstance which would reasonably be expected to result in a Material Adverse Effect shall have occurred other than such events as may be attributable to an Effect of Bankruptcy.

(e)     After giving effect to the Loan or Letter of Credit requested to be made on any such date and the use of proceeds thereof, Availability shall be greater than zero.

Each Loan Notice submitted by the Borrower shall be deemed to be a representation and warranty by the Borrower that the conditions specified in Sections 4.02(a) and (b) and (d) have been satisfied on and as of the date of the applicable Loan. The conditions set forth in this Section 4.02 are for the sole benefit of the Credit Parties but until the Required Revolving Lenders otherwise direct the Agent to cease making Loans and direct each L/C Issuer to cease issuing Letters of Credit, the Lenders will fund their Applicable Percentage of all Loans whenever made, which are requested by the Borrower and which, notwithstanding the failure of the Loan Parties to comply with the provisions of this Article IV, agreed to by the Agent, provided, however, the making of any such Loans shall not be deemed a modification or waiver by any Credit Party of the provisions of this Article IV on any future occasion or a waiver of any rights or the Credit Parties as a result of any such failure to comply.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

To induce the Credit Parties to enter into this Agreement and to make Loans and to issue Letters of Credit hereunder, each Loan Party represents and warrants to the Agent and the other Credit Parties that:

**5.01    Existence, Qualification and Power Each Loan Party.** (a) is a corporation, limited liability company, partnership or limited partnership, duly incorporated, organized or formed, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its incorporation, organization or formation, (b) has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) subject to the entry of the Borrowing Order, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and, where applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except (x) in respect of governmental licenses, permits, authorizations, consents and approvals and (y) in each case referred to in clause (c), to the extent that failure to do so would not reasonably be expected

to have a Material Adverse Effect. Schedule 5.01 annexed hereto sets forth, as of the Restatement Date, each Loan Party's name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

**5.02 Authorization; No Contravention.** Subject to the entry of the Borrowing Order, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party, has been duly authorized by all necessary corporate or other organizational action, and does not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (i) any Material Contract or any Material Indebtedness to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries (except as an Effect of Bankruptcy) or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; (c) result in or require the creation of any Lien upon the assets of any Loan Party (other than Liens in favor of the Agent under the Security Documents and as provided in the Borrowing Order); or (d) violate any Law.

**5.03 Governmental Authorization; Other Consents.** Subject to the entry of the Borrowing Order, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the Liens created under the Security Documents (including the first priority nature thereof) or (b) such as have been obtained or made and are in full force and effect.

**5.04 Binding Effect.** This Agreement has been, and each other Loan Document, when delivered, will have been, duly executed and delivered by each Loan Party that is party thereto. Upon the entry of the Borrowing Order, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**5.05 Financial Statements; No Material Adverse Effect.**

(a) The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all Material Indebtedness and other liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)  Since the date of the Audited Financial Statements, except as an Effect of Bankruptcy, there has been no event or circumstance, either individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(c)  To the best knowledge of the Borrower, no Internal Control Event exists or has occurred since the date of the Audited Financial Statements that has resulted in or would reasonably be expected to result in a misstatement in any material respect, (i) in any financial information delivered or to be delivered to the Agent or the Lenders, (ii) of the Borrowing Base, (iii) of covenant compliance calculations provided hereunder or (iv) of the assets, liabilities, financial condition or results of operations of the Borrower and its Subsidiaries on a Consolidated basis.

**5.06  Litigation.**  Except for the Chapter 11 Case, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) either individually or in the aggregate, if determined adversely, would reasonably be expected to have a Material Adverse Effect.

**5.07  No Default.**  No Loan Party or any Subsidiary is in default beyond any applicable notice and cure period under or with respect to, or party to, any Material Indebtedness except as an Effect of Bankruptcy.  No Default or Event of Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

**5.08  Ownership of Property; Liens.**

(a)  Each of the Loan Parties has good record and marketable title in fee simple to or valid leasehold interests in, all Real Estate necessary or used in the ordinary conduct of its business.  Each of the Loan Parties has good and marketable title to, valid leasehold interests in, or valid licenses to use all personal property and assets material to the ordinary conduct of its business.  The property of the Loan Parties are subject to no Liens, other than Liens permitted by Section 7.01.

(b)  Schedule 5.08(b)(1) sets forth the address of all Real Estate (excluding Leases) that is owned by the Loan Parties, together with a list of the holders of any mortgage or other Lien thereon as of the Restatement Date.  Each Loan Party has good, marketable and insurable fee simple title to the Real Estate owned by such Loan Party or such Subsidiary, free and clear of all Liens, other than Permitted Encumbrances.  Schedule 5.08(b)(2) sets forth the address of all Leases of the Loan Parties, together with the name of each lessor and its contact information with respect to each such Lease as of the Restatement Date.  Each of such Leases is in full force and effect, is not subject to any master lease of the Loan Parties, and the Loan Parties are not in default of the terms thereof.

**5.09  Environmental Compliance.**

(a)     No Loan Party (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     None of the properties currently or formerly owned or operated by any Loan Party is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property; there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or, to the best of the knowledge of the Loan Parties, on any property formerly owned or operated by any Loan Party; there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party; and Hazardous Materials have not been released, discharged or disposed of on any property currently or formerly owned or operated by any Loan Party.

(c)     No Loan Party is undertaking, and no Loan Party has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and all Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party have been disposed of in a manner not reasonably expected to result in material liability to any Loan Party.

**5.10    Insurance.**  The properties of the Loan Parties are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such, with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption, property damage and directors and officers liability insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties operate.  Schedule 5.10 sets forth a description of all insurance maintained by or on behalf of the Loan Parties as of the Restatement Date.  As of the Restatement Date, each insurance policy listed on Schedule 5.10 is in full force and effect and all premiums in respect thereof that are due and payable have been paid.

**5.11    Taxes.**  The Loan Parties have filed all federal, state and other tax returns and reports required to be filed, and have paid all federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings being diligently conducted, for which adequate reserves have been provided in accordance with GAAP, as to which Taxes no Lien has been filed and which contest effectively suspends the collection of the contested obligation and the enforcement of any Lien securing such obligation.  There is no proposed tax assessment against any Loan Party that would, if made, have a Material Adverse Effect.  No Loan Party or any Subsidiary thereof is a party to any tax sharing agreement.

**5.12    ERISA Compliance.**

(a)     Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Tax Code and other Federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Tax Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification.  The Loan Parties and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Tax Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Tax Code has been made with respect to any Plan.  No Lien imposed under the Tax Code or ERISA exists or is likely to arise on account of any Plan.

(b)     There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that would reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or would reasonably be expected to result in a Material Adverse Effect.

(c)     (i)     No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.13    Subsidiaries; Equity Interests.**  As of the Restatement Date, the Loan Parties have no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, which Schedule sets forth the legal name, jurisdiction of incorporation or formation and authorized Equity Interests of each such Subsidiary.  All of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party (or a Subsidiary of a Loan Party) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents.  Except as set forth in Schedule 5.13, there are no outstanding rights to purchase any Equity Interests in any Subsidiary.  As of the Restatement Date, the Loan Parties have no equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13.  All of the outstanding Equity Interests in the Loan Parties have been validly issued, and are fully paid and non-assessable and are owned in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except for those created under the Security Documents.  The copies of the Organization Documents of each Loan Party and each amendment thereto provided pursuant to Section 4.01 are true and correct copies of each such document, each of which is valid and in full force and effect.

**5.14 Margin Regulations; Investment Company Act.**

(a) No Loan Party is engaged or will be engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock. None of the proceeds of the Loans shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock, for the purpose of reducing or retiring any Indebtedness that was originally incurred to purchase or carry any margin stock or for any other purpose that might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulations T, U, or X issued by the FRB.

(b) None of the Loan Parties, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.15 Disclosure.** Each Loan Party has disclosed to the Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect. No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.16 Compliance with Laws.** Each of the Loan Parties is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

**5.17 Intellectual Property; Licenses, Etc.** The Loan Parties own, or possess the right to use, all of the Intellectual Property, licenses, permits and other authorizations that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person. To the best knowledge of the Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon any rights held by any other Person, and no claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

**5.18 Labor Matters.** There are no strikes, lockouts, slowdowns or other material labor disputes against any Loan Party pending or, to the knowledge of any Loan Party,

threatened. The hours worked by and payments made to employees of the Loan Parties comply with the Fair Labor Standards Act and any other applicable federal, state, local or foreign Law dealing with such matters except to the extent that any such violation would not reasonably be expected to have a Material Adverse Effect. No Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Act or similar state Law. All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or properly accrued in accordance with GAAP as a liability on the books of such Loan Party. Except as set forth on Schedule 5.18, no Loan Party is a party to or bound by any collective bargaining agreement, management agreement, employment agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement. There are no representation proceedings pending or, to any Loan Party's knowledge, threatened to be filed with the National Labor Relations Board, and no labor organization or group of employees of any Loan Party has made a pending demand for recognition. There are no complaints, unfair labor practice charges, grievances, arbitrations, unfair employment practices charges or any other claims or complaints against any Loan Party pending or, to the knowledge of any Loan Party, threatened to be filed with any Governmental Authority or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment of any employee of any Loan Party. The consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound.

**5.19 Security Documents.**

(a) The Security Agreement creates in favor of the Agent, for the benefit of the Credit Parties, a legal, valid, continuing and enforceable security interest in the Collateral (as defined in the Security Agreement), the enforceability of which is subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law. The financing statements, releases and other filings are in appropriate form and have been or will be filed in the offices specified in Schedule II of the Security Agreement. Upon such filings and/or the obtaining of "control" (as defined in the UCC), and the entry of the Borrowing Order, the Agent will have a perfected Lien on, and security interest in, to and under all right, title and interest of the grantors thereunder in all Collateral that may be perfected under the UCC (in effect on the date this representation is made) by filing, recording or registering a financing statement or analogous document (including without limitation the proceeds of such Collateral subject to the limitations relating to such proceeds in the UCC) or by obtaining control, in each case prior and superior in right to any other Person, subject in priority to Permitted Liens having priority by operation of applicable Law.

(b) When the Security Agreement (or a short form thereof) is filed in the United States Copyright Office and/or the United States Patent and Trademark Office and when financing statements, releases and other filings in appropriate form are filed in the offices specified on Schedule II of the Security Agreement, and upon entry of the Borrowing Order, the Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of

the applicable Loan Parties in copyrights and related assets constituting Intellectual Property Collateral (as defined in the Security Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Copyright Office and/or the United States Patent and Trademark Office, as applicable, in each case prior and superior in right to any other Person (it being understood that, unless otherwise provided in the Borrowing Order, subsequent recordings in the United States Copyright Office or the United States Patent and Trademark Office may be necessary to perfect a Lien on copyrights, patents or trademarks acquired by the Loan Parties after the Restatement Date).

**5.20    Solvency.**  No transfer of property has been or will be made by any Loan Party and no obligation has been or will be incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of any Loan Party.

**5.21    Deposit Accounts; Credit Card Arrangements.**

(a)    Annexed hereto as Schedule 5.21(a) is a list of all DDAs maintained by the Loan Parties as of the Restatement Date, which Schedule includes, with respect to each DDA (i) the name and address of the depository and (ii) the identification of each Blocked Account Bank.

(b)    Annexed hereto as Schedule 5.21(b) is a list describing all arrangements as of the Restatement Date to which any Loan Party is a party with respect to the processing and/or payment to such Loan Party of the proceeds of any credit card charges and debit card charges for sales made by such Loan Party.

**5.22    Brokers.**  No broker or finder brought about the obtaining, making or closing of the Loans or transactions contemplated by the Loan Documents, and no Loan Party or Affiliate thereof has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

**5.23    Customer and Trade Relations.**  There exists no actual or, to the knowledge of any Loan Party, threatened, termination or cancellation of, or any material adverse modification or change in the business relationship of any Loan Party with any supplier material to its operations, other than as a result of the Effect of Bankruptcy.

**5.24    Material Contracts.**  Schedule 5.24 sets forth all Material Contracts to which any Loan Party is a party or is bound as of the Restatement Date.  The Loan Parties have delivered true, correct and complete copies of such Material Contracts to the Agent on or before the Restatement Date.  The Loan Parties are not in breach or in default in any material respect of or under any Material Contract which shall have continued beyond any applicable notice and cure period, other than as an Effect of Bankruptcy, and have not received any notice of default under, or of the intention of any other party thereto to terminate, any Material Contract.

**5.25    Customs Brokers and Freight Forwarders.**  Schedule 5.25 sets forth all contracts with any customs brokers and freight forwarders to which any Loan Party is a party or

is bound as of the Restatement Date. The Loan Parties have delivered true, correct and complete copies of such contracts to the Agent on or before the Restatement Date.

**5.26 Casualty.** Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted) or any Letter of Credit shall remain outstanding, the Loan Parties shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Subsidiary to:

**6.01 Financial Statements.** Deliver to the Agent:

(a) as soon as available, but in any event within 90 days after the end of each Fiscal Year of the Borrower, a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income or operations, Shareholders' Equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of a registered public accounting firm of nationally recognized standing reasonably acceptable to the Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards; and

(b) as soon as available, but in any event within 30 days after the end of each month, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such month, and the related consolidated statements of income or operations and cash flows for such month, and for the portion of the Borrower's Fiscal Year then ended, setting forth in each case in comparative form the figures for (A) the corresponding month of the previous Fiscal Year and (B) the corresponding portion of the previous fiscal year, all in reasonable detail, certified by a Responsible Officer of the Borrower as fairly presenting the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries as of the end of such month in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

**6.02 Certificates; Other Information.** Deliver to the Agent, in form and detail reasonably satisfactory to the Agent:

(a) concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower, and in the event of any change in generally accepted accounting principles used in the preparation of such financial statements, the Borrower shall also provide a

statement of reconciliation conforming such financial statements to GAAP and (ii) a copy of management's discussion and analysis with respect to such financial statements;

(b) by no later than 12 p.m. on each Business Day, a Borrowing Base Certificate showing the Borrowing Base as of the end of the immediately preceding Business Day (provided that Eligible Inventory shall only be required to be updated on the first Business Day of each week to reflect inventory levels as of the immediately preceding Saturday, and Eligible Credit Card Receivables shall only be required to be updated on the third Business Day of each week to reflect amounts received as of the immediately preceding Saturday, and provided further that certain reserves shall be updated on a monthly basis in accordance with the agreement of the parties hereto), each Borrowing Base Certificate to be certified as complete and correct by a Responsible Officer of the Borrower and accompanied by all applicable system generated documentation supporting the information contained within the Borrowing Base Certificate, including but not limited to inventory reporting inclusive of inventory mix by category and/or department and, where applicable, accounts receivable detail documentation and any additional documentation reasonably requested by the Agent;

(c) promptly upon receipt, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by its accountants in connection with the accounts or books of the Loan Parties or any Subsidiary, or any audit of any of them, including, without limitation, specifying any Internal Control Event;

(d) promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Loan Parties, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934 or with any national securities exchange;

(e) The financial and collateral reports described on Schedule 6.02(e) hereto, at the times set forth in such Schedule;

(f) as soon as available, but in any event within 30 days after the end of each Fiscal Year of the Loan Parties, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Agent, or any Lender through the Agent, may reasonably specify;

(g) promptly after the Agent's request therefor, copies of all Material Contracts and documents evidencing Material Indebtedness (to the extent such Material Contracts and documents are not available on EDGAR);

(h) on Tuesday of each week commencing with the first (1st) week after the Restatement Date, a variance report showing the Borrower's actual performance compared to the Approved Budget for the immediately preceding week, on a four-week rolling basis and on a cumulative basis on and after the Restatement Date, and projected results for the subsequent 13 week period, in form and substance reasonably acceptable to the Agent; and

(i)    promptly, such additional information regarding the business affairs, financial condition or operations of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Agent or any Lender may from time to time reasonably request.

The Loan Parties hereby acknowledge that the Agent will make available to the Lenders and each L/C Issuer materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "Borrower Materials").

**6.03    Notices.**

(a)    Promptly notify the Agent of (i) the occurrence of any Default or Event of Default, (ii) any matter that has resulted or would reasonably be expected to result in a Material Adverse Effect, (iii) any breach or non-performance of, or any default under, a Material Contract or with respect to Material Indebtedness of any Loan Party or any Subsidiary thereof, (iv) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority; or the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws, (v) the occurrence of any ERISA Event, (vi) any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof, (vii) any change in any Loan Party's senior executive officers, (viii) the discharge by any Loan Party of its present registered public accounting firm or any withdrawal or resignation by such accountants, (ix) any collective bargaining agreement or other labor contract to which a Loan Party becomes a party, or the application for the certification of a collective bargaining agent, (x) any new customs broker, freight forwarder or carrier used by any Loan Party, together with a copy of the contract entered into by and between such customs broker, freight forwarder or carrier and any Loan Party, (xi) the filing of any Lien for unpaid Taxes against any Loan Party, (xii) any modifications of or amendments to any documents governing Subordinated Indebtedness or any Material Contract, (xiii) any modifications or amendments to Leases increasing rent or other amounts due or due dates for payment thereof, or (xiv) any casualty or other insured damage to any material portion of the Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the Collateral is damaged or destroyed; and

(b)    Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

**6.04    Payment of Obligations.**  To the extent permitted under the Chapter 11 Case and the Borrowing Order, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators, and carriers) which, if unpaid, would by Law become a Lien upon its property; and (c) all Material Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness, except, in each case,

where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (d) no Lien has been filed with respect thereto and (e) the failure to make payment pending such contest would not reasonably be expected to result in a Material Adverse Effect. Nothing contained herein shall be deemed to limit the rights of the Agent with respect to determining Reserves pursuant to this Agreement.

**6.05 Preservation of Existence, Etc.** (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization or formation except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its Intellectual Property, except to the extent such Intellectual Property is no longer used or useful in the conduct of the business of the Loan Parties.

**6.06 Maintenance of Properties.** (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

**6.07 Maintenance of Insurance.**

(a) Maintain with financially sound and reputable insurance companies reasonably acceptable to the Agent and not Affiliates of the Loan Parties, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business and operating in the same or similar locations or as is required by Law, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons and as are reasonably acceptable to the Agent.

(b) Maintain for themselves and their Subsidiaries, a Directors and Officers insurance policy, and a "Blanket Crime" policy including employee dishonesty, forgery or alteration, theft, disappearance and destruction, robbery and safe burglary, property, and computer fraud coverage with responsible companies in such amounts as are customarily carried by business entities engaged in similar businesses similarly situated, and will upon request by the Agent furnish the Agent certificates evidencing renewal of each such policy.

(c) Cause fire and extended coverage policies maintained with respect to any Collateral to be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to Real Estate) and lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Agent, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan

Parties, Credit Parties or any other Person shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(d)      Cause commercial general liability policies to be endorsed to name the Agent as an additional insured.

(e)      Cause business interruption policies to name the Agent as a loss payee and to be endorsed or amended to include (i) a provision that, from and after the Restatement Date, the insurer shall pay all proceeds otherwise payable to the Loan Parties under the policies directly to the Agent, (ii) a provision to the effect that none of the Loan Parties, the Agent, the Agent or any other party shall be a co-insurer and (iii) such other provisions as the Agent may reasonably require from time to time to protect the interests of the Credit Parties.

(f)      Cause each such policy referred to in this Section 6.07 to also provide that it shall not be canceled, modified or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Agent (giving the Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than thirty (30) days' prior written notice thereof by the insurer to the Agent.

(g)      Deliver to the Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent, including an insurance binder) together with evidence reasonably satisfactory to the Agent of payment of the premium therefor.

(h)      Permit any representatives that are designated by the Agent to inspect the insurance policies maintained by or on behalf of the Loan Parties and to inspect books and records related thereto and any properties covered thereby.

None of the Credit Parties, or their agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.07.  Each Loan Party shall look solely to its insurance companies or any other parties other than the Credit Parties for the recovery of such loss or damage and such insurance companies shall have no rights of subrogation against any Credit Party or its agents or employees.  If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then the Loan Parties hereby agree, to the extent permitted by law, to waive their right of recovery, if any, against the Credit Parties and their agents and employees.  The designation of any form, type or amount of insurance coverage by any Credit Party under this Section 6.07 shall in no event be deemed a representation, warranty or advice by such Credit Party that such insurance is adequate for the purposes of the business of the Loan Parties or the protection of their properties.

**6.08    Compliance with Laws.**  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been set aside and maintained by the Loan Parties

in accordance with GAAP; (b) such contest effectively suspends enforcement of the contested Laws, and (c) the failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

**6.09 Books and Records; Accountants.**

(a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Loan Parties or such Subsidiary, as the case may be; and (ii) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Parties or such Subsidiary, as the case may be.

(b) At all times retain a registered public accounting firm which is reasonably satisfactory to the Agent and instruct such registered public accounting firm to cooperate with, and be available to, the Agent or its representatives to discuss the Loan Parties' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such firm, as may be raised by the Agent acting in a commercially reasonable manner.

**6.10 Inspection Rights.**

(a) Permit representatives and independent contractors of the Agent to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and accountants, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided, however, that when a Default or an Event of Default exists the Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Loan Parties at any time during normal business hours and without advance notice.

(b) Upon the request of the Agent after reasonable prior notice, permit the Agent or professionals (including investment bankers, consultants, accountants, and lawyers) retained by the Agent to conduct inventory appraisals, commercial finance examinations and other evaluations, including, without limitation, of (i) the Borrower's practices in the computation of the Borrowing Base (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves, and (iii) the Loan Parties' business plan, forecasts and cash flows, all at the Borrower's expense. Without limiting the foregoing, the Loan Parties acknowledge that the Agent may undertake an inventory appraisal and a commercial field examination no later than 45 days after the Restatement Date at the Borrower's expense.

**6.11 Additional Loan Parties.** Notify the Agent at the time that any Person becomes a Subsidiary, and promptly thereafter (and in any event within fifteen (15) days), cause any such Person (a) to (i) become a Loan Party by executing and delivering to the Agent a Joinder to this Agreement or a Joinder to the Facility Guaranty or such other documents as the Agent shall

deem appropriate for such purpose, (ii) grant a Lien to the Agent on such Person's assets of the same type that constitute Collateral to secure the Obligations, and (iii) deliver to the Agent documents of the types referred to in clauses (iii) and (iv) of Section 4.01(a) and favorable opinions of counsel to such Person (which shall cover, among other things, the legality, validity, binding effect and enforceability of the documentation referred to in clause (a)), and (b) if any Equity Interests or Indebtedness of such Person are owned by or on behalf of any Loan Party, to pledge such Equity Interests and promissory notes evidencing such Indebtedness (except that, if such Subsidiary is a foreign Subsidiary, the Equity Interests of such Subsidiary to be pledged may be limited to 65% of the outstanding Equity Interests of such Subsidiary), in each case in form, content and scope reasonably satisfactory to the Agent. In no event shall compliance with this Section 6.11 waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.11 if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute, with respect to any Subsidiary, an approval of such Person as a Loan Party or permit the inclusion of any acquired assets in the computation of the Borrowing Base.

**6.12    Cash Management.**

(a)    On or prior to the Restatement Date:

(i)    deliver to the Agent copies of notifications (each, a "Credit Card Notification") reasonably satisfactory in form and substance to the Agent which have been executed on behalf of such Loan Party and delivered to such Loan Party's credit card clearinghouses and processors listed on Schedule 5.21(b); and

(ii)    enter into a Blocked Account Agreement reasonably satisfactory in form and substance to the Agent with each Blocked Account Bank (collectively, the "Blocked Accounts").

(b)    Cause the wire transfer to the collection account controlled by the Agent at Bank of America, N.A. (the "Collection Account"), daily unless such transfer would be less than $100 (and whether or not there are then any outstanding Obligations), all cash receipts and collections received by each Loan Party from all sources, including, without limitation, the following:

(i)    anticipated cash receipts from the sale of Inventory through the prior day's recorded sales (including without limitation, proceeds of credit card charges) and other assets (whether or not constituting Collateral);

(ii)    all proceeds of collections of Accounts; and

(iii)    all proceeds and cash payments received by a Loan Party from any Person or from any source or on account of any Disposition or other transaction or event, including, without limitation, any Prepayment Event.

(c)    The Collection Account shall at all times be under the sole dominion and control of the Agent and all funds therein shall be wired to an account specified by Agent no less frequently than daily. The Agent shall cause all funds received by it from the Collection

Account to be applied to the Obligations, which amounts shall be applied to the Obligations in the order proscribed in either Section 2.04 or Section 8.03 of this Agreement, as applicable. The Loan Parties hereby acknowledge and agree that (i) the Loan Parties have no right of withdrawal from the Collection Account, (ii) the funds on deposit in the Collection Account shall at all times be collateral security for all of the Obligations and (iii) the funds on deposit in the Collection Account shall be applied to the Obligations as provided in this Agreement. In the event that, notwithstanding the provisions of this Section 6.12, any Loan Party receives or otherwise has dominion and control of any such cash receipts or collections, such receipts and collections shall be held in trust by such Loan Party for the Agent, shall not be commingled with any of such Loan Party's other funds or deposited in any account of such Loan Party and shall, not later than the Business Day after receipt thereof, be deposited into the Collection Account or dealt with in such other fashion as such Loan Party may be instructed by the Agent.

(d) Upon the request of the Agent, cause bank statements and/or other reports to be delivered to the Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

**6.13 Information Regarding the Collateral.**

(a) Furnish to the Agent at least thirty (30) days prior written notice of any change in: (i) any Loan Party's name; (ii) the location of any Loan Party's chief executive office, its principal place of business, or any office in which it maintains books or records relating to Collateral owned by it (including the establishment of any such new office); (iii) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (iv) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. The Loan Parties shall not effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral for its own benefit and the benefit of the other Credit Parties.

(b) Should any of the information on any of the Schedules hereto become inaccurate or misleading in any material respect as a result of changes after the Restatement Date, advise the Agent in writing of such revisions or updates as may be necessary or appropriate to update or correct the same, and subject to the Agent's approval of the same, which approval shall not be unreasonably withheld, the applicable Schedules shall be deemed to be amended or supplemented with such updated information. From time to time as may be reasonably requested by the Agent, the Borrower shall supplement each Schedule hereto, or any representation herein or in any other Loan Document, with respect to any matter arising after the Restatement Date that, if existing or occurring on the Restatement Date, would have been required to be set forth or described in such Schedule or as an exception to such representation or that is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby (and, in the case of any supplements to any Schedule, such Schedule shall be appropriately marked to show the changes made therein). Notwithstanding the foregoing, no supplement or revision to any Schedule or representation shall be deemed the Credit Parties' consent to the matters reflected in such updated Schedules or revised representations nor permit the Loan Parties to undertake any actions otherwise prohibited hereunder or fail to undertake any

action required hereunder from the restrictions and requirements in existence prior to the delivery of such updated Schedules or such revision of a representation; nor shall any such supplement or revision to any Schedule or representation be deemed the Credit Parties' waiver of any Default or Event of Default resulting from the matters disclosed therein.

**6.14 Physical Inventories.**

(a) Cause not less than one (1) physical inventory to be undertaken, at the expense of the Loan Parties, in each Fiscal Year and periodic cycle counts at the Loan Parties' distribution centers, in each case consistent with past practices, conducted by such inventory takers as are reasonably satisfactory to the Agent and following such methodology as is consistent with the methodology used in the immediately preceding inventory or as otherwise may be reasonably satisfactory to the Agent. The Agent, at the expense of the Loan Parties, may participate in and/or observe each scheduled physical count of Inventory which is undertaken on behalf of any Loan Party. The Borrower, within fifteen (15) days following the completion of such inventory, shall provide the Agent with a reconciliation of the results of such inventory (as well as of any other physical inventory or cycle counts undertaken by a Loan Party) and shall post such results to the Loan Parties' stock ledgers and general ledgers, as applicable.

(b) Permit the Agent, in its discretion, if any Default or Event of Default exists, to cause additional such inventories to be taken as the Agent determines (each, at the expense of the Loan Parties).

**6.15 Environmental Laws.**

(a) Conduct its operations and keep and maintain its Real Estate in material compliance with all Environmental Laws; (b) obtain and renew all environmental permits necessary for its operations and properties; and (c) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to maintain the value and marketability of the Real Estate or to otherwise comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate, provided, however, that neither a Loan Party nor any of its Subsidiaries shall be required to undertake any such cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and adequate reserves have been set aside and are being maintained by the Loan Parties with respect to such circumstances in accordance with GAAP.

**6.16 Further Assurances.**

(a) Execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required under any Law, or which any Agent may request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties. The Loan Parties also agree to provide to the Agent, from time to time upon request, evidence reasonably

satisfactory to the Agent as to the perfection and priority of the Liens created or intended to be created by the Security Documents.

(b) If any material assets are acquired by any Loan Party after the Restatement Date (other than assets constituting Collateral under the Security Documents that become subject to the perfected first-priority Lien under the Security Documents upon acquisition thereof), notify the Agent thereof, and the Loan Parties will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or shall be requested by any Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section 6.16, all at the expense of the Loan Parties. In no event shall compliance with this Section 6.16(b) waive or be deemed a waiver or Consent to any transaction giving rise to the need to comply with this Section 6.16(b) if such transaction was not otherwise expressly permitted by this Agreement or constitute or be deemed to constitute Consent to the inclusion of any acquired assets in the computation of the Borrowing Base.

(c) Upon the request of the Agent, cause each of its customs brokers, freight forwarders, consolidators and/or carriers to deliver an agreement (including, without limitation, a Customs Broker/Carrier Agreement) to the Agent covering such matters and in such form as the Agent may reasonably require.

**6.17 Compliance with Terms of Leaseholds.**

Except as otherwise expressly permitted hereunder or under the Bankruptcy Code, or as provided in the Bankruptcy Court's order granting the Store Closing Program Motion or the Leasehold Sale Motion, (a) make all payments and otherwise perform all obligations in respect of all Leases to which any Loan Party or any of its Subsidiaries is a party, keep such Leases in full force and effect (b) not allow such Leases to lapse or be terminated or any rights to renew such Leases to be forfeited or cancelled except in the ordinary course of business, consistent with past practices, (c) notify the Agent of any default by any party with respect to such Leases and cooperate with the Agent in all respects to cure any such default, and (d) cause each of its Subsidiaries to do the foregoing, except, in any case, where the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

**6.18 Material Contracts.** (a) Perform and observe all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect except to the extent such Material Contract is no longer used or useful in the conduct of the business of the Loan Parties in the ordinary course of business, consistent with past practices, (c) subject to the Loan Parties' reasonable commercial judgment, enforce each such Material Contract in accordance with its terms, and (d) cause each of its Subsidiaries to do the foregoing, except, in any case, where the failure to do so, either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.

**6.19 Bankruptcy Related Covenants.**

(a) (i) Continue to retain Alliance Management (or another restructuring advisor reasonably satisfactory to the Agent) as the Borrower's consultant, financial and restructuring advisor at all times after the Restatement Date (the "Consultant") (ii) cooperate and cause the Borrower's representative to cooperate fully with such Consultant and (iii) grant the Consultant full and complete access to the Borrower's books and records.

(b) Not consent to or permit to exist any of the following:

(i) Any modification, stay, vacation or amendment to the Borrowing Order or the Plan of Reorganization to which the Agent has not consented in writing;

(ii) A priority claim or administrative expense or unsecured claim against the Borrower (now existing or hereafter arising or any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the Agent in respect of the Obligations, except with respect to the Carve Out;

(iii) Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations, other than with respect to the Carve Out;

(iv) Any order which authorizes the return of any of the Borrower's property pursuant to Section 546(h) of the Bankruptcy Code;

(v) Any order which authorizes the payment of any Indebtedness (other than Indebtedness reflected in the Approved Budget, and other Indebtedness approved by the Agent, in each case incurred prior to the Petition Date or the grant of "adequate protection" (whether payment in cash or transfer of property) with respect to any such Indebtedness which is secured by a Lien other than as set forth in the Borrowing Order); or

(vi) Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

(c) Adhere to the following timeframes:

(i) Diligently prosecute the Leasehold Sale Motion that was filed with the Bankruptcy Court on November 6, 2012 and any other Leasehold Sale Motion that the Borrower may file (each of which shall be acceptable to the Agent, in its reasonable discretion);

(ii) No later than November 30, 2012 submit a motion seeking approval of a disclosure statement relating to the Plan of Reorganization, along with the Plan of Reorganization, to the Bankruptcy Court for approval, and diligently seek approval and confirmation of such disclosure statement and such Plan of Reorganization;

provided that the Agent shall have the opportunity to review and approve a draft of any such disclosure statement and Plan of Reorganization prior to submission

(iii) No later than January 7, 2013 obtain an order from the Bankruptcy Court approving the Borrower's disclosure statement and comply with the terms of such order;

(iv) No later than February 15, 2013, obtain a confirmation order acceptable to the Agent from the Bankruptcy Court with respect to the Plan of Reorganization.

**6.20 Certain Account.** Maintain the Borrower's money market account with Stifel, Nicolaus & Company, Incorporated in accordance with past practices for the purpose of collecting federal and state withholding taxes in connection with the exercise of employee stock options or the vesting of restricted shares, and not permit or cause any funds of the Borrower to be deposited in such account.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification claims for which a claim has not been asserted) or any Letter of Credit shall remain outstanding, no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

**7.01 Liens.** Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired or sign or file or suffer to exist under the UCC or any similar Law or statute of any jurisdiction a financing statement that names any Loan Party or any Subsidiary thereof as debtor; sign or suffer to exist any security agreement authorizing any Person thereunder to file such financing statement; sell any of its property or assets subject to an understanding or agreement (contingent or otherwise) to repurchase such property or assets with recourse to it or any of its Subsidiaries; or assign or otherwise transfer any accounts or other rights to receive income, other than, as to all of the above, Permitted Encumbrances.

**7.02 Investments.** Make any Investments, except Permitted Investments.

**7.03 Indebtedness; Disqualified Stock; Equity Issuances.** Create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except Permitted Indebtedness; (b) issue Disqualified Stock, or (c) issue and sell any other Equity Interests unless such Equity Interests shall be issued solely by the Borrower and not by a Subsidiary of a Loan Party.

**7.04 Fundamental Changes.** Merge, dissolve, liquidate, consolidate with or into another Person, (or agree to do any of the foregoing), except that, so long as no Default or Event of Default shall have occurred and be continuing prior to or immediately after giving effect to any action described below or would result therefrom:

(a) any Subsidiary which is not a Loan Party may merge with (i) a Loan Party, provided that the Loan Party shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries which are not Loan Parties, provided that when any wholly-owned Subsidiary is merging with another Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person; and

(b) any Subsidiary which is a Loan Party may merge into any Subsidiary which is a Loan Party or into the Borrower, provided that in any merger involving the Borrower, the Borrower shall be the continuing or surviving Person.

**7.05 Dispositions.** Make any Disposition or enter into any agreement to make any Disposition, except Permitted Dispositions.

**7.06 Restricted Payments.** Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that each of the following shall be permitted so long as no Default or Event of Default shall have occurred and be continuing prior, or immediately after giving effect, to the following, or would result therefrom:

(a) each Subsidiary of a Loan Party may make Restricted Payments to any Loan Party;

(b) the Loan Parties and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person, stock splits and similar distributions; and

(c) the Loan Parties and each Subsidiary may make Restricted Payments consisting of cashless exercises (including by delivery of previously outstanding shares) or terminations of options or warrants or similar transactions.

**7.07 Prepayments of Indebtedness.** Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness, or make any payment in violation of any subordination terms of any Subordinated Indebtedness, except as permitted under the Borrowing Order.

**7.08 Change in Nature of Business.** Engage in any line of business substantially different from the business conducted by the Loan Parties and their Subsidiaries on the Restatement Date or any business substantially related or incidental thereto.

**7.09 Transactions with Affiliates.** Enter into, renew, extend or be a party to any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or such Subsidiary as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to (a) a transaction between or among the Loan Parties, (b) advances for commissions, travel and other similar purposes in the ordinary course of business to directors, officers and employees, (c) the payment of reasonable fees and out-of-pocket costs to directors, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of the Borrower or any

of its Subsidiaries, and (d) as long as no Change of Control results therefrom, any issuances of securities of the Borrower (other than Disqualified Stock and other Equity Interests not permitted hereunder) or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans (in each case in respect of Equity Interests in the Borrower) of the Borrower or any of its Subsidiaries.

**7.10    Burdensome Agreements.**    Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments or other distributions to any Loan Party or to otherwise transfer property to or invest in a Loan Party, (ii) of any Subsidiary to Guarantee the Obligations, (iii) of any Subsidiary to make or repay loans to a Loan Party, or (iv) of the Loan Parties or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person in favor of the Agent; provided, however, that this clause (iv) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under clauses (c) or (d) of the definition of Permitted Indebtedness solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

**7.11    Use of Proceeds.**    Use the proceeds of any Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately, (a) to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund Indebtedness originally incurred for such purpose, or (b) for any purposes other than (i) on or after the Restatement Date, for the payment of transaction expenses, for the payment of fees, expenses and costs incurred in connection with the Chapter 11 Case, for the payment of any adequate protection payments approved in the Borrowing Order and to finance working capital and general corporate purposes of the Borrower, in each case to the extent expressly permitted under Law and the Loan Documents and (ii) upon entry of the Borrowing Order by the Bankruptcy Court, to refinance the Indebtedness under the Existing Credit Agreement.

**7.12    Amendment of Material Documents.**    Amend, modify or waive any of a Loan Party's rights under (a) its Organization Documents in a manner materially adverse to the Credit Parties, or (b) any Material Contract or Material Indebtedness, in each case to the extent that such amendment, modification or waiver would result in a Default or Event of Default under any of the Loan Documents, would be materially adverse to the Credit Parties, or otherwise would be reasonably likely to have a Material Adverse Effect.

**7.13    Fiscal Year.**    Change the Fiscal Year of any Loan Party, or the accounting policies or reporting practices of the Loan Parties, except as required by GAAP.

**7.14    Deposit Accounts; Credit Card Processors.**    Open new DDAs unless the Loan Parties shall have delivered to the Agent appropriate Blocked Account Agreements consistent with the provisions of Section 6.12 and otherwise reasonably satisfactory to the Agent.  No Loan Party shall maintain any bank accounts or enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein or in Section 6.12 hereof.

**7.15 Budgeted Expenses.**

(a) Pay any expenses other than those set forth in the thirteen week budget approved by the Agent prior to the Restatement Date, which budget shall be updated weekly on a rolling thirteen week basis following the Restatement Date (such initial budget, together with any subsequent budget which the Agent may, in its reasonable discretion, approve, the "Approved Budget").

(b) Not permit the variance of (a) the four-week rolling average of each of (i) Inventory receipts, (ii) total sources of cash and (iii) total cash disbursements, to (b) the corresponding projected amounts set forth in the Approved Budget, to exceed 10.0% (unless more favorable to the Borrower). The foregoing shall be tested on Tuesday of each week as of the end of the prior week pursuant to the variance report delivered by the Borrower to the Agent, in each case on a weekly, four-week rolling basis and cumulative basis commencing with the first such date after the Restatement Date.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.01 Events of Default.** Any of the following shall constitute an Event of Default:

(a) Non-Payment. The Borrower or any other Loan Party fails to pay when and as required to be paid, (i) any amount of principal of, or interest on, any Loan, or (ii) any fee due hereunder, or (iii) any other amount payable hereunder or under any other Loan Document; or

(b) Specific Covenants. (i) Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Sections 6.01, 6.02, 6.03, 6.05, 6.07, 6.10, 6.11, 6.12, 6.13, 6.17, 6.18, 6.19 or Article VII; or

(c) Other Defaults. Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for 15 days; or

(d) Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including, without limitation, any Borrowing Base Certificate) shall be incorrect or misleading in any material respect when made or deemed made; or

(e) Judgments. There is entered against any Loan Party or any Subsidiary thereof (i) one or more judgments or orders for the payment of money in respect of post-petition claims in an aggregate amount (as to all such judgments and orders) exceeding $50,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or (ii) any one or more post-petition non-monetary judgments that have, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment

or order, or (B) there is a period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, is not in effect; or

(f) ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $50,000 or which would reasonably likely result in a Material Adverse Effect, or (ii) a Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $50,000 or which would reasonably likely result in a Material Adverse Effect; or

(g) Invalidity of Loan Documents. (i) Any Loan Document, at any time after its execution and delivery and for any reason, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document or seeks to avoid, limit or otherwise adversely affect any Lien purported to be created under any Security Document; or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party or any other Person not to be, a valid and perfected Lien on any Collateral of the type included in the Borrowing Base or any other material portion of the Collateral, with the priority required by the applicable Security Document; or

(h) Change of Control. There occurs any Change of Control;

(i) Cessation of Business. Except as otherwise expressly permitted hereunder or without the prior approval of the Agent, the Loan Parties, taken as a whole, shall take any action to suspend the operation of their business in the ordinary course, liquidate all or a material portion of their assets or Store locations, or employ an agent or other third party to conduct a program of closings, liquidations or “Going-Out-Of-Business” sales of any material portion of their business; or

(j) Loss of Collateral. There occurs any uninsured loss to any material portion of the Collateral; or

(k) Indictment. (i) Any Loan Party is (A) criminally indicted or convicted of a felony for fraud or dishonesty in connection with the Loan Parties’ business, or (B) charged by a Governmental Authority under any law that would reasonably be expected to lead to forfeiture of any material portion of Collateral, or (ii) any director or senior officer of any Loan Party is (A) criminally indicted or convicted of a felony for fraud or dishonesty in connection with the Loan Parties’ business, unless such director or senior officer promptly resigns or is removed or replaced or (B) charged by a Governmental Authority under any law that would reasonably be expected to lead to forfeiture of any material portion of Collateral; or

(l) Subordination. (i) The subordination provisions of the documents evidencing or governing the Subordinated Indebtedness (the "Subordinated Provisions") shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness; or (ii) the Borrower or any other Loan Party shall, directly or indirectly, disavow or contest in any manner (A) the effectiveness, validity or enforceability of any of the Subordination Provisions, (B) that the Subordination Provisions exist for the benefit of the Credit Parties, or (C) that all payments of principal of or premium and interest on the applicable Subordinated Indebtedness, or realized from the liquidation of any property of any Loan Party, shall be subject to any of the Subordination Provisions; or

(m) Borrowing Order. Any order shall be entered in the Chapter 11 Case which stays, modifies or reverses the Borrowing Order or which otherwise materially adversely affects the effectiveness of the Borrowing Order without the express written consent of the Agent; or

(n) Conversion to Chapter 7. There occurs either (i) the appointment in the Chapter 11 Case of a trustee or of any examiner having expanded powers to operate all or any part of the Borrower's business, or (ii) the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code; or

(o) Reserved; or

(p) Relief from Automatic Stay. Any order is entered without the prior written consent of the Agent which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits any creditor to realize upon, or to exercise any right or remedy with respect to, any asset of the Borrower or to terminate any license, franchise, or similar agreement, where the exercise of such right or remedy or such realization or termination would reasonably be likely to have a Material Adverse Effect; or

(q) Additional Super-Priority Claims. The Borrower files any application without the express prior written consent of the Agent for the approval of any super-priority claim in the Chapter 11 Case which is pari passu with or senior to the priority of the claims of the Agent and the Lenders for the Obligations, or there shall arise any such super-priority claim under the Bankruptcy Code (other than the Carve Out and the super-priority claim provided to the Agent in the Bankruptcy Court's order granting the Store Closing Program Motion); or

(r) Payment of Other Indebtedness. There shall occur any payment or other discharge by the Borrower of any Indebtedness incurred prior to the Petition Date, except as expressly permitted hereunder, in the Approved Budget or by order in the Chapter 11 Case to which order the Agent has provided its written consent; or

(s) Adequate Protection. Any order is entered in the Chapter 11 Case without the consent of the Agent which provides adequate protection, or the granting by the Borrower of similar relief in favor of any one or more of its pre-petition creditors, contrary to the terms and conditions of the Borrowing Order; or

(t) Compliance with DIP Order. The Borrower fails (i) to comply with each and all of the terms and conditions of the Borrowing Order, or (ii) to materially comply with any other order entered in the Chapter 11 Case if such failure would reasonably likely result in a Material Adverse Effect; or

(u) Other Financing. (i) The Borrower files any motion or any order is entered in the Chapter 11 Case: (A) permitting working capital or other financing (other than ordinary course trade credit or unsecured debt) for the Borrower from any Person other than the Agent and the Lenders hereunder (unless the proceeds of such financing are used to pay in full of all Obligations, and all Obligations then due and owing in connection with any contingent obligations hereunder for which a claim has been asserted (collectively, the "Unliquidated Claims"), and the establishment of a reserve account for all indemnification obligations hereunder), (B) granting a Lien on, or security interest in any of the Collateral, other than with respect to this Agreement or as otherwise permitted herein or the super-priority claim provided to the Agent in the Bankruptcy Court's order granting the Store Closing Program Motion (unless such Liens are granted in connection with a financing, the proceeds of which are applied to the payment in full of all Obligations, other Unliquidated Claims and indemnification obligations hereunder), (C) except as permitted by this Agreement, permitting the use of any of the Collateral pursuant to Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent, (D) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (E) dismissing any of the Chapter 11 Case or (ii) any party in interest or any Creditors' Committee appointed in the Chapter 11 Case files any motion seeking any of the matters specified in the foregoing clause (i) that would, in the reasonable business judgment of the Agent, have an adverse and material effect on the administration of the Chapter 11 Case, the Borrowing Order or the financing contemplated hereby or thereby, or the transactions contemplated by the Store Closing Program Motion or the Leasehold Sale Motion, and such motion is not dismissed or denied within five (5) Business Days of the date of the filing of such motion (or such later date agreed to in writing by the Agent); or

(v) Plan of Reorganization. The Borrower files any motion seeking approval of a disclosure statement and a plan of reorganization, or the entry of an order confirming a plan of reorganization other than the Plan of Reorganization, or the Creditors' Committee fails to support in writing the Plan of Reorganization.

**8.02 Remedies Upon Event of Default.** If any Event of Default occurs and is continuing, subject to the terms of the Borrowing Order, the Agent may, or, at the request of the Required Lenders shall, take any or all of the following actions:

(a) declare the Revolving Commitments of each Revolving Lender to make Revolving Loans and any obligation of any L/C Issuer to make L/C Credit Extensions to be terminated, whereupon such Revolving Commitments and obligation shall be terminated;

(b) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;

(c)     require that the Loan Parties Cash Collateralize the L/C Obligations;

(d)     capitalize any accrued and unpaid interest by adding such amount to the outstanding principal balance of the Loans, at which time such capitalized amount shall bear interest at the Default Rate;

(e)     whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, proceed to protect, enforce and exercise all rights and remedies of the Credit Parties under this Agreement, any of the other Loan Documents or applicable Law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Credit Parties; and/or

(f)     terminate the Exit Financing Commitment Letter.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

**8.03     Application of Funds.**  After the exercise of remedies provided for in Section 8.02 (or after the Obligations have automatically become immediately due and payable, any amounts received on account of the Obligations shall be applied by the Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, Credit Party Expenses and other amounts (including fees, charges and disbursements of counsel to the Agent and amounts payable under Article III) payable to the Agent;

Second, to payment of that portion of the Obligations constituting indemnities (including indemnities due under Section 10.03 hereof), Credit Party Expenses, and other amounts (other than principal, interest and fees) payable to the Lenders and any L/C Issuer (including Credit Party Expenses to the respective Lenders and L/C Issuers and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to the extent not previously reimbursed by the Lenders, to payment to the Agent of that portion of the Obligations constituting principal and accrued and unpaid interest on any Permitted Overadvances;

Fourth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, and fees, ratably among the Lenders and L/C Issuers in proportion to the respective amounts described in this clause Fourth payable to them;

Fifth, to payment of that portion of the Obligations constituting unpaid principal of the Revolving Loans, ratably among the Revolving Lenders in proportion to the respective amounts described in this clause Fifth held by them;

Sixth, to the Agent for the account of the L/C Issuers, to Cash Collateralize that portion of L/C Obligations (to the extent not already Cash Collateralized) comprised of the aggregate undrawn amount of Letters of Credit;

Seventh, to payment of that portion of the Obligations constituting unpaid principal of the Term Loan and all other Obligations related to the Term Loan, ratably among the Term Lenders in proportion to the respective amounts described in this clause Seventh held by them;

Eighth, to payment of all other Obligations (including without limitation the cash collateralization of unliquidated indemnification obligations as provided in Section 10.04), ratably among the Credit Parties in proportion to the respective amounts described in this clause Seventh held by them;

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Sixth above shall be applied to satisfy drawings under such Letters of Credit as they occur. Subject to Section 2.04(e), if any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

## ARTICLE IX
## THE AGENT

**9.01    Appointment and Authority.**  Each of the Lenders (in its capacity as a Lender) hereby irrevocably appoints Salus to act on its behalf as the administrative agent and collateral agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof (including, without limitation, acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations), together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Agent, the Lenders and the L/C Issuers, and no Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of such provisions.

**9.02    Rights as a Lender.**  The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though they were not the Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Loan Parties or any

Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

**9.03   Exculpatory Provisions.**  The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agent:

       (a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

       (b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or Law; and

       (c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of its Affiliates that is communicated to or obtained by the Person serving as the Agent or any of its Affiliates in any capacity.

The Agent shall not be liable for any action taken or not taken by it (i) with the Consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent by the Loan Parties, a Lender or a L/C Issuer.  In the event that the Agent obtains such actual knowledge or receives such a notice, the Agent shall give prompt notice thereof to each of the other Credit Parties.  Upon the occurrence of a Default or an Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Applicable Lenders.  Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Credit Parties.  In no event shall the Agent be required to comply with any such directions to the extent that the Agent believes that its compliance with such directions would be unlawful.

The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the

occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agent.

**9.04 Reliance by Agent.** The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, or the issuance of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or a L/C Issuer, the Agent may presume that such condition is satisfactory to such Lender or such L/C Issuer unless the Agent shall have received written notice to the contrary from such Lender or such L/C Issuer prior to the making of such Loan or the issuance of such Letter of Credit. The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**9.05 Delegation of Duties.** The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Agent.

**9.06 Resignation of Agent.** The Agent may at any time give written notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders and the L/C Issuers, appoint a successor Agent; provided that if the Agent shall notify the Borrower and the Lenders that no Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders or the L/C Issuers under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender and each L/C Issuer directly, until such time as the Required Lenders appoint a successor Agent as

provided for above in this Section. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent hereunder.

Any resignation by Salus as Agent pursuant to this Section shall also constitute its resignation as an L/C Issuer. Upon the acceptance of a successor's appointment as Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of such retiring L/C Issuer, (b) such retiring L/C Issuer shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents, and (c) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, issued by such retiring L/C Issuer and outstanding at the time of such succession or make other arrangements reasonably satisfactory to such retiring L/C Issuer to effectively assume the obligations of such retiring L/C Issuer with respect to such Letters of Credit

**9.07 Non-Reliance on Agent and Other Lenders.** Each Lender and each L/C Issuer acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and each L/C Issuer also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder. Except as provided in Section 9.11, the Agent shall not have any duty or responsibility to provide any Credit Party with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Agent.

**9.08 Reserved.**

**9.09 Collateral and Guaranty Matters.** The Credit Parties irrevocably authorize the Agent, at its option and in its discretion,

(a) to release any Lien on any property granted to or held by the Agent under any Loan Document (i) upon termination of the Aggregate Revolving Commitments and payment in full of all Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the expiration, termination or Cash Collateralization of all Letters of Credit, (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Applicable Lenders in accordance with Section 10.01; and

(b) to release any Guarantor from its obligations under the Facility Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder.

Upon request by the Agent at any time, the Applicable Lenders will confirm in writing the Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Facility Guaranty pursuant to this Section 9.09. In each case as specified in this Section 9.09, the Agent will, at the Loan Parties' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Facility Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.09.

**9.10 Notice of Transfer.** The Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in Section 10.06.

**9.11 Reports and Financial Statements.** By signing this Agreement, each Lender:

(a) is deemed to have requested that the Agent furnish, and the Agent agrees to furnish, such Lender, promptly after they become available, copies of all Borrowing Base Certificates and financial statements required to be delivered by the Loan Parties hereunder and all commercial finance examinations and appraisals of the Collateral received by the Agent (collectively, the "Reports");

(b) expressly agrees and acknowledges that the Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(c) expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(d) agrees to keep all Reports confidential in accordance with the provisions of Section 10.07 hereof; and

(e) without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Loans that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans; and (ii) to pay and protect, and indemnify, defend, and hold the Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Agent and any such other Lender

preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**9.12 Agency for Perfection.** Each Credit Party hereby appoints each other Credit Party as agent for the purpose of perfecting Liens for the benefit of the Credit Parties, in assets which, in accordance with Article 9 of the UCC or any other Law of the United States can be perfected only by possession or control. Should any Credit Party (other than the Agent) obtain possession or control of any such Collateral, such Credit Party shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or otherwise deal with such Collateral in accordance with the Agent's instructions.

**9.13 Indemnification of Agent.** Without limiting the obligations of the Loan Parties hereunder, the Lenders shall indemnify the Agent, each L/C Issuer and any Related Party, as the case may be, ratably according to their Applicable Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Agent, such L/C Issuer, and their Related Parties in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by the Agent, such L/C Issuer and their Related Parties in connection therewith; provided, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's, such L/C Issuer's and their Related Parties' gross negligence or willful misconduct as determined by a final and nonappealable judgment of a court of competent jurisdiction.

**9.14 Relation Among Lenders.** The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of the Agent) authorized to act for, any other Lender.

**9.15 Defaulting Lenders.**

(a) If for any reason any Lender shall become a Defaulting Lender, then, in addition to the rights and remedies that may be available to the other Credit Parties, the Loan Parties or any other party at law or in equity, and not at limitation thereof, (i) such Defaulting Lender's right to participate in the administration of, or decision-making rights related to, the Obligations, this Agreement or the other Loan Documents shall be suspended during the pendency of such failure or refusal, (ii) a Defaulting Lender shall be deemed to have assigned any and all payments due to it from the Loan Parties, whether on account of outstanding Loans, interest, fees or otherwise, to the remaining non-Defaulting Lenders for application to, and reduction of, their proportionate shares of all outstanding Obligations, and (iii) at the option of the Agent, any amount payable to such Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise) shall, in lieu of being distributed to such Defaulting Lender, be retained by the Agent as cash collateral for future funding obligations of the Defaulting Lender in respect of any Loan or existing or future participating interest in any Letter of Credit. The Defaulting Lender's decision-making and participation rights and rights to payments as set forth in clauses (i), (ii) and (iii) hereinabove shall be restored only upon the payment by the Defaulting Lender of its Applicable Percentage of any Obligations, any participation obligation, or expenses as to which it is delinquent, together with interest thereon at the rate set forth in

Section 2.07 hereof from the date when originally due until the date upon which any such amounts are actually paid.

(b) The non-Defaulting Lenders shall also have the right, but not the obligation, in their respective, sole and absolute discretion, to cause the termination and assignment, without any further action by the Defaulting Lender for no cash consideration (pro rata, based on the respective Revolving Commitments of those Revolving Lenders electing to exercise such right), of the Defaulting Lender's Revolving Commitment to fund future Loans. Upon any such purchase of the Applicable Percentage of any Defaulting Lender, the Defaulting Lender's share in future Loans and its rights under the Loan Documents with respect thereto shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest, including, if so requested, an Assignment and Assumption.

(c) Each Defaulting Lender shall indemnify the Agent and each non-Defaulting Lender from and against any and all loss, damage or expenses, including but not limited to reasonable attorneys' fees and funds advanced by the Agent or by any non-Defaulting Lender, on account of a Defaulting Lender's failure to timely fund its Applicable Percentage of a Loan or to otherwise perform its obligations under the Loan Documents.

## ARTICLE X
## MISCELLANEOUS

**10.01 Amendments, Etc.**

(a) No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Agent, with the Consent of the Required Lenders, and the applicable Loan Party, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or Consent shall:

(i) increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.02) without the written Consent of such Lender;

(ii) as to any Lender, postpone any date fixed by this Agreement or any other Loan Document for (i) any scheduled payment (including the Termination Date) of principal, interest, fees or other amounts due hereunder or under any of the other Loan Documents without the written Consent of such Lender, or (ii) any scheduled or mandatory reduction or termination of the Aggregate Revolving Commitments hereunder or under any other Loan Document, without the written Consent of such Revolving Lender;

(iii) as to any Lender, reduce the principal of, or the rate of interest specified herein on, any Loan held by such Lender, or (subject to clause (iv) of the second proviso to this Section 10.01) any fees or other amounts payable hereunder or under any other Loan Document to or for the account of such Lender, without the written

Consent of such Lender; provided, however, that only the Consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(iv)    as to any Lender, change Section 2.12 or Section 8.03 in a manner that would alter the pro rata sharing of payments required thereby without the written Consent of such Lender;

(v)    change any provision of this Section or the definition of "Required Lenders," "Required Revolving Lenders," or "Required Term Lenders" or any other provision hereof or of any Loan Document specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or under any other Loan Document or make any determination or grant any Consent hereunder or thereunder, without the written Consent of each Lender;

(vi)    except as expressly permitted hereunder or under any other Loan Document, release, or limit the liability of, any Loan Party without the written Consent of each Lender;

(vii)    except for Permitted Dispositions or as provided in Section 9.10, release all or substantially all of the Collateral from the Liens of the Security Documents without the written Consent of each Lender;

(viii)    increase the Aggregate Revolving Commitments without the written Consent of each Lender;

(ix)    increase any advance rate percentage set forth in the definition of "Borrowing Base" from that set forth in such definitions at closing without the written consent of each Lender, provided that the foregoing shall not limit the discretion of the Agent to change, establish or eliminate any Reserves;

(x)    modify the definition of Permitted Overadvance so as to increase the amount thereof or, except as otherwise provided in such definition, the time period for which a Permitted Overadvance may remain outstanding without the written Consent of each Lender; and

(xi)    except as expressly permitted herein or in any other Loan Document, subordinate the Obligations hereunder or the Liens granted hereunder or under the other Loan Documents, to any other Indebtedness or Lien, as the case may be without the written Consent of each Lender;

and, provided further, that (i) no amendment, waiver or Consent shall, unless in writing and signed by the applicable L/C Issuer in addition to the Lenders required above, affect the rights or duties of such L/C Issuer under this Agreement or any Issuer Document relating to any Letter of Credit issued or to be issued by it and (ii) no amendment, waiver or Consent shall, unless in writing and signed by the Agent in addition to the Lenders required above, affect the rights or duties of the Agent under this Agreement or any other Loan Document.  Notwithstanding anything to the contrary herein, no Deteriorating Lender or Defaulting Lender shall have any

right to approve or disapprove any amendment, waiver or Consent hereunder, except that the Commitment of such Lender may not be increased or extended without the Consent of such Lender.

(b) Notwithstanding anything to the contrary in this Agreement or any other Loan Document, any Loan Document may be amended and waived with the Consent of the Agent at the request of the Borrower without the need to obtain the Consent of any other Lender if such amendment or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to cure ambiguities or defects or (iii) to cause any Loan Document to be consistent with this Agreement and the other Loan Documents.

**10.02 Notices; Effectiveness; Electronic Communications.**

(a) Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i) if to the Loan Parties or the Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii) if to any Lender or any L/C Issuer, to the address, telecopier number, electronic mail address or telephone number specified on the signature pages hereto or in the Assignment and Assumption delivered by such Lender.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b) Electronic Communications. Notices and other communications to the Lenders and the L/C Issuers hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agent, provided that the foregoing shall not apply to notices to any Lender or any L/C Issuer pursuant to Article II if such Lender or such L/C Issuer has notified the Agent that it is incapable of receiving notices under such Article by electronic communication. The Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from

the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Internet.  In no event shall the Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Loan Party, any Lender, any L/C Issuer or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Loan Parties' or the Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to any Loan Party, any Lender, any L/C Issuer or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.  Each of the Loan Parties and the Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each Lender and each L/C Issuer may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Agent.  In addition, each Lender agrees to notify the Agent from time to time to ensure that the Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Agent, L/C Issuers and Lenders.  The Agent, the L/C Issuers and the Lenders shall be entitled to rely and act upon any notices (including telephonic Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Agent, each L/C Issuer, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic notices to and other telephonic communications with the Agent may be recorded by the Agent, and each of the parties hereto hereby consents to such recording.

**10.03  No Waiver; Cumulative Remedies.**  No failure by any Credit Party to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided herein and in the other Loan Documents are

cumulative and not exclusive of any rights, remedies, powers and privileges provided by law. Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at Law in connection with such enforcement shall be instituted and maintained exclusively by, the Agent in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, or (b) any Lender from exercising setoff rights in accordance with Section 10.08 (subject to the terms of Section 2.12); and provided, further, that if at any time there is no Person acting as Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.12, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**10.04 Expenses; Indemnity; Damage Waiver.**

(a) Costs and Expenses. The Loan Parties shall pay all Credit Party Expenses.

(b) Indemnification by the Loan Parties. The Loan Parties shall indemnify the Agent (and any sub-agent thereof), each other Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, costs, and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or the administration of this Agreement and the other Loan Documents, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by any L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit, any bank advising or confirming a Letter of Credit or any other nominated person with respect to a Letter of Credit seeking to be reimbursed or indemnified or compensated, and any third party seeking to enforce the rights of a Borrower, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds, or holder of an instrument or document related to any Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any claims of, or amounts paid by any

Credit Party to, a Blocked Account Bank or other Person which has entered into a control agreement with any Credit Party hereunder, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c) Reimbursement by Lenders. Without limiting their obligations under Section 9.13 hereof, to the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it, each Lender severally agrees to pay to the Agent (or any such sub-agent), the applicable L/C Issuer or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Agent (or any such sub-agent) or such L/C Issuer in its capacity as such, or against any Related Party of any of the foregoing acting for the Agent (or any such sub-agent) or such L/C Issuer in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.11(d).

(d) Waiver of Consequential Damages, Etc. To the fullest extent permitted by Law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof.

(e) Payments. All amounts due under this Section shall be payable on demand therefor.

(f) Limitation of Liability. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(g) Survival. The agreements in this Section shall survive the resignation of any Agent and any L/C Issuer, the assignment of any Commitment or Loan by any Lender, the replacement of any Lender, the termination of the Aggregate Revolving Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05 Payments Set Aside.** To the extent that any payment by or on behalf of the Loan Parties is made to any Credit Party, or any Credit Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Credit Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender and each L/C Issuer severally agrees to pay to the Agent upon demand its Applicable Percentage (without duplication) of any amount so recovered from or repaid by the Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders and the L/C Issuers under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06 Successors and Assigns.**

(a) Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.06(b), (ii) by way of participation in accordance with the provisions of subsection Section 10.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Credit Parties) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Assignments by Lenders. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans (including for purposes of this clause (b), participations in L/C Obligations at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i) Minimum Amounts.

(A) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, no minimum amount need be assigned; and

(B) in any case not described in subsection (b)(i)(A)of this Section, the aggregate amount of the Commitment (which for this purpose

includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000 unless the Agent otherwise consents (such consent not to be unreasonably withheld or delayed);

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(iii)    Required Consents.   No consent shall be required for any assignment except to the extent required in the definition of "Eligible Assignee" or by subsection (b)(i)(B) of this Section and, in addition, the consent of the Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of any Commitment if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)     Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided, however, that the Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

Subject to acceptance and recording thereof by the Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrower (at its expense) shall execute and deliver one or more Notes to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.06(d).

(c)     Register.  The Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Loan Parties, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all

purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.

(d) Participations. Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Agent, sell participations to any Person (other than a natural person or the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Agent, the Lenders and the L/C Issuers shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any Participant shall agree in writing to comply with all confidentiality obligations set forth in Section 10.07 as if such Participant was a Lender hereunder.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant. Subject to subsection (e) of this Section, the Loan Parties agree that each Participant shall be entitled to the benefits of Sections 3.01, and 3.04 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.06(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.11 as though it were a Lender. Each Lender, acting for this purpose as an agent of the Loan Parties, shall maintain at its offices a record of each agreement or instrument effecting any participation and a register for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts and other Obligations from time to time (each a "Participation Register"). The entries in each Participation Register shall be conclusive absent manifest error and the Loan Parties, the Agent, the L/C Issuers and the Lenders may treat each Person whose name is recorded in a Participant Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under Section 3.01, Section 3.04, and Section 10.08). The Participation Register shall be available for inspection by the Borrower, and any Lender, at any reasonable time and from time to time upon reasonable prior notice

(e) Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(f) Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender

from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(h)     Resignation as L/C Issuer after Assignment.  Notwithstanding anything to the contrary contained herein, if at any time Salus assigns all of its Revolving Commitment and Revolving Loans pursuant to subsection (b) above, Salus may, upon thirty (30) days' notice to the Borrower and the Revolving Lenders, resign as a L/C Issuer.  In the event of any such resignation as a L/C Issuer, the Borrower shall be entitled to appoint from among the Revolving Lenders a successor L/C Issuer hereunder; provided, however, that no failure by the Borrower to appoint any such successor shall affect the resignation of Salus as a L/C Issuer.  If Salus resigns as a L/C Issuer, it shall retain all the rights, powers, privileges and duties of the L/C Issuer hereunder with respect to all Letters of Credit issued by it and outstanding as of the effective date of its resignation as a L/C Issuer and all L/C Obligations with respect thereto.  Upon the appointment of a successor L/C Issuer, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of such retiring L/C Issuer, and (b) the successor L/C Issuer shall issue letters of credit in substitution for the Letters of Credit, if any, issued by such retiring L/C Issuer and outstanding at the time of such succession or make other arrangements reasonably satisfactory to Salus to effectively assume the obligations of Salus with respect to such Letters of Credit.

(i)     Assignments by Salus Entities.   Notwithstanding anything in this Agreement or the other Loan Documents, (x) no Salus Entity shall be required to comply with Section 10.06(b) in connection with any transaction involving any other Salus Entity or any of its or their lenders or funding or financing sources, none of the foregoing shall be considered an assignee hereunder and Salus shall have no obligation to disclose any such transaction to any Person, and (y) there shall be no limitation or restriction on (I) the ability of any Salus Entity to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, or any Obligation to any other Salus Entity or any lender or financing or funding source of a Salus Entity or (II) any such lender's or funding or financing source's ability to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, or any Obligation; provided, however, that Salus shall continue to be liable as a "Lender" under this Agreement and the other Loan Documents unless such other Person complies with the provisions of this Agreement to become a "Lender."

**10.07  Treatment of Certain Information; Confidentiality.**  Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, Approved Funds, and to its and its Affiliates'

and Approved Funds' respective partners, directors, officers, employees, agents, funding sources, attorneys, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority), (c) to the extent required by Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement (including any electronic agreement contained in any Platform) containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than the Loan Parties.

For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary thereof relating to the Loan Parties or any Subsidiary thereof or their respective businesses, other than any such information that is available to any Credit Party on a non-confidential basis prior to disclosure by the Loan Parties or any Subsidiary thereof, provided that, in the case of information received from any Loan Party or any Subsidiary after the Restatement Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Credit Parties acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with Law, including federal and state securities Laws.

**10.08 Right of Setoff.** If an Event of Default shall have occurred and be continuing or if any Lender shall have been served with a trustee process or similar attachment relating to property of a Loan Party, each Lender, each L/C Issuer and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Agent or the Required Lenders, to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) or other property at any time held and other obligations (in whatever currency) at any time owing by such Lender, such L/C Issuer or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the Obligations now or hereafter existing under this Agreement or any other Loan Document to such Lender or such L/C Issuer, regardless of the adequacy of the Collateral, and irrespective of whether or not such Lender or the L/C Issuer shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent

or unmatured or are owed to a branch or office of such Lender or such L/C Issuer different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender, each L/C Issuer and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, such L/C Issuer or their respective Affiliates may have. Each Lender and each L/C Issuer agrees to notify the Borrower and the Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09 Interest Rate Limitation.** Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Law (the "Maximum Rate"). If the Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans and other Obligations or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by the Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10 Counterparts; Integration; Effectiveness.** This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy, pdf or other electronic transmission shall be as effective as delivery of a manually executed counterpart of this Agreement.

**10.11 Survival.** All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Credit Parties, regardless of any investigation made by any Credit Party or on their behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding. Further, the provisions of Sections 3.01, 3.04, and 10.04 and Article IX shall survive and remain in full force and effect regardless of the repayment of the Obligations or the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof. In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agent may require such indemnities and collateral security as it shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that

may subsequently be reversed or revoked and (y) any Obligations that may thereafter arise under Section 10.04 hereof.

**10.12 Severability.** If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13 Governing Law; Jurisdiction; Etc.**

(a) GOVERNING LAW. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAW OF THE STATE OF NEW YORK.

(b) SUBMISSION TO JURISDICTION. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE AGENT, ANY LENDER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF MISSOURI, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS. EACH OF THE LOAN PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY CREDIT PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c) WAIVER OF VENUE. EACH LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW,

ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION.  EACH OF THE LOAN PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**10.14  Waiver of Jury Trial.**  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**10.15  No Advisory or Fiduciary Responsibility.**  In connection with all aspects of each transaction contemplated hereby, the Loan Parties each acknowledge and agree that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Loan Parties, on the one hand, and the Credit Parties, on the other hand, and each of the Loan Parties is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each Credit Party is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) none of the Credit Parties has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Loan Parties with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether any of the Credit Parties has advised or is currently advising any Loan Party or any of its Affiliates on other matters) and none of the Credit Parties has any obligation to any Loan Party or any of its Affiliates with respect to the

transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Credit Parties and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and none of the Credit Parties has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the Credit Parties have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. Each of the Loan Parties hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against each of the Credit Parties with respect to any breach or alleged breach of agency or fiduciary duty.

**10.16  USA PATRIOT Act Notice.**  Each Lender that is subject to the Act (as hereinafter defined) and the Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Agent, as applicable, to identify each Loan Party in accordance with the Act. Each Loan Party is in compliance, in all material respects, with the Patriot Act. No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended. The Loan Parties shall, promptly following a request by the Agent or any Lender, provide all documentation and other information that the Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**10.17  Foreign Asset Control Regulations.**  Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, none of the Loan Parties or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

**10.18  Time of the Essence.**  Time is of the essence of the Loan Documents.

**10.19 Press Releases.**

(a) Each Credit Party executing this Agreement agrees that neither it nor its Affiliates will in the future issue any press releases or other public disclosure using the name of the Agent or its Affiliates or referring to this Agreement or the other Loan Documents without at least two (2) Business Days' prior notice to the Agent and without the prior written consent of the Agent unless (and only to the extent that) such Credit Party or Affiliate is required to do so under Law and then, in any event, such Credit Party or Affiliate will consult with the Agent before issuing such press release or other public disclosure.

(b) Each Loan Party consents to the publication by the Agent or any Lender of advertising material, including any "tombstone" or comparable advertising, on its website or in other marketing materials of Agent, relating to the financing transactions contemplated by this Agreement using any Loan Party's name, product photographs, logo, trademark or other insignia. The Agent or such Lender shall provide a draft reasonably in advance of any advertising material to the Borrower prior to the publication thereof. The Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

**10.20 No Strict Construction.** The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.21 Attachments.** The exhibits, schedules and annexes attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for the purposes stated herein, except that in the event of any conflict between any of the provisions of such exhibits and the provisions of this Agreement, the provisions of this Agreement shall prevail.

**10.22 Relationship with the Borrowing Order.** In the event of any inconsistency between the terms of the Borrowing Order and the Loan Documents, the terms of the Borrowing Order shall control and the representations, warranties, covenants, agreements or events of default made herein and in the other Loan Documents shall be subject to the terms of the Borrowing Order.

[*Signature Pages to Follow*]

*IN WITNESS WHEREOF*, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWER:**

**BAKERS FOOTWEAR GROUP, INC.**,
as Debtor and Debtor-in-Possession

By: ________________________________
Name: Peter A. Edison
Title: Chief Executive Officer

**SALUS CAPITAL PARTNERS, LLC**,
as Agent

By: ___________________________________
Name: Kyle C. Shonak
Title: Senior Vice President, Special Opportunities

**SALUS CAPITAL PARTNERS, LLC**,
as a Lender

By: ___________________________________
Name: Kyle C. Shonak
Title: Senior Vice President, Special Opportunities

**Exhibit "2"**

**Budget**

**Bakers Footwear**
**Weekly Forecast - Ch. 11 Scenario (DIP Budget)**
**Cash Flow Statement and Availability Analysis**

| $000s | Post-Petition => | | | | | | | | | | | | | | | | | | | | | | Total Post Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | <=Actual | Projected>>> | | | | | | | | | | | | | | | | |
| | October | | | | November | | | | December | | | | | January | | | | | February | | | | |
| | 10/6/12 | 10/13/12 | 10/20/12 | 10/27/12 | 11/3/12 | 11/10/12 | 11/17/12 | 11/24/12 | 12/1/12 | 12/8/12 | 12/15/12 | 12/22/12 | 12/29/12 | 1/5/13 | 1/12/13 | 1/19/13 | 1/26/13 | 2/2/13 | 2/9/13 | 2/16/13 | 2/23/13 | 3/2/13 | |
| **Sources of Cash** | | | | | | | | | | | | | | | | | | | | | | | |
| +Cash Receipts from Retail Sales | 776 | 3,139 | 3,200 | 2,780 | 2,378 | 2,395 | 1,290 | 1,478 | 1,796 | 1,801 | 2,129 | 3,199 | 2,293 | 949 | 759 | 569 | 683 | 835 | 1,066 | 1,683 | 1,346 | 1,514 | 38,056 |
| + Equity Bid on Sale of Inventory (b) - 85% of Inventory @ Cost | | | | | | 8,746 | 0 | 0 | 0 | 1,543 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,289 |
| + Sale of FF&E from GOB Sales / (Reimbursement of Retainers) | | | | | | | | | | | | | | 225 | | | | | | | | | 225 |
| + Reimbursment of Retainers | | | | | | | | | | | | | | | | | 0 | | | | 950 | | 950 |
| +Lease Auction - (Aldo and Other) | | | | | | | | | | | | 1,150 | | | | | | | | | | | 1,150 |
| **Total Sources of Cash** | **776** | **3,139** | **3,200** | **2,780** | **2,378** | **11,140** | **1,290** | **1,478** | **1,796** | **3,345** | **2,129** | **4,349** | **2,293** | **1,174** | **759** | **569** | **683** | **835** | **1,066** | **1,683** | **2,296** | **1,514** | **50,670** |
| **Uses of Cash** | | | | | | | | | | | | | | | | | | | | | | | |
| **Payroll Disbursements** | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll - Stores (DD + Payroll Checks) | 1 | 222 | 615 | 243 | 598 | 209 | 605 | 221 | 605 | 221 | 605 | 221 | 807 | 221 | 178 | 65 | 237 | 65 | 237 | 65 | 237 | 65 | 6,544 |
| Payroll - Non-Store | | 257 | | 257 | | 257 | | 257 | | 257 | | 176 | | 176 | | 176 | | 176 | | 176 | | 176 | 2,339 |
| Payroll Taxes 9.7% | | | 105 | | 102 | | 103 | | 103 | | 103 | | 138 | | 55 | | 46 | | 46 | | 46 | | 850 |
| Severance | | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | | | | | | | | | | 0 |
| Benefits / Other | 0 | 24 | 42 | 50 | 41 | 7 | 41 | 23 | 41 | 23 | 41 | 104 | 55 | 41 | 23 | 41 | 104 | 55 | 53 | 53 | 53 | 53 | 970 |
| **Total Payroll Disbursements** | **1** | **503** | **762** | **550** | **742** | **473** | **750** | **500** | **750** | **500** | **750** | **500** | **1,000** | **438** | **256** | **282** | **387** | **296** | **337** | **294** | **337** | **294** | **10,703** |
| **Other (Required) Operating Disbursements** | | | | | | | | | | | | | | | | | | | | | | | |
| Rent, CAM and RE Tax Payments | 0 | 0 | 0 | 0 | 0 | 2,352 | 898 | 0 | 0 | 2,352 | 898 | 0 | 0 | 0 | 760 | 253 | 0 | 0 | | 760 | 253 | | 8,526 |
| Payment of Cure | | | | | | | | | | | | | | | | | | 1,300 | | | | | 1,300 |
| Sales Taxes (based on prior month Retail Sales Receipts) 6.2% | 4 | 18 | 14 | 439 | 246 | 17 | 50 | 400 | 100 | 50 | 50 | 300 | 200 | 70 | 70 | 70 | 278 | 209 | 24 | 24 | 24 | 165 | 2,819 |
| Taxes Other than Payroll (e.g., State Business Taxes) | 0 | 0 | 0 | 0 | 179 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 179 |
| Interest Pmts | | 13 | | | 129 | 0 | | | | | | | | | | | | | | | | | 142 |
| Freight & Postage (Domestic) | 0 | 235 | 395 | 41 | 146 | 82 | 163 | 116 | 116 | 116 | 115 | 115 | 115 | 73 | 60 | 39 | 52 | 69 | 124 | 158 | 123 | 136 | 2,588 |
| Other Land Cost Payments ("OLC" - Int'l Freight & Customs) | 0 | 129 | 203 | 55 | 79 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 467 |
| Merchandise Payments (US Domestic) - CIT | 0 | 0 | 0 | 0 | 1 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| Foreign Direct Payments ("FDP" - Offshore Manufacturing) | 0 | 0 | 514 | 655 | 1,065 | 451 | 0 | 25 | 580 | 580 | 580 | 573 | 573 | 573 | 363 | 302 | 194 | 259 | 345 | 619 | 792 | 615 | 9,658 |
| **Subtotal** | **4** | **395** | **1,127** | **1,191** | **1,845** | **2,912** | **1,111** | **541** | **796** | **3,098** | **1,643** | **987** | **887** | **715** | **1,253** | **664** | **524** | **1,836** | **493** | **1,561** | **1,192** | **915** | **25,691** |
| Utilities | 0 | | 30 | 0 | 187 | 0 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 874 |
| Store Repairs - Post Filing | | | 0 | 0 | 0 | 0 | 8 | 8 | 8 | 5 | 5 | 5 | 5 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 79 |
| Store Supplies - Post Filing | 9 | | | 0 | 6 | 0 | 17 | 17 | 17 | 8 | 8 | 8 | 8 | 12 | 12 | 12 | 12 | 12 | 7 | 7 | 7 | 7 | 181 |
| Insurance - Corp post filing | | | | | 10 | | 87 | | | | 99 | | | | | 82 | | | | 55 | | | 334 |
| Corp repairs and mantenance - Post Filing | | | 10 | | 3 | | 11 | | | | 11 | | | | | 13 | | | | 12 | | | 60 |
| Audit and Tax - Post Filing | | | | | 0 | | 70 | | | | | | 59 | | | | 89 | | | | 59 | | 277 |
| Financial Advisor - (Alliance Mgmt) Pre-Petition | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Financial Advisor - (Alliance Mgmt) + Asset Sale Fee, Refinancing Fee | | | | | | 0 | | 202 | | | | 478 | | | | | 120 | 53 | | | 220 | 75 | [illegible] |
| Financial Advisor to Creditor Committee (BDO) | | | | | | | | 0 | | | | 160 | | | | | 160 | | | | 80 | | 400 |
| Company/Debtor's Counsel (Bryan Cave) | | | | | | 0 | | 200 | | | | 160 | | | | | 80 | | | | 110 | | 550 |
| Creditor Committee Counsel (Pachulski) | | | | | | | 200 | 0 | | | | 160 | | | | | 160 | | | | 80 | | 600 |
| Bank - Legal Counsel | | | | | | | | 0 | | | | 0 | | | | | 50 | | | | | | 50 |
| Claims Agent | | | | | | | | | | | | 35 | | | | | 45 | | | | | | 80 |
| Real Estate Consultant | | | | | | | | | | | | 100 | | | | | 50 | | | | 50 | | 200 |
| Other Legal (Employment) | | | | | | | | 25 | | | | 25 | | | | | 80 | | | | 80 | | 210 |
| All Other Legal and Professional Fees (Freight, Leasing, etc.) | | | 0 | | 0 | 0 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 160 |
| Corporate MIS | | | | 20 | 25 | 0 | 62 | 62 | | 79 | | 79 | | | 79 | | 79 | | | 41 | | 41 | 570 |
| Corp Postage and Equipment | | | | | 3 | | | 46 | | | | 37 | | | | | 28 | | | | 24 | | 138 |
| Licensing, Franchise Licenses, Permits | | | 14 | 100 | | | 100 | 14 | | 100 | | 16 | | | | | 14 | | | | 16 | | 373 |
| Bank Charges (DIP Financing Fee + Early Termination Fee) and Interes | 300 | | | | 0 | 200 | 111 | 45 | 47 | | | 14 | | 72 | | | | 476 | | | | 66 | 1,331 |
| US Trustee Fees | | | | | | | | | | | | | | | | | | | | 30 | | | 30 |
| Reclamation Payments | | | | | | | | | | | | | | | | | | | 1,550 | | | | 1,550 |
| Advertising | 0 | | | 0 | 0 | 0 | 75 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 93 |
| Travel & Entertainment | 4 | | 10 | 0 | 11 | 0 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 105 |
| Other G&A | 16 | 30 | 32 | 49 | 8 | 54 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 349 |
| **Subtotal** | **329** | **30** | **96** | **169** | **254** | **254** | **826** | **721** | **156** | **277** | **207** | **1,362** | **156** | **173** | **180** | **152** | **1,013** | **585** | **1,603** | **191** | **772** | **235** | **9,740** |
| Net change in cash available for disbursements | (33) | 21 | 641 | (665) | 518 | (301) | 301 | | | | | | | | | | | | | | | | 482 |
| Liquidator Exp Reimbursement: Store Payroll, Taxes & Benefits | | | | | | | (100) | | | (566) | | (666) | | (828) | | (196) | | | | | | | (2,356) |
| Liquidator Exp Reimbursement: Sales Tax | | | | | | | | | | | | | | | | | | | | | | | 0 |
| Liquidator Exp Reimbursement: Store Per Diem | | | | | | | (163) | | (569) | (569) | (569) | (569) | (569) | (569) | (285) | | | | | | | | (3,864) |
| Liquidator Exp Reimbursement: Warehouse Per Diem | | | | | | | | | 0 | 0 | 0 | 0 | 0 | | | | | | | | | | 0 |
| Liquidator Exp Reimbursement: Till Cash and Central Svcs Per Diem | | | | | | | (75) | (13) | (10) | (10) | (10) | (10) | (10) | (10) | | | | | | | | | (148) |
| **Total Cash Disbursements:** | **300** | **950** | **2,626** | **1,245** | **3,358** | **3,339** | **2,650** | **1,750** | **1,123** | **2,730** | **2,021** | **1,604** | **1,464** | **(82)** | **1,405** | **903** | **1,924** | **2,718** | **2,432** | **2,045** | **2,300** | **1,444** | **40,248** |
| **(1) Net Operating Cash Flow** | **476** | **2,189** | **574** | **1,535** | **(981)** | **7,802** | **(1,361)** | **(272)** | **672** | **615** | **108** | **2,745** | **829** | **1,256** | **(645)** | **(333)** | **(1,241)** | **(1,883)** | **(1,366)** | **(363)** | **(4)** | **71** | **10,422** |
| **Investing Cash Flow** | | | | | | | | | | | | | | | | | | | | | | | |
| Net Cap X | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (60) | 0 | (60) |
| Net (Purchase)/Sale of Other Assets | | | | | | | | | | | | | | | | | | | | | | | 0 |
| **(2) Net Investing Cash Flow** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **(60)** | **0** | **(60)** |
| **Financing Cash Flow** | | | | | | | | | | | | | | | | | | | | | | | |
| Incr/(Decr) LT Debt | | | | | | | 1,500 | | | | | (1,500) | | | | | | | | | | | 0 |
| Cash Deficit/(Excess) to be funded by Principal(s) | | | | | | | | | | | | | | | | | | 3,500 | | | | | 3,500 |
| **(3) Net Financing Cash Flow** | **0** | **0** | **0** | **0** | **0** | **0** | **1,500** | **0** | **0** | **0** | **0** | **(1,500)** | **0** | **0** | **0** | **0** | **0** | **3,500** | **0** | **0** | **0** | **0** | **3,500** |
| | | | | | | | | | | | | | | | | | | | | | | | |
| **(4) Net Cash Flow (1+2+3)** | **476** | **2,189** | **574** | **1,535** | **(981)** | **7,802** | **139** | **(272)** | **672** | **615** | **108** | **1,245** | **829** | **1,256** | **(645)** | **(333)** | **(1,241)** | **1,617** | **(1,366)** | **(363)** | **(64)** | **71** | **13,862** |
| **(5) Beginning Cash** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **(6) Change in LOC Balance** | **(476)** | **(2,189)** | **(574)** | **(1,535)** | **981** | **(7,802)** | **(139)** | **272** | **(672)** | **(615)** | **(108)** | **(1,245)** | **(829)** | **(1,256)** | **645** | **333** | **1,241** | **(1,617)** | **1,366** | **363** | **64** | **(71)** | **(13,862)** |
| **(7) Ending Cash (4+5+6)** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |

**Bakers Footwear**

**Weekly Forecast - Ch. 11 Scenario (DIP Budget)**

**Cash Flow Statement and Availability Analysis**

| **$000s** | Post-Petition => | | | | | <=Actual | Projected>>> | | | | | | | | | | | | | | | | **Total Post Petition** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | October | | | | November | | | | December | | | | | January | | | | | February | | | | |
| | 10/6/12 | 10/13/12 | 10/20/12 | 10/27/12 | 11/3/12 | 11/10/12 | 11/17/12 | 11/24/12 | 12/1/12 | 12/8/12 | 12/15/12 | 12/22/12 | 12/29/12 | 1/5/13 | 1/12/13 | 1/19/13 | 1/26/13 | 2/2/13 | 2/9/13 | 2/16/13 | 2/23/13 | 3/2/13 | |
| **Revolver Availability** | | | | | | | | | | | | | | | | | | | | | | | |
| **Eligible Inventory** | | | | | | | | | | | | | | | | | | | | | | | |
| Retail Value of Inventory | 77,794 | 75,927 | 74,452 | 76,293 | 79,608 | 35,541 | 35,577 | 34,733 | 34,475 | 33,756 | 32,543 | 29,714 | 28,253 | 27,635 | 27,181 | 26,726 | 26,271 | 25,816 | 26,012 | 26,122 | 26,232 | 26,341 | |
| Cost % | 28.7% | 28.7% | 28.9% | 28.9% | 28.9% | 28.9% | 29.0% | 29.0% | 29.0% | 29.0% | 28.6% | 28.6% | 28.6% | 28.8% | 28.8% | 28.8% | 28.8% | 28.8% | 28.7% | 28.7% | 28.7% | 28.7% | |
| Cost Value of Inventory | 22,335 | 21,799 | 21,487 | 22,018 | 22,975 | 10,257 | 10,324 | 10,080 | 10,005 | 9,796 | 9,317 | 8,507 | 8,089 | 7,958 | 7,827 | 7,696 | 7,565 | 7,434 | 7,466 | 7,497 | 7,529 | 7,560 | |
| Eligible In-Transit Inventory | 3,823 | 3,136 | 2,305 | 952 | 77 | 0 | | | | | | | | | | | | | | | | | |
| **Ending Inventory at Cost** | **26,158** | **24,935** | **23,792** | **22,971** | **23,052** | **10,257** | **10,324** | **10,080** | **10,005** | **9,796** | **9,317** | **8,507** | **8,089** | **7,958** | **7,827** | **7,696** | **7,565** | **7,434** | **7,466** | **7,497** | **7,529** | **7,560** | |
| Net Inventory Reserves | (612) | (621) | (642) | (914) | (719) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (350) | (204) | (210) | (214) | (220) | |
| **Eligible Inventory** | **25,546** | **24,314** | **23,151** | **22,057** | **22,333** | **9,907** | **9,974** | **9,730** | **9,655** | **9,446** | **8,967** | **8,157** | **7,739** | **7,608** | **7,477** | **7,346** | **7,215** | **7,084** | **7,262** | **7,287** | **7,314** | **7,340** | **7,340** |
| Appraised Inventory Value (NOLV x Advance Rate) | 77.7% | 77.7% | 77.7% | 77.7% | 84.4% | 84.4% | 84.4% | 84.4% | 82.9% | 82.9% | 82.9% | 82.9% | 82.9% | 71.2% | 71.2% | 71.2% | 71.2% | 71.2% | 71.3% | 71.3% | 71.3% | 71.3% | |
| **Loan Value of Inventory (Collateral Value)** | **19,852** | **18,894** | **17,990** | **17,140** | **18,840** | **8,358** | **8,414** | **8,208** | **8,007** | **7,834** | **7,437** | **6,765** | **6,418** | **5,417** | **5,324** | **5,230** | **5,137** | **5,044** | **5,178** | **5,196** | **5,215** | **5,234** | **5,234** |
| Eligible Credit Card Receivables | 1,209 | 1,123 | 1,171 | 1,123 | 1,151 | 1,017 | 474 | 1,000 | 789 | 632 | 789 | 884 | 789 | 811 | 500 | 500 | 500 | 500 | 384 | 384 | 384 | 384 | |
| **Total Loan Value of Credit Card Receivables** 95% | **1,149** | **1,067** | **1,112** | **1,067** | **1,094** | **967** | **450** | **950** | **750** | **600** | **750** | **840** | **750** | **771** | **475** | **475** | **475** | **475** | **365** | **365** | **365** | **365** | **365** |
| **Total Borrowing Base** | **21,000** | **19,961** | **19,102** | **18,207** | **19,933** | **9,324** | **8,864** | **9,158** | **8,757** | **8,434** | **8,187** | **7,605** | **7,168** | **6,187** | **5,799** | **5,705** | **5,612** | **5,519** | **5,543** | **5,561** | **5,580** | **5,599** | **5,599** |
| Less: Carve Out for Professional Fees - Creditors' Committee | (200) | (200) | (200) | (200) | (400) | (400) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | 0 | 0 | 0 | 0 | |
| Less: Carve Out for Professional Fees - Debtor Professionals | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | (150) | 0 | 0 | 0 | 0 | |
| Less: Availability Reserves (Gift Certs, Store Credits, TX Taxes) | (1,329) | (1,353) | (1,395) | (1,421) | (1,301) | (1,301) | (1,129) | (1,129) | 550 | (1,129) | (1,129) | (1,129) | (1,129) | (1,129) | (1,129) | (1,129) | (1,129) | (1,129) | (1,129) | (1,129) | (1,129) | (1,129) | |
| Less: Landing Cost Reseves | (765) | (627) | (461) | (190) | (15) | (21) | (90) | (163) | (609) | (520) | (470) | (384) | (716) | (318) | (313) | (308) | (303) | (297) | (299) | (300) | (301) | (302) | |
| Less: Rent Reserves | 0 | 0 | 0 | 0 | (29) | (80) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Add: Cash In-Transit (pending Liquidator Payment) 80% | | | | | | | 1,235 | 1,235 | 1,235 | | | | | | | | | | | | | | |
| Add: Cash In-Transit (incl pending ACH's, Concentration Acct) | 802 | 482 | 200 | 147 | 100 | 96 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | |
| **Sum of Available Collateral** | **19,358** | **18,112** | **17,096** | **16,393** | **18,138** | **7,467** | **8,680** | **8,900** | **9,733** | **6,585** | **6,387** | **5,892** | **5,123** | **4,540** | **4,156** | **4,068** | **3,980** | **3,892** | **4,265** | **4,282** | **4,299** | **4,317** | **4,317** |
| Less: Availability Block - $200k beginning 11/17/12 | (1,452) | (1,358) | (1,282) | (1,229) | (1,360) | (1,000) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | (200) | |
| **Total Available Collateral** | **17,906** | **16,754** | **15,814** | **15,163** | **16,778** | **6,467** | **8,480** | **8,700** | **9,533** | **6,385** | **6,187** | **5,692** | **4,923** | **4,340** | **3,956** | **3,868** | **3,780** | **3,692** | **4,065** | **4,082** | **4,099** | **4,117** | **4,117** |
| +Adjustment to Rent Reserve | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| +Pending ACH's | | | | | | | | | | | | | | | | | | | | | | | |
| +Concentration Account | | | | | | | | | | | | | | | | | | | | | | | |
| + FILO Traunche Inventory Advance | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 578 | 568 | 558 | 548 | 538 | 545 | 547 | 549 | 551 | 551 |
| **Total Adjusted Available Collateral** | **17,906** | **16,754** | **15,814** | **15,163** | **16,778** | **6,467** | **8,480** | **8,700** | **9,533** | **6,385** | **6,187** | **5,692** | **4,923** | **4,918** | **4,524** | **4,426** | **4,328** | **4,230** | **4,609** | **4,628** | **4,648** | **4,667** | **4,667** |
| **Maximum Available Collateral** | | | | | | | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** | **8,000** |
| **Lesser of Maximum Available or Total Adjusted Collateral** | | | | | | | **8,000** | **8,000** | **8,000** | **6,385** | **6,187** | **5,692** | **4,923** | **4,918** | **4,524** | **4,426** | **4,328** | **4,230** | **4,609** | **4,628** | **4,648** | **4,667** | **4,667** |
| **Revolver Balance** | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning Revolver Balance | 17,756 | 17,281 | 15,091 | 14,517 | 12,982 | 13,963 | 6,161 | 6,022 | 6,294 | 5,622 | 5,007 | 4,899 | 3,654 | 2,825 | 1,569 | 2,214 | 2,548 | 3,788 | 2,171 | 3,538 | 3,900 | 3,964 | **17,756** |
| +Curr Week Additional Financing Reqd | 0 | 0 | 0 | 0 | 981 | 0 | 0 | 272 | 0 | 0 | 0 | 0 | 0 | 0 | 645 | 333 | 1,241 | 0 | 1,366 | 363 | 64 | 0 | 0 |
| - Cash Available to Pay Down | (476) | (2,189) | (574) | (1,535) | 0 | (7,802) | (139) | 0 | (672) | (615) | (108) | (1,245) | (829) | (1,256) | 0 | 0 | 0 | (1,617) | 0 | 0 | 0 | (71) | (13,862) |
| **Ending Revolver Balance/(Cash Balance)** | **17,281** | **15,091** | **14,517** | **12,982** | **13,963** | **6,161** | **6,022** | **6,294** | **5,622** | **5,007** | **4,899** | **3,654** | **2,825** | **1,569** | **2,214** | **2,548** | **3,788** | **2,171** | **3,538** | **3,900** | **3,964** | **3,894** | **3,894** |
| **Weekly Borrowing Base Availability** | **626** | **1,663** | **1,297** | **2,181** | **2,815** | **306** | **1,978** | **1,706** | **2,378** | **1,378** | **1,288** | **2,038** | **2,098** | **3,349** | **2,310** | **1,879** | **540** | **2,059** | **1,072** | **728** | **684** | **774** | **774** |
| **Less: DIP Minimum Availability Covenant** | | | | | | | | | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| **Weekly Borrowing Base Availability after Covenant** | **626** | **1,663** | **1,297** | **2,181** | **2,815** | **306** | **1,978** | **1,706** | **2,378** | **1,378** | **1,288** | **2,038** | **2,098** | **3,349** | **2,310** | **1,879** | **540** | **2,059** | **1,072** | **728** | **684** | **774** | **774** |
| Operating Cash Account | | | | | | | | | | | | | | | | | | | | | | | 0 |
| **Additional Financing Required** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| Total Inventory (incl In-Transit) @ Cost + A/R | 27,367 | 26,057 | 24,963 | 24,094 | 24,203 | 11,275 | 10,798 | 11,080 | 10,794 | 10,428 | 10,106 | 9,391 | 8,878 | 8,769 | 8,327 | 8,196 | 8,065 | 7,934 | 7,850 | 7,881 | 7,913 | 7,944 | |
| Revolver / DIP Financing Balance | 17,281 | 15,091 | 14,517 | 12,982 | 13,963 | 6,161 | 6,022 | 6,294 | 5,622 | 5,007 | 4,899 | 3,654 | 2,825 | 1,569 | 2,214 | 2,548 | 3,788 | 2,171 | 3,538 | 3,900 | 3,964 | 3,894 | |
| **Collateral Coverage Ratio** | **1.6** | **1.7** | **1.7** | **1.9** | **1.7** | **1.8** | **1.8** | **1.8** | **1.9** | **2.1** | **2.1** | **2.6** | **3.1** | **5.6** | **3.8** | **3.2** | **2.1** | **3.7** | **2.2** | **2.0** | **2.0** | **2.0** | |
| **Merchandise Receipts at Cost** | **12** | **88** | **0** | **461** | **1,044** | **837** | **609** | **580** | **580** | **580** | **573** | **573** | **573** | **363** | **302** | **194** | **259** | **345** | **619** | **792** | **615** | **679** | **6,510** |

**Exhibit "3"**

**Carve Out Budget**

**Bakers Footwear**

**Estimated Weekly Accrued Professional Fees**

| $000s | Post-Petition DIP Budget=> | | | | | | | | | | | | | Total Post Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | October | | | | November | | | | December | | | | | |
| | 10/6/12 | 10/13/12 | 10/20/12 | 10/27/12 | 11/3/12 | 11/10/12 | 11/17/12 | 11/24/12 | 12/1/12 | 12/8/12 | 12/15/12 | 12/22/12 | 12/29/12 | |
| Financial Advisor - (Alliance Mgmt) + Asset Sale Fee (11/10/12) | 33 | 73 | 73 | 73 | 63 | 165 | 63 | 63 | 25 | 50 | 50 | 50 | 25 | **802** |
| Company/Debtor's Counsel (Bryan Cave) | 33 | 73 | 73 | 73 | 63 | 63 | 63 | 63 | 25 | 50 | 50 | 50 | 25 | **700** |
| Creditor Committee Counsel (tbd) | | 21 | 21 | 21 | 31 | 31 | 31 | 31 | 10 | 35 | 35 | 35 | 10 | **313** |
| Creditor Committee Financial Advisor (tbd) | | 21 | 21 | 21 | 16 | 16 | 16 | 16 | 8 | 16 | 16 | 16 | 8 | **188** |
| **Total Accrued Professional Fees** | **65** | **187** | **187** | **187** | **172** | **274** | **172** | **172** | **68** | **151** | **151** | **151** | **68** | **2,002** |